**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION**

| | |
|---|---|
| **INPATIENT CONSULTANTS OF** ) | |
| **NORTH CAROLINA, P.C.** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **No. _____** |
| ) | 7:22cv000199 |
| **DR. BRADLEY J. GOAD,** ) | |
| **DR. JEFFREY GARLAND,** ) | |
| **CARRIE BURNETTE,** ) | |
| **GAPS HEALTH,** ) | |
| **PREMIER GERIATRIC SOLUTIONS, PLLC,** ) | |
| **GAPS HEALTH NC, PLLC,** ) | |
| **ELITE PRACTICE MANAGEMENT &** ) | |
| **CONSULTING LLC,** ) | |
| **DR. VANESSA JEAN STURGILL FANT,** ) | |
| **DR. DAVID CAMPBELL,** ) | |
| **DR. VICTOR BELL,** ) | |
| **JESSI DALTON,** ) | |
| **MATTHEW FIFE,** ) | |
| **JAMIE WOOD SMITH,** ) | |
| **LISA ELMORE CURTIS,** ) | |
| **ARNEDA F. LYONS,** ) | |
| **HOLLY HULLETT ROY,** ) | |
| **STACY JOHNSON GAMBILL,** ) | |
| **FARRAH RUSSELL VAUGHN** ) | |
| **ASHLEY CUPP,** ) | |
| **AMANDA LANIER,** ) | |
| **RYAN CARLTON,** ) | |
| **VIOLA JONES,** ) | |
| **JESSICA L. VAN AUKEN,** ) | |
| **MICHIE BOLDEN,** ) | |
| **NATASHA OBRIST,** ) | |
| **CANDACE YOUNG,** ) | |
| ) | |
| **Defendants.** ) | |

**COMPLAINT**

1

Comes the Plaintiff InPatient Consultants of North Carolina, P.C. ("IPC" or "TeamHealth"), and for its Complaint against the Defendants, states, avers and alleges upon information and belief, as follows:

## Introduction

1.     The Plaintiff, IPC, is engaged in the business of providing post-acute medical care to patients and residents in skilled/long term care and assisted living/retirement facilities in Virginia, North Carolina, Tennessee and South Carolina, among other States.

2.     Integral to the business of IPC are: medical directorship, and/or physician and advanced practice clinician provider, contracts and expectancies with facilities; workforce of physicians, advanced practice clinicians, and managers whom IPC has employed to perform IPC's contracts with the facilities; personal goodwill and business rights purchased from others; IPC's own goodwill and reputation; and confidential and proprietary information.

3.     IPC has legitimate interests in protecting its business assets, contracts and expectancies, as well as in the ability to maintain professional personnel in its employ to enable it to provide the services required under its contracts with the facilities.

4.     This action arises because of damage that has been done, and continues to be done, to IPC's business assets, contracts, workforce and expectancies for which IPC seeks monetary, injunctive and other relief.

5.     This action is brought against Defendants, who individually and in conspiracy with each other, not only planned and schemed to harm the business of IPC, but also carried out those plans and schemes.

6.     The claims asserted against Defendants herein are civil in nature, and arise under statute and the common law, sounding not only in tort but also in contract including claims

pursuant to or for: (I) Racketeer Influenced and Corrupt Organization Act (18 U.S.C. § 1961, *et. seq.*); (II) Virginia Business Conspiracy Act (e.g., *Va. Code* § 18.2-499 – § 18.2-500); (III) Common Law Conspiracy; (IV) Tortious Interference with Contract and/or Business Expectancy; (V) Fraud; (VI) Trespass to Chattel or Conversion; (VII-XII) Breach of Contract; and (XIII) Common Law Breach of Fiduciary Duty.

7.     Defendants' acts underlying these clams involve larceny (e.g., *Va. Code* § 18.2-95; *N.C. Gen. Stat.* § 14-72), false pretenses (e.g., *Va. Code* § 18.2-23 and/or § 18.2-178; *N.C. Gen. Stat.* § 14-100), embezzlement (e.g., *Va. Code* § 18.2-111; *N.C. Gen. Stat.* § 14-90), and business conspiracy (e.g., *Va. Code* § 18.2-499).   These acts and omissions constitute a pattern of racketeering activity pursuant to 18 U.S.C. §1961(5).

8.     In addition, Defendants' acts involve wrongful and unlawful interference and unfair competition with IPC's contracts and expectancies with facilities, as well as its contracts with its employees.  Defendants' acts also involve misappropriation of IPC's assets, and confidential and proprietary information.

9.     IPC demands that Defendants be held accountable, with IPC being restored its business assets, contracts, workforce and expectancies that it has lost and continues to lose, and otherwise compensated monetarily therefor.

<u>**The Parties**</u>

10.     IPC is a corporation organized under the laws of the State of North Carolina with a principal place of business at 8511 Fallbrook Ave., Suite 120, West Hills, California 91304.  IPC has certificates of authority to conduct business in multiple states in the mid-atlantic region, including Virginia, North Carolina, South Carolina and Tennessee.

11.     The Defendant Dr. Bradley J. Goad ("Goad") is a United States citizen and a resident of Virginia residing at 54 Watchtower Drive, Moneta, Virginia 24121.

12.     The Defendant Dr. Jeffrey Garland ("Garland") is a United States citizen and a resident of Virginia residing at 155 Fairway Oaks Drive, Galax, Virginia 24333.

13.     The Defendant Carrie Burnette ("Burnette") is a United States citizen and a resident of Virginia residing at 108 Straight Away Lane, Laurel Fork, Virginia 24352.

14.     The Defendant GAPS Health ("GAPS Health") is a Dallas, Texas based physician-led organization that proclaims to specialize in medical directorships and value-based initiatives for post-acute facilities and assisted living communities.  It proclaims to operate in 20 states with licensure in almost all states, which would include Virginia, North Carolina and South Carolina. GAPS Health can be served via its officer Bradley Goad at 54 Watchtower Drive, Moneta, Virginia 24121.

15.     The Defendant Premier Geriatric Solutions, PLLC ("PGS") is a limited liability company organized under the laws of Virginia with a principal place of business at 6701 Peters Creek Rd, Suite 110, Roanoke, Virginia 24019.  PGS' registered agent upon whom service of process can be made is Business Filings Incorporated, 4701 Cox Rd., Suite 285, Glen Allen, Virginia 23060.  PGS was formed on November 13, 2019.

16.     The Defendant GAPS Health NC, PLLC ("GAPS Health NC") is a limited liability company organized under the laws of North Carolina with a principal place of business at 160 Mine Lake Ct., Suite 200, Raleigh, North Carolina 27615.  GAPS Health NC does not have a certificate of authority to do business in Virginia.  GAPS Health NC was formed on June 12, 2019 by its authorized officer Bradley J. Goad using a Virginia phone number, and was registered to do business in South Carolina on September 15, 2020.  GAPS Health NC can be served via its officer Bradley Goad at 54 Watchtower Drive, Moneta, Virginia 24121.

17.     The Defendant Elite Practice Management & Consulting LLC ("Elite") is a limited liability company organized under the laws of Virginia with a principal place of business at 108 Straight Away Ln, Laurel Fork, Virginia 24352.  Elite can be served via its owner Carrie Burnette at its principal place of business.

18.     The Defendant Dr. Vanessa Jean Sturgill Fant ("Fant") is a United States citizen and a resident of Virginia residing at 2292 Greenville Rd., Galax, Virginia 24333.

19.     The Defendant Dr. David Campbell ("Campbell") is a United States citizen and a resident of Virginia residing at 2851 New Ridge Road, Elliston, Virginia 24087.

20.     The Defendant Dr. Victor Bell ("Bell") is a United States citizen and a resident of Virginia residing at 911 Howbert Ave., Roanoke, Virginia 24015.

21.     The Defendant Jessi Dalton ("Dalton") is a United States citizen and a resident of Virginia residing at 882 Little Valley Rd., Meadows of Dan, Virginia 24120.

22.     The Defendant Matthew Fife ("Fife") is a United States citizen and a resident of West Virginia residing at 610 Leah Dr., Princeton, West Virginia 24739.

23.     The Defendant Jamie Wood Smith ("Smith") is a United States citizen and a resident of Virginia residing at 61 Old Forge Road, Callaway, Virginia.

24.     The Defendant Lisa Elmore Curtis ("Curtis") is a United States citizen and a resident of Virginia residing at 211 Rose Hill Lane, Covington, Virginia.

25.     The Defendant Arneda F. Lyons ("Lyons") is a United States citizen and a resident of Virginia residing at 4751 Barton Drive, Dublin, Virginia.

26.     The Defendant Holly Hullett Roy ("Roy") is a United States citizen and a resident of Virginia residing at 10559 Moneta Road, Bedford, Virginia.

27.     The Defendant Stacy Johnson Gambill ("Gambill") is a United States citizen and a resident of Virginia residing at 5765 Fieldview Drive, Roanoke, Virginia.

28.     The Defendant Farrah Russell Vaughn ("Vaughn") is a United States citizen and a resident of Virginia residing at 2230 Pleasant View Road, Austinville, Virginia.

29.     The Defendant Ashley Cupp ("Cupp") is a United States citizen and a resident of Virginia residing at 150 Ashe Drive, Christiansburg, Virginia.

30.     The Defendant Amanda Lanier ("Lanier") is a United States citizen and a resident of Georgia residing at 6470 Metcalf Rd, Thomasville, Georgia, who has performed professional duties in Woodlawn, Virginia.

31.     The Defendant Ryan Carlton ("Carlton") is a United States citizen and a resident of Virginia residing at 5764 Fieldview Drive, Roanoke, Virginia.

32.     The Defendant Viola Jones ("Jones") is a United States citizen and a resident of Virginia residing at 457 Ripley Drive, Danville, Virginia.

33.     The Defendant Jessica L. Van Auken ("Van Auken") is a United States citizen and a resident of Virginia residing at 102 Summit Ridge Road, Daleville, Virginia.

34.     The Defendant Michie Bolden ("Bolden") is a United States citizen and a resident of Virginia residing at 5715 Glen Haven Dr., Roanoke, Virginia 24019.

35.     The Defendant Natasha Obrist ("Obrist") is a United States citizen and a resident of Virginia residing at 3865 Colonial Green Circle SW, Roanoke, Virginia.

36.     The Defendant Candace Young ("Young") is a United States citizen and a resident of Virginia residing at 259 Kenny Ln., Martinsville, Virginia 24112.

## Jurisdiction and Venue

37.     This Court has subject matter jurisdiction over this action pursuant to 18 U.S.C. § 1964.

38.     In addition, this Court has supplemental jurisdiction over the state law claims asserted in this Complaint pursuant to 28 U.S.C. §1367 because the state law claims form part of the same case or controversy as the federal law claims.

39.     Venue is proper in this judicial district pursuant to 18 U.S.C. §1965 and 28 U.S.C. §1391 because each Defendant is subject to personal jurisdiction in this judicial district.

### Factual Allegations Common To All Counts

40.     This section, pertaining to the factual allegations common to all counts, is organized into the following subparts:

A.     Background on Mid-Atlantic ElderCare and Mid-Atlantic QuickCare;
B.     Background on Goad's Employment at IPC;
C.     Background on Garland's Employment at IPC;
D.     Background on Burnette's Employment at IPC;
E.     Background on Each Physician's Employment at IPC;
F.     Background on Each Advanced Practice Clinician's Employment at IPC;
G.     Background on Each Clinical Practice Manager's Employment at IPC;
H.     Goad's Termination of His Employment at IPC;
I.     Goad's Employment with, and the Formation of, Competitors to IPC;
J.     The Goad Conspiracy Group;
K.     The Pattern Racketeering of The Goad Conspiracy Group;
L.     The Interference and Unfair Competition To IPC's Contracts With Facilities; and
M.     The Interference and Unfair Competition To IPC's Employment Contracts.

**A.      Background On Mid-Atlantic ElderCare And Mid-Atlantic QuickCare.**

41.     IPC's relationship with Garland, Goad and Burnette arose from IPC's acquisition of Mid-Atlantic ElderCare, PLLC (MAEC) on or around August 31, 2015.

42.     MAEC had been formed by Goad on September 14, 2007.  MAEC was in the business of providing post-acute medical care to patients and residents in skilled/long-term care and assisted living/retirement facilities.  MAEC conducted its business in facilities geographically located in the mid-atlantic region of Virginia, North Carolina, Tennessee and/or South Carolina. Garland became the Chief Executive Officer of MAEC in or around February 2011.  Burnette

became the Chief Operating Officer and/or an Administrator for MAEC in or around December 2012.

43.     During that same period of December 2012, Garland and Goad co-founded Mid-Atlantic Quickcare, PLLC ("MAC").  MAC is in the business of providing urgent care services to patients.  Garland is the CEO of MAC, which position he continued to hold throughout the duration of his employment at IPC.  Burnette is the Chief Operating Officer and/or an Administrator of MAC, which position/s, unbeknownst to IPC, she continued to hold throughout the duration of her employment at IPC.

44.     MAC was a companion company to MAEC.  MAC and MAEC shared the same founders and/or officers, namely Goad, Garland and/or Burnette.  Both MAC and MAEC shared a similar Mid-Atlantic name.  Both MAC and MAEC operated out of the same building located at 5261 Carrollton Pike, Woodlawn, Virginia (the "Building").

45.     IPC, MAEC, Goad and Garland made and entered into that certain Asset Purchase Agreement dated August 31, 2015, a true and correct copy of which is attached hereto as Exhibit A and incorporated herein by reference.  At the time of that Asset Purchase Agreement, Goad and Garland each owned 50% of MAEC.  Via the Asset Purchase Agreement, IPC purchased certain of the assets of MAEC, Goad and Garland, including the personal goodwill of Goad and Garland, in return for cash and other valuable consideration.  That consideration included but was not limited to Four Million Dollars ($4,000,000) plus earnout payments to Goad and Garland.

46.     Pursuant to that Asset Purchase Agreement, IPC purchased the assets from MAEC, Goad and Garland set forth in the "PC Acquired Assets" portion of Schedule 1.1.  Among other assets, those assets expressly included the personal goodwill of Goad; the personal goodwill of Garland; and MAEC's, Goad's and Garland's rights to engage in the Business and to enter into

new agreements with the Facilities referenced in Attachment 1 to Schedule 1.1 or listed on Attachment 2 to Schedule 1.1.

47.     The term "Business" as used in the context of the assets purchased by IPC is defined in Section 7.9(c) of the Asset Purchase Agreement as:

"**Business**" shall mean the business of Seller, Acquirors, and/or any Affiliates of Acquirors, as the case may be, which is deemed to be any of the following: (i) the arranging for and/or provision of Facilities-based medical care, and associated services for patients of other physicians, or for patients who do not have a primary care physician, while such patients are in Facilities (whether or not such patients are referred via an arms-length contractual relationship with a Facility or a payor); (ii) the arranging for and/or provision of more than a Provider's pro-rata share of emergency room, department, critical care or Facility coverage at a Facility if such Provider is required to provide such coverage by contractual arrangement or by the Facility's medical staff bylaws, policies, or procedures generally applicable to members of such Facility's medical staff; (iii) the arranging for and/or provision of medical care and associated services by a Provider for patients in a skilled nursing facility, nursing home, assisted living facility, continuing care retirement community, group home or hospice where such Provider is acting as a primary caregiver; (iv) the arranging for and/or provision of emergency room, department critical care or Facility coverage at a Facility which does not require such coverage by its medical staff bylaws, policies, or procedures; (v) the development and implementation of programs to provide and/or manage such Facilities-based medical care; (vi) the provision of billing, management, medical director or other services or software to any such Facilities or programs; and (vii) any locum tenens, vacation, holiday or substitute coverage for another Provider in connection with clauses (i) through (vi) above. For the avoidance of doubt, "Business" shall not include (i) any outpatient primary care services provided by Seller or Owners or (ii) any portion of the Urgent Care Business retained by Owners.

48.     The term "Facility" as used in the context of the assets purchased by IPC is defined in Section 7.9(j) of the Asset Purchase Agreement as:

"**Facility**" shall mean short-term and long-term acute care hospitals (including rehabilitation hospitals), specialty hospitals, skilled nursing facilities, nursing homes, assisted living facilities, continuing care retirement communities, group homes, hospices, and other related settings.

49.     The term "Personal Goodwill" as used in the context of the assets purchased by IPC is defined in Section 7.9(x) of the Asset Purchase Agreement as:

"**Personal Goodwill**" shall mean the business created or developed by each Owner, or by or through each Owner's personal reputation, contacts or relationships, or otherwise

possessed by such Owner in connection with the management and operation of the Business, including each Owner's personal business relationships with referral sources, customers, suppliers and any others having business relationships with Seller.

50.     As set forth in Section 1.13 of the Asset Purchase Agreement, the "Business" of MAEC generated approximately Six Million One Hundred Thousand Dollars ($6,100,000) in revenues for the trailing nine (9) month period ending June 30, 2015 and approximately 6,000 monthly patient encounters for the same period.  Included in those revenues was approximately One Million Dollars ($1,000,000) in medical directorship stipends from Facilities.

51.     At the time of IPC's acquisition of MAEC, MAEC employed a number of physicians and advanced practice clinicians.  Aside from Goad and Garland, the physicians included but were not limited to Fant and Dr. William Ward.  The advanced practice clinicians included but were not limited to Smith, Curtis, Lyons, and Roy.  Burnette was an administrator of MAEC.  Each of those physicians, advanced practice clinicians or administrators became an employee of IPC in furtherance of IPC's acquisition of MAEC.

52.     MAC also employed a number of advanced practice clinicians.  At least two of those clinicians (i.e., Gambill and Vaughn) became employed at IPC through Garland, Burnette, and/or Goad after IPC had acquired MAEC.

53.     MAEC also had confidential and proprietary information related to its Business (including but not necessarily limited to data, know-how, customer lists, current and anticipated customer requirements, price lists, market studies, business plans) that were purchased by IPC. That confidential and proprietary information became the confidential and proprietary information of IPC as a result of IPC's acquisition of MAEC.

54.     In October 2015, shortly after IPC had acquired MAEC, Goad, Garland and/or Burnette had IPC sign a property lease for the Building for the purpose of them operating IPC's newly acquired business of MAEC.

**B.     Background On Goad's Employment At IPC.**

55.     Goad, who was employed as an officer and/or physician at both MAEC and MAC, was hired as a physician and Practice Group Leader by IPC on or around August 31, 2015, when IPC acquired MAEC.

56.     Through Goad's employment at IPC, Goad was given access to the confidential and proprietary information of IPC, including but not limited to the confidential and proprietary information of MAEC that Goad had sold to IPC.  That information included but was not limited to IPC's confidential and proprietary information about its program and workforce for providing post-acute medical care to patients and residents in skilled/long-term care and assisted living/retirement facilities.  Included therein were the terms and conditions of IPC's contracts, as well as the opportunities for contracts, with skilled/long-term care and assisted living/retirement facilities for medical directorships and/or for the provision of physician and advanced practice clinician medical care services.  Also included therein were the terms and conditions of contracts, as well as the opportunities for contracts, involving the physicians and advanced practice clinicians who IPC employed or who IPC had the opportunity to employ.

57.     During Goad's employment with IPC he executed one employment agreement and one amendment, specifically: (a) An Employment Agreement signed by Goad on August 31, 2015 (the "Goad 2015 Agreement"), a true and correct copy of which is attached hereto as Exhibit B and incorporated herein by reference; (b) The Amendment to Employment Agreement (the "Goad 2017 Amendment"), a true and correct copy of which is attached hereto as Exhibit C and incorporated herein by reference.

### a. The Goad 2015 Agreement.

58. The Goad 2015 Agreement was supported by valuable and sufficient consideration. For instance, among other mutual promises and obligations, Goad received employment at IPC.

59. The Goad 2015 Agreement contained a Schedule 1.1 setting forth certain definitions to apply throughout the Agreement, including:

> A. "**Facility**" or "**Facilities**" shall mean short-term and long-term acute care hospitals, skilled nursing facilities, nursing homes, assisted living facilities, adult care homes, hospices and other related settings.
>
> B. "**Hospitalist Operations**" shall mean any of the following: (i) the arranging for and/or the provision of Facilities-based medical care and associated services on a referral or consulting basis for patients of other providers or for patients who do not have a primary care physician, while such patients are in Facilities; (ii) the arranging for and/or provision of more than a provider's pro rata share of emergency room or department call coverage at a Facility if a provider is required to provide such coverage by the Facility's medical staff bylaws, policies, or procedures generally applicable to members of such Facility's medical staff; (iii) the arranging for and/or provision of medical care and associated services by a provider for patients in a skilled nursing facility or nursing home where such provider is acting as a primary care physician; (iv) the arranging for and/or provision of emergency room or department call coverage at a Facility which does not require such coverage by its medical staff bylaws, policies, or procedures; and (v) any locum tenens, vacation, holiday or substitute coverage for any other provider in connection with clauses (i) through (iv) above.

See Exhibit B (Schedule 1.1).

60. Via the Goad 2015 Agreement, Goad agreed to assume certain professional duties as an employee of IPC. Those duties included but were not necessarily limited to rendering medical services as a hospitalist physician and as a Practice Group Leader for IPC. See Exhibit B (§ 1.1(a)).

61. Via the Goad 2015 Agreement, Goad agreed to perform his professional duties on a full-time and exclusive basis for IPC, in pertinent part:

> Exclusive Basis. Employee agrees to render Hospitalist Services on behalf of Employer on a full-time, exclusive basis. Employee agrees that he or she shall not render Hospitalist Services for any other person or party and shall not engage in any other health care related

business or profession during the Term of this Agreement without prior written notice to and written approval from Company.

*See* Exhibit B (§ 1.1(b)).

62.     Via the Goad 2015 Agreement, Goad agreed to safeguard and to not disclose to others IPC's proprietary and confidential information, specifically:

> Proprietary and Confidential Information.  Employee shall comply with all of the terms and conditions of the Proprietary and Confidential Information Rider attached hereto as Exhibit 3.1.

*See* Exhibit B (§ 3.1 & Exh. 3.1).

63.     Via the Goad 2015 Agreement, Goad agreed to not interfere and compete with IPC.

*See* Exhibit B (§ 3.4).

64.     Goad acknowledged IPC's legitimate protectable interest in its goodwill and in its materials (including trade secrets, proprietary and confidential information, referral sources, and customers and payors), and agreed to protect that goodwill and those materials, as well as to further enforce the agreements and covenants in the proprietary and confidential information rider (Exhibit 3.1) of the Goad 2015 Agreement, by agreeing not to compete as follows:

> Agreement Not to Compete.  During Employee's employment by Company, Employee will be given access to and will become familiar with trade secrets, proprietary and confidential information, referral sources and customers and payors of Company (individually and collectively, "Company Materials").  As a material term of this Agreement, as an inducement to Company to enter into this Agreement with Employee, in order to protect Company's goodwill and Company Materials, and to further enforce the agreements and covenants contained in Exhibit 3.1 attached hereto, Employee agrees to the following:
>
> (a)  During Employee's employment hereunder and for a period of two (2) years following the last day of the Term hereof (the "Restricted Period"), Employee shall not directly or indirectly enter into, engage, participate or allow Employee's name to be used in or in connection with any business or activity, that is in competition in any manner whatsoever with the Hospitalist Operations of Company in the Restricted Territory (as defined in Schedule 1.1).  Without limiting the foregoing, during the Restricted Period in the Restricted Territory, Employee shall not promote or assist, financially or otherwise,

manage, or invest in any person, firm, association, partnership, corporation or other entity engaged in any Hospitalist Operations.

*See* Exhibit B (§ 3.4 & Schedule 1.1).

65.     Goad acknowledged the reasonableness of the noncompetition covenant, agreeing:

Reasonableness.  Employee acknowledges and agrees that the breach of the provision of this Section 3.4 will give rise to irreparable injury to Company which cannot be adequately compensated with monetary damages.   Employee acknowledges that Employee's obligations under this Agreement are reasonable in the context of the nature of Company's business and the competitive injuries likely to be sustained by Company if Professional were to violate such obligations.

*See* Exhibit B (§ 3.4(d)).   In addition, Goad agreed that noncompetition restriction survived termination or expiration of the Goad 2015 Agreement for any reason, specifically:

Employee specifically agrees that the provisions of this Article 3 shall survive the termination or expiration of this Agreement for any reason, regardless of the reason therefore or the correctness thereof.

*Id.*

### b.     *The Goad 2017 Amendment.*

66.     The Goad 2017 Amendment amended the Goad 2015 Agreement.  *See* Exhibit C. The effective date of the Goad 2017 Amendment was April 1, 2017.  *See* Exhibit C (¶ 3).

67.     The Goad 2017 Amendment was supported by valuable and sufficient consideration.   For instance, among other mutual promises and obligations, Goad received continued employment at IPC.

68.     Via the Goad 2017 Amendment, Goad's professional duties as an employee of IPC changed.  *See* Exhibit C (§ 1).  More particularly, Goad no longer had a Practice Group Leader duty at IPC.  *Id*.  Goad's duty to render medical services as a hospitalist physician for IPC remained the same.  *Id*.

**C.**     **Background On Garland's Employment At IPC.**

69.     Garland, who was employed as an officer and/or physician at both MAEC and MAC, was hired as a physician and a Practice Group Leader by IPC on or around August 31, 2015, when IPC acquired MAEC.

70.     Through Garland's employment at IPC, Garland was given access to the confidential and proprietary information of IPC, including but not limited to the confidential and proprietary information of MAEC that Garland had sold to IPC.  That information included but was not limited to IPC's confidential and proprietary information about its program and workforce for providing post-acute medical care to patients and residents in skilled/long-term care and assisted living/retirement facilities.  Included therein were the terms and conditions of IPC's contracts, as well as the opportunities for contracts, with skilled/long-term care and assisted living/retirement facilities for medical directorships and/or for the provision of physician and advanced practice clinician medical care services.  Also included therein were the terms and conditions of contracts, as well as the opportunities for contracts, involving the physicians and advanced practice clinicians who IPC employed or who IPC had the opportunity to employ.

71.     During Garland's employment with IPC he executed three employment agreements, specifically:  (a) An Employment Agreement signed by Garland on August 31, 2015 (the "Garland 2015 Agreement"), a true and correct copy of which is attached hereto as Exhibit D and incorporated herein by reference; (b) A Medical Professional Employment Agreement dated April 24, 2018 (the "Garland 4/2018 Agreement"), a true and correct copy of which is attached hereto as Exhibit E and incorporated herein by reference; and (c) A Medical Professional Employment Agreement dated December 14, 2018 (the "Garland 12/2018 Agreement"), a true and correct copy of which is attached hereto as Exhibit F and incorporated herein by reference.

### a.      *The Garland 2015 Agreement.*

72.     The Garland 2015 Agreement contains the same general terms and conditions as the Goad 2015 Agreement.

73.     The Garland 2015 Agreement was supported by valuable and sufficient consideration.  For instance, among other mutual promises and obligations, Garland received employment at IPC.

74.     The Garland 2015 Agreement contained a Schedule 1.1 setting forth certain definitions to apply throughout the Agreement, including:

A.      "**Facility**" or "**Facilities**" shall mean short-term and long-term acute care hospitals, skilled nursing facilities, nursing homes, assisted living facilities, adult care homes, hospices and other related settings.

B.      "**Hospitalist Operations**" shall mean any of the following:  (i) the arranging for and/or the provision of Facilities-based medical care and associated services on a referral or consulting basis for patients of other providers or for patients who do not have a primary care physician, while such patients are in Facilities; (ii) the arranging for and/or provision of more than a provider's pro rata share of emergency room or department call coverage at a Facility if a provider is required to provide such coverage by the Facility's medical staff bylaws, policies, or procedures generally applicable to members of such Facility's medical staff; (iii) the arranging for and/or provision of medical care and associated services by a provider for patients in a skilled nursing facility or nursing home where such provider is acting as a primary care physician; (iv) the arranging for and/or provision of emergency room or department call coverage at a Facility which does not require such coverage by its medical staff bylaws, policies, or procedures; and (v) any locum tenens, vacation, holiday or substitute coverage for any other provider in connection with clauses (i) through (iv) above.

*See* Exhibit D (Schedule 1.1).

75.     Via the Garland 2015 Agreement, Garland agreed to assume certain professional duties as an employee of IPC.  Those duties included but were not necessarily limited to rendering medical services as a hospitalist physician and as a Practice Group Leader for IPC.  *See* Exhibit D (§ 1.1(a)).

16

76.     Via the Garland 2015 Agreement, Garland agreed to perform his professional duties

on a full-time and exclusive basis for IPC, in pertinent part:

> Exclusive Basis.  Employee agrees to render Hospitalist Services on behalf of Employer
> on a full-time, exclusive basis.  Employee agrees that he or she shall not render Hospitalist
> Services for any other person or party and shall not engage in any other health care related
> business or profession during the Term of this Agreement without prior written notice to
> and written approval from Company.

*See* Exhibit D (§ 1.1(b)).

77.     Via the Garland 2015 Agreement, Garland agreed to safeguard and to not disclose

to others IPC's proprietary and confidential information, specifically:

> Proprietary and Confidential Information.  Employee shall comply with all of the terms
> and conditions of the Proprietary and Confidential Information Rider attached hereto as
> Exhibit 3.1.

*See* Exhibit D (§ 3.1 & Exh. 3.1).

78.     Via the Garland 2015 Agreement, Garland agreed to not interfere and compete with

IPC.  *See* Exhibit D (§ 3.4).

79.     Garland acknowledged IPC's legitimate protectable interest in its goodwill and in

its materials (including trade secrets, proprietary and confidential information, referral sources,

and customers and payors), and agreed to protect that goodwill and those materials, as well as to

further enforce the agreements and covenants in the proprietary and confidential information rider

(Exhibit 3.1) of the Garland 2015 Agreement, by agreeing not to compete as follows:

> Agreement Not to Compete.  During Employee's employment by Company, Employee
> will be given access to and will become familiar with trade secrets, proprietary and
> confidential information, referral sources and customers and payors of Company
> (individually and collectively, "Company Materials").  As a material term of this
> Agreement, as an inducement to Company to enter into this Agreement with Employee, in
> order to protect Company's goodwill and Company Materials, and to further enforce the
> agreements and covenants contained in Exhibit 3.1 attached hereto, Employee agrees to
> the following:

(a)  During Employee's employment hereunder and for a period of two (2) years following the last day of the Term hereof (the "Restricted Period"), Employee shall not directly or indirectly enter into, engage, participate or allow Employee's name to be used in or in connection with any business or activity, that is in competition in any manner whatsoever with the Hospitalist Operations of Company in the Restricted Territory (as defined in Schedule 1.1).  Without limiting the foregoing, during the Restricted Period in the Restricted Territory, Employee shall not promote or assist, financially or otherwise, manage, or invest in any person, firm, association, partnership, corporation or other entity engaged in any Hospitalist Operations.

*See* Exhibit D (§ 3.4 & Schedule 1.1).

80.    Garland acknowledged the reasonableness of the noncompetition covenant, agreeing:

Reasonableness.  Employee acknowledges and agrees that the breach of the provision of this Section 3.4 will give rise to irreparable injury to Company which cannot be adequately compensated with monetary damages.  Employee acknowledges that Employee's obligations under this Agreement are reasonable in the context of the nature of Company's business and the competitive injuries likely to be sustained by Company if Professional were to violate such obligations.

*See* Exhibit D (§ 3.4(d)).  In addition, Garland agreed that noncompetition restriction survived termination or expiration of the Garland 2015 Agreement for any reason, specifically:

Employee specifically agrees that the provisions of this Article 3 shall survive the termination or expiration of this Agreement for any reason, regardless of the reason therefore or the correctness thereof.

*Id.*

### b.    The Garland 4/2018 Agreement

81.    Garland ended the Garland 2015 Agreement on January 31, 2018, and replaced it with the Garland 4/2018 Agreement.  Although the Garland 4/2018 Agreement was dated April 24, 2018, its effective date was reported to be February 1, 2018.

82.    The Garland 4/2018 Agreement was supported by valuable and sufficient consideration.  For instance, among other mutual promises and obligations, Garland received continued employment at IPC.  In addition, in exchange for Garland agreeing to be bound by

certain restrictive covenants [*see, e.g.*, Exhibit E (§§ 13-14)], IPC agreed to provide benefits in the event IPC terminated the employment "without cause" [*see, e.g.*, Exhibit E (§§ 12.1-12.2)].

83.     Garland's 4/2018 Agreement contained an Addendum "2" setting forth certain definitions to apply throughout the Agreement, including:

> **Definitions**:
> A.     "**Facility**" or "**Facilities**" shall mean short-term and long-term acute care hospitals, skilled nursing facilities, nursing homes, assisted living facilities, adult care homes, hospices and other related settings.
>
> B.     "**Business Operations**" shall mean any of the following:  (i) the arranging for and/or the provision of Facilities-based medical care and associated services on a referral or consulting basis for patients of other providers or for patients who do not have a primary care physician, while such patients are in Facilities; (ii) the arranging for and/or provision of more than a provider's pro rata share of emergency room or department call coverage at a Facility if a provider is required to provide such coverage by the Facility's medical staff bylaws, policies, or procedures generally applicable to members of such Facility's medical staff; (iii) the arranging for and/or provision of medical care and associated services by a provider for patients in a skilled nursing facility or nursing home where such provider is acting as a primary care physician; (iv) the arranging for and/or provision of emergency room or department call coverage at a Facility which does not require such coverage by its medical staff bylaws, policies, or procedures; and (v) any locum tenens, vacation, holiday or substitute coverage for any other provider in connection with clauses (i) through (iv) above.

*See* Exhibit E (Addendum "2").  The definition for "Business Operations" in the Garland 4/2018 Agreement is the same definition that was used for "Hospitalist Operations" in the Garland 2015 Agreement.

84.     Via Garland's 4/2018 Agreement, Garland agreed to assume certain professional duties as an employee of IPC.  Those duties included but were not necessarily limited to rendering medical services, performing administrative services including medical director services at specified Facilities (which Facilities included but were not necessarily limited to:   Kissito Healthcare Maple Grove, Heritage Hall–Laurel Meadows, Hillsville Rehabilitation and Healthcare Center, Kissito Healthcare Bland County, and Skyline Nursing and Rehab), and providing

supervision for advanced practice clinicians at the Facilities designated by IPC.  *See* Exhibit E (§ 1 & Addendum "2").

85.     Via Garland's 4/2018 Agreement, Garland agreed to perform his/her professional duties on an exclusive basis for IPC, in pertinent part:

> Exclusive Basis.  Professional agrees to render Services on behalf of Company on a full-time, exclusive basis.  Professional agrees that he or she shall not render professional medical services for any other person or party and shall not engage in any other health care related business or profession during the Term of this Agreement without prior written notice to and written approval from the Company.

*See* Exhibit E (§ 2).  In addition, Garland represented and warranted that he "shall, at all times during the term of this Agreement provide medical and other health care related services (including medical directorship and other similar services) only through Company."  *Id*.  Garland further agreed that:

> Professional shall promptly pay to and hereby assigns to the Company all income earned and received by Professional from any person or entity other than Company related to the rendering of Professional's medical services (including medical directorship services) on behalf of the Company during the Term of this Agreement.

*Id.*

86.     Via the Garland 4/2018 Agreement, Garland agreed to safeguard and to not disclose to others IPC's proprietary and confidential information, specifically:

> Proprietary and Confidential Information.  Professional agrees at all times during the Term of this Agreement and following termination of this Agreement, to maintain in all respects, and not to disclose to any third party, any confidential or private information relating to the business practices, operations, contracts, trade secrets, pricing and any other confidential information of Company, including the terms of this Agreement.

*See* Exhibit E (§ 13.1).

87.     Via the Garland 4/2018 Agreement, Garland agreed to not interfere and compete with IPC.  There were three subparts to the noninterference and noncompetition to which Garland agreed.  *See* Exhibit E (§ 14).

88.     In the first subpart, Garland acknowledged IPC's legitimate protectable interest in its relationships with its Facilities, and in its relationships with its employees and contractors, providing in pertinent part:

> Noninterference.   Professional acknowledges that Company has a protectable business interest in its relationships with Facilities, or with employees and contractors of the Company, all of which have been developed by Company at Company's considerable effort and expense.

See Exhibit E (§ 14.1).  To protect this legitimate interest, Garland agreed that:

> Therefore, Professional agrees that during the Term of this Agreement and for one (1) year following expiration or termination of this Agreement for any reason, Professional will not, either individually, or in conjunction with any other person, entity or third party, directly or indirectly solicit or interfere with Company's or its division's relationships or agreements with Facilities, or any employees and contractors of Company, which prohibited activity shall include:  (i) encouraging or inducing any Facilities, or any employees and contractors of Company to terminate or modify their relationship with Company or its divisions, or its affiliated companies, or (ii) providing services at Facilities after engaging in any of the prohibited activity set forth in (i) above.

Id.

89.     In the second subpart, Garland acknowledged IPC's legitimate protectable interest in its goodwill and in its materials (including trade secrets, proprietary and confidential information, referral sources, and customers and payors), and agreed to protect that goodwill and those materials, as well as to further enforce the agreements and covenants in the proprietary and confidential information section (Section 13, including subpart 13.1) of the Garland 4/2018 Agreement, by agreeing not to compete as follows:

> Agreement Not to Compete.
>                                        * * * * *
> (a)       During Professional's employment hereunder and for a period of two (2) years following the last day of the Term hereof (the "Restricted Period"), Professional shall not directly or indirectly enter into, engage, participate, or allow Professional's name to be used in or in connection with any business or activity, that is in competition in any manner whatsoever with the Business Operations (as defined in Addendum "2") of Company in the Restricted Territory (as defined in Addendum "2").  Without limiting the foregoing, during the Restricted Period in the Restricted Territory, Professional shall not promote or

assist, financially or otherwise, manage, or invest in any person, firm, association, partnership, corporation, or other entity engaged in any Business Operations.

*See* Exhibit E (§ 14.2(a)).

90.     In the third subpart, Garland acknowledged the reasonableness of the noninterference and noncompetition agreement, agreeing:

> Reasonableness.  Professional acknowledges and agrees that the breach of the provision of Sections 14.1 and 14.2 will give rise to irreparable injury to Company which cannot be adequately compensated with monetary damages.   Professional acknowledges that Professional's obligations under this Agreement are reasonable in the context of the nature of Company's business and the competitive injuries likely to be sustained by Company if Professional were to violate such obligations.

*See* Exhibit E (§ 14.3).  In addition, in that subpart Garland agreed that the noninterference and noncompetition restrictions survive termination or expiration of the Garland 4/2018 Agreement for any reason, specifically:

> Professional specifically agrees that the provisions of this Section 14 shall survive the termination or expiration of this Agreement for any reason, regardless of the reason therefore or the correctness thereof.

*Id.*

### c.     *The Garland 12/2018 Agreement.*

91.     Garland executed another agreement with IPC in 2018, specifically the Garland 12/2018 Agreement.

92.     The Garland 12/2018 Agreement was supported by valuable and sufficient consideration.  For instance, among other mutual promises and obligations, Garland received continued employment at IPC.  In addition, in exchange for Garland agreeing to be bound by certain restrictive covenants [*see, e.g.*, Exhibit F (§§ 13-14)], IPC agreed to provide benefits in the event IPC terminated the employment "without cause" [*see, e.g.*, Exhibit F (§§ 12.1-12.2)].

93.     Garland's 12/2018 Agreement contained an Addendum "2" setting forth certain definitions to apply throughout the Agreement, including:

> **Definitions**:
> A.     "**Facility**" or "**Facilities**" shall mean short-term and long-term acute care hospitals, skilled nursing facilities, nursing homes, assisted living facilities, adult care homes, hospices and other related settings.

*See* Exhibit F (Addendum "2").   This definition for "Facility" or "Facilities" was the same definition as appeared in the Garland 4/2018 Agreement.

94.     Via Garland's 12/2018 Agreement, Garland agreed to assume certain professional duties as an employee of IPC.  Those duties included but were not necessarily limited to rendering medical services, and providing supervision for advanced practice clinicians at the Facilities designated by IPC.  *See* Exhibit F (§ 1).

95.     Via Garland's 12/2018 Agreement, Garland agreed to perform his professional duties on a "PRN" or "as needed" basis.  *See* Exhibit F (§ 2).  Like the Garland 4/2018 Agreement, the Garland 12/2018 Agreement provides that:

> Professional shall promptly pay to and hereby assigns to the Company all income earned and received by Professional from any person or entity other than Company related to the rendering of Professional's medical services (including medical directorship services) on behalf of the Company during the Term of this Agreement.

*Id.*

96.     Via the Garland 12/2018 Agreement, like the Garland 4/2018 Agreement, Garland agreed to safeguard and to not disclose to others IPC's proprietary and confidential information, specifically:

> Proprietary and Confidential Information.  Professional agrees at all times during the Term of this Agreement and following termination of this Agreement, to maintain in all respects, and not to disclose to any third party, any confidential or private information relating to the business practices, operations, contracts, trade secrets, pricing and any other confidential information of Company, including the terms of this Agreement.

*See* Exhibit F (§ 13.1).

97.     Via the Garland 12/2018 Agreement, Garland agreed to not interfere and compete

with IPC.  There were three subparts to the noninterference and noncompetition to which Garland

agreed.  *See* Exhibit F (§ 14).

98.     In the first subpart, like the first subpart in the Garland 4/2018 Agreement, Garland

again acknowledged IPC's legitimate protectable interest in its relationships with its Facilities, and

in its relationships with its employees and contractors, providing in pertinent part:

> Noninterference.  Professional acknowledges that Company has a protectable business
> interest in its relationships with Facilities, or with employees and contractors of the
> Company, all of which have been developed by Company at Company's considerable
> effort and expense.

*See* Exhibit F (§ 14.1).  To protect this legitimate interest, Garland again agreed that:

> Therefore, Professional agrees that during the Term of this Agreement and for one (1) year
> following expiration or termination of this Agreement for any reason, Professional will not,
> either individually, or in conjunction with any other person, entity or third party, directly
> or indirectly solicit or interfere with Company's or its division's relationships or
> agreements with Facilities, or any employees and contractors of Company, which
> prohibited activity shall include:  (i) encouraging or inducing any Facilities, or any
> employees and contractors of Company to terminate or modify their relationship with
> Company or its divisions, or its affiliated companies, or (ii) providing services at Facilities
> after engaging in any of the prohibited activity set forth in (i) above.

*Id.*

99.     In the second subpart, the Garland 12/2018 Agreement left blank Section 14.2.  *See*

Exhibit F (§ 14.2).

100.    In the third subpart, like the Garland 4/2018 Agreement, Garland again

acknowledged the reasonableness of the noninterference and noncompetition covenant, agreeing:

> Reasonableness.  Professional acknowledges and agrees that the breach of the provision of
> Sections 14.1 and 14.2 will give rise to irreparable injury to Company which cannot be
> adequately compensated with monetary damages.  Professional acknowledges that
> Professional's obligations under this Agreement are reasonable in the context of the nature

of Company's business and the competitive injuries likely to be sustained by Company if Professional were to violate such obligations.

*See* Exhibit F (§ 14.3).  In addition, in that subpart Garland agreed that the noninterference and noncompetition restrictions survive termination or expiration of the Garland 12/2018 Agreement for any reason, specifically:

> Professional specifically agrees that the provisions of this Section 14 shall survive the termination or expiration of this Agreement for any reason, regardless of the reason therefore or the correctness thereof.

*Id.*

101.    Garland was a business partner of Goad during the time period during which Garland was employed by IPC, including but not limited to the portion of that time period during which Goad was no longer employed by IPC.

102.    Garland was supervised by, and/or collaborated with, Goad during the time period during which Garland was employed by IPC, including but not limited to the portion of that time period during which Goad was no longer employed by IPC.

103.    Garland was a business partner of Burnette outside of their employment at IPC, during the time period during which Garland and Burnette were employed by IPC.

104.    IPC terminated Garland's employment in September 2021.

**D.      Background On Burnette's Employment At IPC.**

105.    Burnette, who was employed as an officer and/or administrator at MAEC, was hired by IPC on or around August 31, 2015, when IPC acquired MAEC.  With an effective date of May 20, 2019, Burnette became the Vice President of Operations at IPC.  Then, with an effective date of November 2, 2020, Burnette became the Senior Vice President of Operations at IPC.

106.    Through Burnette's employment at IPC, Burnette was given access to the confidential and proprietary information of IPC, including but not limited to the confidential and

proprietary information of MAEC that Goad and Garland had sold to IPC. That information included but was not limited to IPC's confidential and proprietary information about its program and workforce for providing post-acute medical care to patients and residents in skilled/long-term care and assisted living/retirement facilities. Included therein were the terms and conditions of IPC's contracts, as well as the opportunities for contracts, with skilled/long-term care and assisted living/retirement facilities for medical directorships and/or for the provision of physician and advanced practice clinician medical care services. Also included therein were the terms and conditions of contracts, as well as the opportunities for contracts, involving the physicians and advanced practice clinicians who IPC employed or who IPC had the opportunity to employ.

107.    Burnette signed two letters of understanding concerning the terms and conditions of her employment at IPC. A true and correct copy of the agreements signed by Burnette is attached hereto as collective Exhibit G and incorporated herein by reference. The agreements that Burnette signed are referred to herein as the "Burnette Agreement".

108.    The Burnette Agreement was supported by valuable and sufficient consideration. For instance, among other mutual promises and obligations, Burnette received position advancement and continued employment at IPC.

109.    In the Burnette Agreement, Burnette agreed for her position at IPC to be "full-time." *See* Exhibit G ("Position"). Burnette also committed to "not engage in any other employment, consulting or other business activity (whether full-time or part-time) that could create a conflict of interest with the Company." *Id*. At the times of signing the Burnette Agreement, Burnette confirmed, not once but twice, that she had no contractual commitments or other legal obligations that would prohibit her from her performing her full-time position with IPC. *Id.*

110.    Via the Burnette Agreement, Burnette agreed to safeguard and to not disclose to others IPC's proprietary and confidential information, specifically:

> You will not, during the term of your employment with TeamHealth, or thereafter, use or disclose to any third party, any Confidential Information of or concerning TeamHealth. "Confidential Information" shall mean information concerning TeamHealth, whether written or oral, which you possess or become aware of during the course of your employment and which has not been publicly disclosed.  Confidential Information shall not be deemed "publicly disclosed" if disclosed by you in violation of this Agreement or as a result of such information being disclosed to employees or agents of TeamHealth. Moreover, you agree that all Confidential Information shall be deemed to be trade secrets.

*See* Exhibit G ("Confidentiality and Noncompetition").

111.    Via the Burnette Agreement, Burnette agreed to not interfere and unfairly compete with IPC, specifically:

> . . . you agree that during the term of your employment, and for one (1) year following the termination of your employment for any reason, you will not engage in any of the following activities in any geographical market or region where you had management responsibilities during your employment with TeamHealth or its related companies:  (i) work for or otherwise participate in any business that provides medical services to residents of skilled nursing facilities, nursing homes, assisted living facilities or any business that manages another entity that provides such services; (ii) solicit or hire (on your own behalf or on behalf of any other party, including on behalf of any future employers) any person who is then, or was during the period in which you were employed by us, an employee or contractor (including contract clinicians) of TeamHealth or its related companies, or (iii) solicit, induce or attempt to induce, directly or indirectly, any person or entity doing business with TeamHealth to terminate such relationship, or (iii) work for any other entity who utilizes your knowledge and experience with TeamHealth to perform any of the competitive activities listed above that you are personally prohibited from performing.

*See* Exhibit G ("Confidentiality and Noncompetition").

112.    Burnette had been supervised by, and/or collaborated with, Garland during the time period during which Burnette was employed by MAEC.

113.    Burnette had been supervised by, and/or collaborated with, Goad during the time period during which Burnette was employed by MAEC.

114.    Burnette engaged in conflicts of interest during her employment at IPC that impaired and compromised her business judgment in operating the affairs of IPC as a Vice President of Operations.

115.    Unbeknownst to IPC, Burnette has been employed, and continues to be employed, by MAC, a company founded and owned by Goad, which conflict was not disclosed by Burnette, and which conflict impaired and compromised her business judgment at IPC in conducting business matters involving Garland and/or Goad.

116.    Unbeknownst to IPC, Burnette owns and has been employed, and continues to own and be employed, by Elite, which conflict was not disclosed to IPC by Burnette, and which conflict impaired and compromised her business judgment at IPC in conducting business matters involving Garland and Goad.

117.    Unbeknownst to IPC, on or about June 14, 2019, which was after Goad had terminated his employment at IPC, Garland, Goad and/or Burnette formed Elite Urgent Care, PLLC, a Tennessee limited liability company.  The principal place of business for Elite Urgent Care, PLLC, is in Piney Flats, Tennessee and is a property owned by Garland.  Elite Urgent Care, PLLC, uses the same billing address as MAC, a company owned by Goad.    Burnette has been employed, and continues to be employed, by Elite Urgent Care, PLLC, which is a conflict of interest that was not disclosed to IPC by Burnette, and which conflict impaired and compromised her business judgment at IPC in conducting business matters involving Garland and Goad.

118.    Burnette has been supervised by, and/or collaborated with, Garland during the time period during which Burnette was employed by MAC.  That supervision and/or collaboration continues to this day.

119.    Burnette has been supervised by, and/or collaborated with, Goad during the time period during which Burnette has been employed by MAC.  That supervision and/or collaboration continues to this day.

120.    Burnette has been supervised by, and/or collaborated with, Garland during the time period during which Burnette has been employed by Elite Urgent Care, PLLC.  That supervision and/or collaboration continues to this day.

121.    Burnette has been supervised by, and/or collaborated with, Goad during the time period during which Burnette has been employed by Elite Urgent Care, PLLC.  That supervision and/or collaboration continues to this day.

122.    Goad, individually and/or through an entity, has been, and/or still is, a business customer of Burnette in Elite.

123.    Garland, individually and/or through an entity, has been, and/or still is, a business customer of Burnette in Elite.

124.    Burnette was supervised by, and/or collaborated with, Garland during the time period during which Burnette and Garland were both employed by IPC.

125.    Burnette was supervised by, and/or collaborated with, Goad during the time period during which Burnette and Goad were both employed by IPC.

126.    Burnette was supervised by, and/or collaborated with, Goad during the time period during which Burnette was employed by IPC although Goad was no longer employed by IPC.

127.    Garland and Burnette were supervised by, and/or collaborated with, Goad during the time period during which Garland and Burnette were employed by IPC although Goad was no longer employed by IPC.

128.    Burnette was a business partner of Goad during the time period during which Burnette was employed by IPC although Goad was no longer employed by IPC.

129.    Burnette was a business partner of Garland outside of their employment at IPC, during the time period during which Burnette and Garland were employed by IPC.

130.    IPC terminated Burnette's employment in September 2021.

**E.    Background On Each Physician's Employment At IPC.**

131.    Fant, who was employed as a physician at MAEC, was hired as a physician by IPC on or around August 31, 2015, when IPC acquired MAEC.

132.    Campbell was hired as a physician by IPC on or around January 9, 2017.

133.    Bell was hired as a physician by IPC on or around June 1, 2020.

134.    Fant, Campbell and Bell were all Physicians during their respective employments at IPC (each will be individually referred to herein as a "Physician", and collectively as a group as the "Physicians").

135.    Through each Physician's employment at IPC, each Physician was given access to the confidential and proprietary information of IPC, including but not limited to the confidential and proprietary information of MAEC that Goad and Garland had sold to IPC.  That information included but was not limited to IPC's confidential and proprietary information about its program and workforce for providing post-acute medical care to patients and residents in skilled/long-term care and assisted living/retirement facilities.  Included therein were the terms and conditions of IPC's contracts, as well as the opportunities for contracts, with skilled/long-term care and assisted living/retirement facilities for medical directorships and/or for the provision of physician and advanced practice clinician medical care services.  Also included therein were the terms and conditions of contracts, as well as the opportunities for contracts, involving the physicians and advanced practice clinicians who IPC employed or who IPC had the opportunity to employ.

30

136.    On August 28, 2019, each Physician executed a Medical Professional Employment Agreement with IPC.  A true and correct copy of the Agreements signed by each Physician is attached hereto as collective Exhibit H and incorporated herein by reference.  The Agreement that each Physician signed is referred to herein as the "Physician Agreement".

137.    Each Physician Agreement was supported by valuable and sufficient consideration. For instance, among other mutual promises and obligations, each Physician received continued employment at IPC.  In addition, in exchange for each Physician agreeing to be bound by certain restrictive covenants [*see, e.g.*, Exhibit H (§§ 13-14)], IPC agreed to provide benefits in the event IPC terminated the employment "without cause" [*see, e.g.*, Exhibit H (§§ 12.1-12.2)].

138.    Each Physician Agreement contained an Addendum "2" setting forth certain definitions to apply throughout each Physician Agreement (and therefore herein), including:

> **Definitions**:
> A.      "**Facility**" or "**Facilities**" shall mean any post-acute and/or long term care facility, or any other health care related facility or entity that provides services to residents in a post-acute and/or long term care setting, including but not limited to skilled nursing facilities, nursing homes, assisted living facilities, adult care homes, independent living facilities, hospices and other related settings where Professional performed services on behalf of Company during Professional's employment with Company.
>
> B.      "**Business Operations**" shall mean the arranging for and/or the provision of Facilities-based medical care and associated services at or for any post-acute and/or long term care facility, or at or for any other health care related facility or entity that provides services to residents in a post-acute and/or long term care setting, including but not limited to skilled nursing facilities, nursing homes, assisted living facilities, adult care homes, independent living facilities, hospices and other related settings.

*See* Exhibit H (Addendum "2").

139.    Via the Physician Agreement, each Physician agreed to assume certain professional duties as an employee of IPC.  Those duties included but were not necessarily limited to rendering medical services, performing administrative services including medical director services, and

providing collaboration and/or supervision for advanced practice clinicians at the Facilities designated by IPC.  *See* Exhibit H (§ 1).

140.   Via the Physician Agreement, each Physician agreed to perform his/her professional duties on a full-time, exclusive basis for IPC, in pertinent part:

> Exclusive Basis.  Professional agrees to render Services on behalf of Company on a full-time, exclusive basis.  Professional agrees that he or she shall not render professional medical services for any other person or party and shall not engage in any other health care related business or profession during the Term of this Agreement without prior written notice to and written approval from the Company's Vice President of Operations.

*See* Exhibit H (§ 2).  In addition, each Physician represented and warranted that he/she "shall, at all times during the term of this Agreement provide medical and other health care related services (including medical directorship and other similar services) only through Company."   *See* Exhibit H (§ 2).  Each Physician further agreed that:

> Professional shall promptly pay to and hereby assigns to the Company all income earned and received by Professional from any person or entity other than Company related to the rendering of Professional's medical services (including medical directorship services) on behalf of the Company during the Term of this Agreement.

*Id.*

141.   Via the Physician Agreement, each Physician agreed to safeguard and to not disclose to others IPC's proprietary and confidential information, specifically:

> Proprietary and Confidential Information.  Professional agrees at all times during the Term of this Agreement and following termination of this Agreement, to maintain in all respects, and not to disclose to any third party, any confidential or private information relating to the business practices, operations, contracts, trade secrets, pricing and any other confidential information of Company, including the terms of this Agreement.

*See* Exhibit H (§ 13.1).

142.   Via the Physician Agreement, each Physician agreed to not interfere and unfairly compete with IPC.  There were three subparts to the noninterference and restriction on unfair competition to which each Physician agreed.  *See* Exhibit H (§ 14).

143.     In the first subpart, each Physician acknowledged IPC's legitimate protectable interest in its relationships with its Facilities, and in its relationships with its employees and contractors, providing in pertinent part:

> Noninterference.  Professional acknowledges that Company has a protectable interest in its relationships with each post-acute and/or long term care facility, or with each other health care related facility or entity that provides services to residents in a post-acute and/or long term care setting, including but not limited to skilled nursing facilities, nursing homes, assisted living facilities, adult care homes, independent living facilities, hospices, and other related settings, where Company arranges for provision of medical coverage and other mutually agreed-upon services (each a "Company-Served Facility," and collectively "Company Served Facilities"), and with employees and contractors of the Company, all of which have been developed by Company at Company's considerable effort and expense.

*See* Exhibit H (§ 14.1).  To protect this legitimate interest, each Physician agreed that:

> Therefore, Professional agrees that during the Term of this Agreement and for one (1) year following expiration or termination of this Agreement for any reason, Professional will not, either individually, or in conjunction with any other person, entity or third party, directly or indirectly solicit or interfere with Company's or its division's relationships or agreement with any Company-Served Facility, or any employees and contractors of Company, which prohibited activity shall include: (i) encouraging or inducing any Company-Served Facility, or any employees and contractors of Company to terminate or modify their relationship with Company or its divisions, or its affiliated companies, or (ii) providing services at any Company-Served Facility after engaging in any of the prohibited activity set forth in (i) above.

*Id.*

144.     In the second subpart, each Physician acknowledged IPC's legitimate protectable interest in its goodwill and in its materials (including trade secrets, proprietary and confidential information, referral sources, and customers and payors), and agreed to protect that goodwill and those materials, as well as to further enforce the agreements and covenants in the proprietary and confidential information section (Section 13, including subpart 13.1) of the Physician Agreement, by agreeing not to compete as follows:

> Agreement Not to Compete.                    * * * * *

(a)      During Professional's employment hereunder and for a period of one (1) year following the last day of the term hereof (the "Restricted Period"), Professional shall not directly or indirectly enter into, engage, participate, or allow Professional's name to be used in or in connection with any business or activity that is in competition in any manner whatsoever with the Business Operations (as defined in Addendum "2") of Company and that involves the provision by Professional of Services at any Facility where Professional rendered Services during Professional's employment with Company.

See Exhibit H (§ 14.2(a)).

145.    In the third subpart, each Physician acknowledged the reasonableness of the noninterference and restriction on unfair competition provision, agreeing:

Reasonableness.  Professional acknowledges and agrees that the breach of the provision of Sections 14.1 and 14.2 will give rise to irreparable injury to Company which cannot be adequately compensated with monetary damages.  Professional acknowledges that Professional's obligations under this Agreement are reasonable in the context of the nature of Company's business and the competitive injuries likely to be sustained by Company if Professional were to violate such obligations.

See Exhibit H (§ 14.3).  In addition, in that subpart each Physician agreed that the noninterference and restriction on unfair competition provision will survive termination or expiration of the Physician Agreement for any reason, specifically:

Professional specifically agrees that the provisions of this Section 14 shall survive the termination or expiration of this Agreement for any reason, regardless of the reason therefore or the correctness thereof.

Id.

146.    The Physician Agreement of each Physician was signed by Garland on IPC's behalf.

147.    Each Physician (except for Campbell) was supervised by, and/or collaborated with, Garland during the time period during which the Physician was employed by MAEC.

148.    Each Physician was supervised by, and/or collaborated with, Garland during the time period during which the Physician was employed by IPC.

34

149.    Each Physician (except for Campbell) was supervised by, and/or collaborated with, Burnette during the time period during which the Physician was employed by MAEC.

150.    Burnette was the Vice President of Operations over each Physician during the time period during which the Physician was employed by IPC.

151.    Each Physician (except for Campbell) was supervised by, and/or collaborated with, at least one of the other Physicians during the time period during which the Physician was employed by MAEC.

152.    Each Physician was supervised by, and/or collaborated with, one or more of the other Physicians during the time period during which the Physician was employed at IPC.

153.    Each Physician (except for Campbell) was supervised by, and/or collaborated with, Goad during the time period during which the Physician was employed by MAEC.

154.    Each Physician was supervised by, and/or collaborated with, Goad during the time period during which each Physician and Goad were both employed by IPC.

155.    Each Physician was supervised by, and/or collaborated with, Goad during the time period during which each Physician was employed by IPC although Goad was no longer employed by IPC.

**F.    Background On Each Advanced Practice Clinician's Employment At IPC.**

156.    Smith, who was employed as a nurse practitioner at MAEC, was hired as a nurse practitioner by IPC on or around August 31, 2015, when IPC acquired MAEC.

157.    Curtis, who was employed as a nurse practitioner at MAEC, was hired as a nurse practitioner by IPC on or around August 31, 2015, when IPC acquired MAEC.

158.    Lyons, who was employed as a nurse practitioner at MAEC, was hired as a nurse practitioner by IPC on or around August 31, 2015, when IPC acquired MAEC.

159. Roy, who was employed as a physician assistant at MAEC, was hired as a physician assistant by IPC on or around August 31, 2015, when IPC acquired MAEC.

160. Gambill, who was employed as a nurse practitioner at MAC, was hired as a nurse practitioner by IPC on or around March 2, 2017, when IPC acquired its companion company MAEC.

161. Vaughn, who was employed as a nurse practitioner at MAC, was hired as a nurse practitioner by IPC on or around June 1, 2018, when IPC acquired its companion company MAEC.

162. Cupp was hired as a nurse practitioner by IPC on or around September 12, 2016.

163. Jones was hired as a nurse practitioner by IPC on or around February 11, 2019.

164. Van Auken was hired as a nurse practitioner by IPC on or around October 12, 2015.

165. Carlton was hired as a nurse practitioner by IPC on or around March 1, 2017.

166. Lanier was hired as a nurse practitioner by IPC on or around June 17, 2019.

167. Bolden was hired as a nurse practitioner by IPC on or around August 28, 2019.

168. Obrist was hired as a nurse practitioner by IPC on or around August 17, 2015.

169. Young was hired as a nurse practitioner by IPC on or around August 28, 2019.

170. Smith, Curtis, Lyons, Roy, Gambill, Vaughn, Cupp, Jones, Van Auken, Carlton, Lanier, Bolden, Obrist, and Young were all Advanced Practice Clinicians during their respective employments at IPC (each will be individually referred to herein as an "APC", and collectively as a group as the "APCs").

171. Through each APC's employment at IPC, each APC was given access to the confidential and proprietary information of IPC, including but not limited to the confidential and proprietary information of MAEC that Goad and Garland had sold to IPC. That information included but was not limited to IPC's confidential and proprietary information about its program

and workforce for providing post-acute medical care to patients and residents in skilled/long-term care and assisted living/retirement facilities.  Included therein were the terms and conditions of IPC's contracts, as well as the opportunities for contracts, with skilled/long-term care and assisted living/retirement facilities for medical directorships and/or for the provision of physician and advanced practice clinician medical care services.  Also included therein were the terms and conditions of contracts, as well as the opportunities for contracts, involving the physicians and advanced practice clinicians who IPC employed or who IPC had the opportunity to employ.

172.    On August 20, 2019, Lanier executed a Medical Professional Employment Agreement with IPC, while the other APCs executed a Medical Professional Employment Agreement with IPC on August 28, 2019.  A true and correct copy of these Agreements are attached hereto as collective Exhibit I and incorporated herein by reference.  The Agreement that each APC signed is referred to herein as the "APC Agreement".

173.    Each APC Agreement was supported by valuable and sufficient consideration.  For instance, among other mutual promises and obligations, each APC received continued employment at IPC.  In addition, in exchange for each APC agreeing to be bound by certain restrictive covenants [see, e.g., Exhibit I (§§ 13-14)], IPC agreed to provide benefits in the event IPC terminated the employment "without cause" [see, e.g., Exhibit I (§§ 12.1-12.2)].

174.    Each APC Agreement contained an Addendum "2" setting forth certain definitions to apply throughout each APC Agreement (and therefore herein), including:

**Definitions**:
A.    "**Facility**" or "**Facilities**" shall mean any post-acute and/or long term care facility, or any other health care related facility or entity that provides services to residents in a post-acute and/or long term care setting, including but not limited to skilled nursing facilities, nursing homes, assisted living facilities, adult care homes, independent living facilities, hospices and other related settings where Professional performed services on behalf of Company during Professional's employment with Company.

B.    "**Business Operations**" shall mean the arranging for and/or the provision of Facilities-based medical care and associated services at or for any post-acute and/or long term care facility, or at or for any other health care related facility or entity that provides services to residents in a post-acute and/or long term care setting, including but not limited to skilled nursing facilities, nursing homes, assisted living facilities, adult care homes, independent living facilities, hospices and other related settings.

*See* Exhibit I (Addendum "2").  These are also the same definitions set forth in the Physician

Agreements attached hereto as Exhibit H.

175.    Via the APC Agreement, each APC agreed to assume certain professional duties as

an employee of IPC.  Those duties included but were not necessarily limited to rendering medical

services at the Facilities designated by IPC.  *See* Exhibit I (§ 1).

176.    Via the APC Agreement, each APC agreed to perform his/her professional duties

on a full-time, exclusive basis for IPC, in pertinent part:

Exclusive Basis.  Professional agrees to render Services on behalf of Company on a full-time, exclusive basis.  Professional agrees that he or she shall not render professional medical services for any other person or party and shall not engage in any other health care related business or profession during the Term of this Agreement without prior written notice to and written approval from the Company's Vice President of Operations.

*See* Exhibit I (§ 2).  In addition, each APC represented and warranted that he/she "shall, at all times

during the term of this Agreement provide medical and other health care related services (including

medical directorship and other similar services) only through Company."   *See* Exhibit I (§ 2).

Each APC further agreed that:

Professional shall promptly pay to and hereby assigns to the Company all income earned and received by Professional from any person or entity other than Company related to the rendering of Professional's medical services (including medical directorship services) on behalf of the Company during the Term of this Agreement.

*Id.*

177.    Via the APC Agreement, each APC agreed to safeguard and to not disclose to others

IPC's proprietary and confidential information, specifically:

> Proprietary and Confidential Information.  Professional agrees at all times during the Term of this Agreement and following termination of this Agreement, to maintain in all respects, and not to disclose to any third party, any confidential or private information relating to the business practices, operations, contracts, trade secrets, pricing and any other confidential information of Company, including the terms of this Agreement.

*See* Exhibit I (§ 13.1).

178.    Via the APC Agreement, each APC agreed to not interfere and unfairly compete with IPC.  There were three subparts to the noninterference and restriction on unfair competition to which each APC agreed.  *See* Exhibit I (§§ 14)].

179.    In the first subpart, each APC acknowledged IPC's legitimate protectable interest in its relationships with its Facilities, and in its relationships with its employees and contractors, providing in pertinent part:

> Noninterference.  Professional acknowledges that Company has a protectable interest in its relationships with each post-acute and/or long term care facility, or with each other health care related facility or entity that provides services to residents in a post-acute and/or long term care setting, including but not limited to skilled nursing facilities, nursing homes, assisted living facilities, adult care homes, independent living facilities, hospices, and other related settings, where Company arranges for provision of medical coverage and other mutually agreed-upon services (each a "Company-Served Facility," and collectively "Company Served Facilities"), and with employees and contractors of the Company, all of which have been developed by Company at Company's considerable effort and expense.

*See* Exhibit I (§ 14.1).  To protect this legitimate interest, each APC agreed that:

> Therefore, Professional agrees that during the Term of this Agreement and for one (1) year following expiration or termination of this Agreement for any reason, Professional will not, either individually, or in conjunction with any other person, entity or third party, directly or indirectly solicit or interfere with Company's or its division's relationships or agreement with any Company-Served Facility, or any employees and contractors of Company, which prohibited activity shall include: (i) encouraging or inducing any Company-Served Facility, or any employees and contractors of Company to terminate or modify their relationship with Company or its divisions, or its affiliated companies, or (ii) providing services at any Company-Served Facility after engaging in any of the prohibited activity set forth in (i) above.

*Id.*

180.   In the second subpart, each APC acknowledged IPC's legitimate protectable interest in its goodwill and in its materials (including trade secrets, proprietary and confidential information, referral sources, and customers and payors), and agreed to protect that goodwill and those materials, as well as to further enforce the agreements and covenants in the proprietary and confidential information section (Section 13, including subpart 13.1) of the APC Agreement, by agreeing not to compete as follows:

Agreement Not to Compete.

\* \* \* \* \*

(a)   During Professional's employment hereunder and for a period of one (1) year following the last day of the term hereof (the "Restricted Period"), Professional shall not directly or indirectly enter into, engage, participate, or allow Professional's name to be used in or in connection with any business or activity that is in competition in any manner whatsoever with the Business Operations (as defined in Addendum "2") of Company and that involves the provision by Professional of Services at any Facility where Professional rendered Services during Professional's employment with Company.

See Exhibit I (§ 14.2(a)).

181.   In the third subpart, each APC acknowledged the reasonableness of the noninterference and restriction on unfair competition provision, agreeing:

Reasonableness.  Professional acknowledges and agrees that the breach of the provision of Sections 14.1 and 14.2 will give rise to irreparable injury to Company which cannot be adequately compensated with monetary damages.  Professional acknowledges that Professional's obligations under this Agreement are reasonable in the context of the nature of Company's business and the competitive injuries likely to be sustained by Company if Professional were to violate such obligations.

See Exhibit I (§ 14.3).  In addition, in that subpart each APC agreed that the noninterference and restriction on unfair competition provision will survive termination or expiration of the APC Agreement for any reason, specifically:

Professional specifically agrees that the provisions of this Section 14 shall survive the termination or expiration of this Agreement for any reason, regardless of the reason therefore or the correctness thereof.

Id.

182.     The APC Agreement of each APC was signed by Garland on IPC's behalf.

183.     Each APC (except for Cupp, Jones, Van Auken, Carlton, Lanier, Bolden and Obrist) was supervised by, and/or collaborated with, Garland during the time period during which the APC was employed by MAEC or MAC.

184.     Each APC was supervised by, and/or collaborated with, Garland during the time period during which the APC was employed by IPC.

185.     Each APC (except for Cupp, Jones, Van Auken, Carlton, Lanier, Bolden and Obrist) was supervised by, and/or collaborated with, Burnette during the time period during which the APC was employed by MAEC or MAC.

186.     Burnette was a Vice President of Operations for each APC during the time period during which the APC was employed by IPC.

187.     Each APC (except for Cupp, Jones, Van Auken, Carlton, Lanier, Bolden and Obrist) was supervised by, and/or collaborated with, at least one of the Physicians during the time period during which the APC was employed by MAEC or MAC.

188.     Each APC was supervised by, and/or collaborated with, one or more of the Physicians during the time period during which the APC was employed at IPC.

189.     Each APC (except for Cupp, Jones, Van Auken, Carlton, Lanier, Bolden and Obrist) was supervised by, and/or collaborated with, Goad during the time period during which the APC was employed by MAEC or MAC.

190.     Each APC was supervised by, and/or collaborated with, Goad during the time period during which the APC and Goad were both employed by IPC.

191.    Each APC was supervised by, and/or collaborated with, Goad during the time period during which the APC was employed by IPC although Goad was no longer employed by IPC.

192.    The Clinical Practice Manager/s for each APC during the time period that the APC was employed at IPC included Matthew Fife and/or Jessi Dalton.

**G.    Background On Each Clinical Practice Manager's Employment at IPC.**

193.    Dalton was hired by IPC on April 17, 2017.  With an effective date of June 17, 2019, Dalton became the Clinical Practice Manager at IPC with her direct supervisor being Burnette.

194.    Fife was hired by IPC on May 28, 2019.  With an effective date of November 16, 2020, Fife became the Senior Clinical Practice Manager at IPC with a supervisor being Burnette.

195.    Dalton and Fife were each Clinical Practice Managers during their respective employments at IPC (each will be individually referred to herein as a "CPM", and collectively as a group as the "CPMs").

196.    Through each CPM's employment at IPC, each CPM was given access to the confidential and proprietary information of IPC, including but not limited to the confidential and proprietary information of MAEC that Goad and Garland had sold to IPC.  That information included but was not limited to IPC's confidential and proprietary information about its program and workforce for providing post-acute medical care to patients and residents in skilled/long-term care and assisted living/retirement facilities.  Included therein were the terms and conditions of IPC's contracts, as well as the opportunities for contracts, with skilled/long-term care and assisted living/retirement facilities for medical directorships and/or for the provision of physician and advanced practice clinician medical care services.  Also included therein were the terms and

conditions of contracts, as well as the opportunities for contracts, involving the physicians and advanced practice clinicians who IPC employed or who IPC had the opportunity to employ.

197.    Each CPM signed a letter of understanding concerning the terms and conditions of the CPM's employment at IPC.  A true and correct copy of the agreement signed by each CPM is attached hereto as collective Exhibit J and incorporated herein by reference.  The agreement that each CPM signed is referred to herein as the "CPM Agreement".

198.    Each CPM Agreement was supported by valuable and sufficient consideration.  For instance, among other mutual promises and obligations, each CPM received position advancement and continued employment at IPC.

199.    In the CPM Agreement, each CPM agreed for her/his position at IPC to be "full-time."  *See* Exhibit J ("Position").  Each CPM also committed to "not engage in any other employment, consulting or other business activity (whether full-time or part-time) that could create a conflict of interest with the Company."  *Id*.  At the time of the signing of each CPM Agreement, each CPM confirmed that she/he had no contractual commitments or other legal obligations that would prohibit the CPM from performing her/his full-time position with IPC.   *Id.*

200.    Via the CPM Agreement, each CPM agreed to safeguard and to not disclose to others IPC's proprietary and confidential information, specifically:

> You will not, during the term of your employment with TeamHealth, or thereafter, use or disclose to any third party, any Confidential Information of or concerning TeamHealth.  "Confidential Information" shall mean information concerning TeamHealth, whether written or oral, which you possess or become aware of during the course of your employment and which has not been publicly disclosed.  Confidential Information shall not be deemed "publicly disclosed" if disclosed by you in violation of this Agreement or as a result of such information being disclosed to employees or agents of TeamHealth.  Moreover, you agree that all Confidential Information shall be deemed to be trade secrets.

*See* Exhibit J ("Confidentiality and Noncompetition").

201.     Via the CPM Agreement, each CPM agreed to not interfere and unfairly compete with IPC, specifically:

> . . . you agree that during the term of your employment, and for one (1) year following the termination of your employment for any reason, you will not engage in any of the following activities in any geographical market or region where you had management responsibilities during your employment with TeamHealth or its related companies: (i) work for or otherwise participate in any business that provides medical services to residents of skilled nursing facilities, nursing homes, assisted living facilities or any business that manages another entity that provides such services; (ii) solicit or hire (on your own behalf or on behalf of any other party, including on behalf of any future employers) any person who is then, or was during the period in which you were employed by us, an employee or contractor (including contract clinicians) of TeamHealth or its related companies, or (iii) solicit, induce or attempt to induce, directly or indirectly, any person or entity doing business with TeamHealth to terminate such relationship, or (iii) work for any other entity who utilizes your knowledge and experience with TeamHealth to perform any of the competitive activities listed above that you are personally prohibited from performing.

*See* Exhibit J ("Confidentiality and Noncompetition").

202.     Each CPM was supervised by, and/or collaborated with, Garland during the time period during which the CPM was employed by IPC.

203.     Burnette was a Vice President of Operations for each CPM during the time period during which the CPM was employed by IPC.

204.     Burnette and Dalton engaged in conflicts of interest at IPC, as unbeknownst to IPC Dalton was employed by Elite which conflict was not disclosed by either Burnette or Dalton.

205.     Each CPM was supervised by, and/or collaborated with, one or more of the Physicians during the time period during which the CPM was employed at IPC.

206.     Dalton was supervised by, and/or collaborated with, Goad during the time period during which Dalton and Goad were both employed by IPC.

207.     Each APC was supervised by, and/or collaborated with, Goad during the time period during which the APC was employed by IPC although Goad was no longer employed by IPC.

### H.  Goad's Termination Of His Employment At IPC.

208.   Unbeknownst to IPC, by at least December 7, 2017, Goad had decided to terminate his employment at IPC.  Goad had decided that working for IPC no longer made him happy.

209.   By at least December 7, 2017, Burnette and/or Garland knew that Goad was going to terminate his employment at IPC.

210.   On December 26, 2017, Goad gave verbal notice to Burnette that he was resigning his employment at IPC.

211.   On January 8, 2018, Goad sent to Burnette his written notice of his resignation from his employment at IPC.

212.   Although Burnette knew of Goad's resignation of employment at IPC back in December 2017, she waited until after January 8, 2018 to notify IPC of Goad's resignation.

213.   Goad's resignation notice set his last day of employment at IPC for February 28, 2018.  Burnette and Goad, and/or Garland, agreed for Goad to remain employed at IPC on a part-time basis through March 31, 2018.  Burnette, however, represented to IPC on January 31, 2018 that Goad's termination date was February 28, 2018.  In addition, Goad and IPC never executed an amendment to his employment agreement so as to change his employment status from full-time to part-time; and Goad never submitted a revised resignation letter changing his termination date from February 28, 2018 to March 31, 2018.

214.   Although purporting to be employed on a part-time basis for IPC during the month of March 2018, Goad was paid by IPC, and did receive from IPC, pay as if he was employed on a full-time basis for IPC.  Goad has never repaid to IPC that additional compensation with which he absconded.

45

I.      **Goad's Employment With, And The Formation Of, Competitors To IPC.**

215.    On or around August 6, 2018, Goad (who was no longer employed at IPC) instructed Dalton (who was still employed at IPC, and who unbeknownst to IPC was also employed by Elite) to submit a request for IPC to provide to Goad a copy of his employment agreement with IPC.

216.    Goad wanted a copy of his employment agreement with IPC so that he could provide it to GAPS Health, a physicians-led competitor of IPC.  Goad did provide his employment agreement with IPC to GAPS Health.  Goad also wanted a copy of the employment agreement so that a scheme could be devised to attempt to disrupt and circumvent the noninterference and noncompetition provision, and/or the confidential and proprietary information provision, of that agreement, which provisions survived Goad's termination of his employment with IPC.

217.    Dalton submitted Goad's request for a copy of his employment agreement to IPC on August 6, 2018 as instructed by Goad.  Dalton then privately forwarded this request directly to Burnette, even though Burnette was not yet Dalton's direct supervisor at IPC given that Dalton would not become a CPM who reported directly to Burnette at IPC until June 17, 2019 (although unbeknownst to IPC Burnette was Dalton's employer at Elite).

218.    In October 2018, which was within two months of Goad's request for his IPC employment agreement, Goad became employed by GAPS Health.

219.    GAPS Health is in the business of providing post-acute medical care to patients and residents in skilled/long-term care and assisted living/retirement facilities.

220.    At the time GAPS Health employed Goad, the business of GAPS Health had not yet been established in Virginia, North Carolina and/or South Carolina.  That is, at the time of Goad's employment, GAPS Health did not have medical directorship or provider contracts with skilled/long-term care and assisted living/retirement facilities in Virginia, North Carolina and/or

South Carolina.  GAPS Health also had not yet employed a workforce of physicians and advanced practice clinicians so as to be able to render post-acute medical care to these facilities.

221.    At the time of Goad's hiring, though, GAPS Health was a national competitor of IPC.

222.    Goad was employed by GAPS Health as its Chief Clinical Officer.

223.    Goad's job duties at GAPS Health included program and workforce development for GAPS Health.  Those duties included Goad developing and implementing a program to obtain medical directorship and/or physician and advanced practice clinician provider contracts with skilled/long-term care and assisted living/retirement facilities in Virginia, North Carolina and/or South Carolina.   Goad's duties also included his forming and developing a workforce of physicians and advanced practice clinicians to enable GAPS Health to perform medical directorship and/or physician and advanced practice clinician provider contracts at skilled/long-term care and assisted living/retirement facilities in Virginia, North Carolina and/or South Carolina.

224.    A method through which GAPS Health conducts its business is to have officers and/or physicians that it employs to form and/or incorporate one or more entities in each state in which it plans to obtain and perform medical directorship and/or physician and advanced practice clinician provider contracts.

225.    On June 3, 2019, Goad, individually and/or through his employment with GAPS Health, formed Claris Health, PLLC ("Claris Health").  Claris Health is a limited liability company organized under the laws of Virginia with a principal place of business at 1303 Autumn Mist Way, Arlington, Texas 76005, and an additional place of business at 200 The Glebe Blvd, Daleville, Virginia 24083. Claris Health's principal place of business address is the address of a founder of

47

GAPS Health.  Claris Health is in the business of medical directorships and/or providing post-acute medical care to patients and residents in skilled/long-term care and assisted living/retirement facilities.  So as of June 3, 2019, Goad and/or GAPS Health had formed at least one entity to interfere and compete with IPC in Virginia.

226.    During that same month, on June 12, 2019, Goad, through his employment with GAPS Health, formed GAPS Health NC, PLLC ("GAPS Health NC") under the laws of the State of North Carolina.  GAPS Health NC is in the business of medical directorships and/or providing post-acute medical care to patients and residents in skilled/long-term care and assisted living/retirement facilities.  In forming GAPS Health NC Goad used the same phone number that he used when he had formed MAEC and/or MAC in Virginia.   Goad is the authorized officer of GAPS Health NC.  So as of June 12, 2019, Goad and GAPS Health had formed an entity to interfere and compete with IPC in North Carolina.

227.    On November 13, 2019, Goad, individually and/or through his employment with GAPS Health, formed Premier Geriatric Solutions, PLLC ("PGS") under the laws of the Commonwealth of Virginia.  PGS is in the business of medical directorships and/or providing post-acute medical care to patients and residents in skilled/long-term care and assisted living/retirement facilities.  So as of November 13, 2019, Goad and/or GAPS Health had formed another entity to interfere and compete with IPC in Virginia.

228.    On September 15, 2020, GAPS Health NC was registered to do business in South Carolina.  So as of September 15, 2020, Goad and GAPS Health had registered an entity to interfere and compete with IPC in South Carolina.

229.    Since Goad left his IPC employment, GAPS Health, Claris Health, GAPS Health NC, and PGS, along with Elite (with whom Goad, GAPS Health, Claris Health, GAPS Health NC,

PGS, MAC and/or Elite Urgent Care, PLLC are customers), have become, individually and/or in concert, competitors of IPC in Virginia, North Carolina and/or South Carolina (each will be individually referred to herein as a "Competitor," and collectively as a group as the "Competitors").

**J.      The Goad Conspiracy Group.**

230.    Goad, along with Burnette, Garland and/or Dalton (each of whom remained employed at IPC), and/or along with one or more of the Competitors, associated themselves into an enterprise (the "Goad Conspiracy Group") wherein they conspired, participated in, and accomplished a scheme to convert, steal and misappropriate the business assets, contracts, workforce, and expectancies of IPC in at least Virginia, North Carolina and South Carolina.

231.    Each of the remaining defendant Physicians, APCs and CPMs have joined and participated in the Goad Conspiracy Group and its scheme against IPC.

232.    The result of this conspiracy was that the Goad Conspiracy Group became a facsimile of IPC under the name of one or more of the Competitors in the Group.  For instance, in Virginia this in part resulted in the reincarnation of MAEC, which IPC had purchased from Goad, under the name PGS.

233.    Tellingly, at the time that Goad left his employment at IPC, none of the Competitor members of the Goad Conspiracy Group had any of the medical directorship contracts, or the physician and advanced practice clinician provider contracts, at the skilled/long-term care and assisted living/retirement facilities in Virginia, North Carolina and South Carolina about which IPC complains.  Presently, however, after performance of the Goad Conspiracy Group, IPC no longer has its contracts with those facilities, because Goad and/or one or more of the Competitors in the Goad Conspiracy Group now has them.  In other words, IPC's business at these facilities in

Virginia, North Carolina and South Carolina has been converted, stolen and misappropriated into the business of Goad and/or one or more of the competitors of the Goad Conspiracy Group.

234.    In addition, at the time that Goad left his employment at IPC, none of the Physicians, APCs and/or CPM members of the Goad Conspiracy Group were employed by or through Goad or one or more of the Competitor members of the Group as a provider to render post-acute medical care to the skilled/long-term care and assisted living/retirement facilities in Virginia, North Carolina and South Carolina about which IPC complains.  Presently, however, after performance of the Goad Conspiracy Group all of them are employed, or have assurances of future employment, by or through Goad or one or more of the Competitor members of the Group as a provider to render post-acute medical care to those facilities in Virginia, North Carolina and South Carolina.  In other words, IPC's business workforce has been converted, stolen and misappropriated into the business workforce of Goad and/or one or more of the competitors of the Goad Conspiracy Group.

235.    IPC was targeted by the Goad Conspiracy Group as IPC possessed what was required to provide post-acute medical care services at facilities in the mid-atlantic region, which the Goad Conspiracy Group coveted but did not possess.  For one, IPC had purchased from Goad and Garland the business assets of MAEC, as well as Goad's and Garland's personal goodwill and rights to engage in the Business.  Two, IPC did have the medical director contracts at each facility about which IPC complains, and/or otherwise the reputation, goodwill and proprietary information necessary to secure other such contracts.  Three, IPC did have the physician and advanced practice clinician provider contracts to render post-acute medical care services at each facility about which IPC complains, and/or otherwise the reputation, goodwill and business information necessary to secure other such contracts.  Four, IPC did have a workforce of physicians and/or advanced

practice clinicians under contract that is necessary to render post-acute medical care services at each facility about which IPC complains, and/or otherwise the reputation, goodwill and business information necessary to grow that workforce.

236.   IPC was targeted by the Goad Conspiracy Group because the Goad Conspiracy Group had access, albeit unlawful, to IPC's assets and confidential and proprietary information. That access was unlawful as IPC had never authorized the Competitor members of the Goad Conspiracy Group to have access to the information, and otherwise, because it was used and disclosed by other members of the Goad Conspiracy Group in violation of the Asset Purchase Agreement and/or restrictive covenants in their respective employment agreements with IPC.

237.   IPC was targeted by the Goad Conspiracy Group because some of its members (e.g., Garland, Burnette, and/or Dalton) had business interests with Goad and/or other members of the Group that conflicted with his or her professional duties owed to IPC, which impaired and compromised their business judgment as to IPC in matters involving Goad and/or the Goad Conspiracy Group, and which jeopardized their ability to continue to prosper from their business side hustles if they did not participate in the Goad Conspiracy Group.

238.   IPC was targeted by the Goad Conspiracy Group because one of the Group's leaders, Goad, wanted to take back business assets, contracts, workforce, and expectancies that he had previously sold to IPC and/or that was developed while Goad was employed at IPC, while his new employers (i.e., GAPS Health, GAPS Health NC, Claris Health, and PGS) desired entry into the Virginia, North Carolina and South Carolina markets – with none of them wanting to pay for IPC's business.

**K.      The Pattern Racketeering Of The Goad Conspiracy Group.**

239.     There were multiple pattern methodologies through which Defendants' business conspiracy accomplished converting, stealing and misappropriating the business assets, contracts, workforce and expectancies of IPC for Defendants' own, including but not necessarily limited to Defendants' pattern of racketeering: (a) to terminate IPC's contracts at facilities; (b) to get IPC to relinquish its restrictive covenants in the APC Agreements on false pretenses; and (c) to misappropriate IPC's assets, and confidential and proprietary information.

*a.      Pattern Of Racketeering To Terminate IPC's Contracts At Facilities.*

240.     The Goad Conspiracy Group engaged in a pattern of racketeering to terminate IPC's contracts at skilled/long-term care and assisted living/retirement facilities in at least Virginia, North Carolina and/or South Carolina.  This pattern utilized a number of methodologies.

241.     One methodology involved members of the Goad Conspiracy Group disparaging IPC to its facility customers to induce the facility to terminate its contract/s with IPC and to replace IPC at the facility with one or more of the Competitor members of the Goad Conspiracy Group. The disparagement played on purported deficiencies of IPC, the appearance of which were generated by members of the Group who were insiders at IPC.

242.     For example, the Carrington Place facilities contacted IPC through Dalton on March 10, 2021 inquiring as to having to deny a patient admission because Campbell's (a Physician) credentials were not approved on the insurer's network, thereby causing the facility to lose the admission.   On April 12, 2021, Dalton disparaged IPC to the customer when she represented to that customer: ". . . I have been trying to get this resolved for a year with our credentialing department."  She then recommended Goad and one of the Competitors in the Goad Conspiracy Group to this IPC customer, specifically:

> However, Dr. Campbell has resigned from TeamHealth as of 6/1/21 and will be going to work for Premier Geriatrics with Bradley Goad, DO. I have his email if you need it. You can reach out to him and make sure to let him know that Dr. Campbell needs to be credentialed with Aetna and hopefully he can get the issue resolved for you.

The customer responded by requesting Goad's contact information, which Dalton immediately provided to the customer on April 12, 2021, which included Competitor PGS. Three days earlier, on April 9, 2021, however, Dalton had sent to Goad IPC's credentialing information on Campbell, including: IPC's certificate of insurance which IPC obtained on December 16, 2019; the June 15, 2020 Virginia Department of Health license lookup that IPC obtained on June 15, 2020; and the DEA registration which IPC obtained on August 7, 2020. On April 28, 2021, Dalton further wrote to the customer as follows:

> I just wanted to inform you that Ryan Carlton's last day with TeamHealth is May 31, 2021. If you are planning to stay with TeamHealth I will work on getting a new NP set up in your facility. If you are planning on going with him to the new company please send a 30 day termination letter as soon as possible. Also, most facilities that have gone with Dr. Goad's group have kept TeamHealth behavioral health services in their building.

Two days later, on April 30, 2021, the customer terminated its contract with IPC replacing IPC with Goad through one of the Competitor members of the Goad Conspiracy Group.

243.    A second methodology involved the Goad Conspiracy Group orchestrating "voluntary" or "mutual" medical directorship termination to induce and enable Competitor members of the Group to replace IPC at those facilities. The "voluntary" or "mutual" aspect of this methodology entailed insider members (e.g., Garland, Burnette, Dalton and/or Fife) of the Goad Conspiracy Group performing a "voluntary" or "mutual" termination of IPC's medical director contract with a facility and recommending that IPC be replaced in that role by Goad through one or more of the Competitors in the Goad Conspiracy Group.

244.    For example, on April 22, 2020 Burnette authorized IPC's "voluntary" termination of its medical director contract at the Pheasant Ridge facility with the recommendation that Goad

through one or more of the Competitors take over the medical director contract at this facility for IPC.  Burnette had Dalton communicate this termination to the facility stating in part: "After speaking with Carrie Burnette, VPO [Vice President of Operations at IPC] we feel that is best to have Bradley Goad, DO take over the Medical Directorship at your facility . . ."

245.   Two days later, on April 24, 2020, Burnette and Dalton had IPC "mutually" terminate the medical director contracts for the Liberty Ridge facility and the Alta Vista facility with the recommendation that Goad through one or more of the Competitors take over the medical director contract at each of those facilities.

246.   A third methodology involved the placeholding of medical directorships at facilities until after expiration of Goad's restrictive covenants in his employment contract at IPC, after which time the placeholder would be replaced by Goad through one or more of the Competitor members of the Group thereby replacing IPC at those facilities.  This placeholding process allowed Goad to become employed by, and to form, the Competitor members of the Goad Conspiracy Group after he terminated his employment at IPC.  Once those Competitors were formed, the placeholder Physicians stepped-aside as the medical director, or otherwise contrived his or her unavailability so as to necessitate a replacement medical director, so that Goad through one or more of the Competitors could convert and steal the medical director contract at the facility for one or more of the Competitors in the Goad Conspiracy Group.

247.   For example, with Goad's termination of his employment at IPC in 2018, Burnette replaced Goad as the medical director at IPC facility customer, Brian Center Alleghany, and at IPC facility customer, Kissito Hot Springs, with Dr. William Ward ("Ward") (who had worked for Goad, Garland and/or Burnette at MAEC prior to its acquisition by IPC).  Ward was a placeholder for Goad, as subsequent to the Competitor members of the Goad Conspiracy Group employing

Goad and/or being formed, Goad stepped-in through one or more of those Competitors and became the medical director for those facilities.

248.    In another example Burnette replaced Goad as the medical director at IPC facility customer, Brian Center Botetourt, with Campbell.  Campbell was a placeholder for Goad, as subsequent to the Competitor members of the Goad Conspiracy Group employing Goad and/or being formed, Goad stepped-in through one or more of those Competitors and became the medical director for those facilities, with Campbell being employed by Goad through one or more of those Competitors.

249.    A fourth methodology involved the pivoting to continuity of care so as to discreetly transition IPC's workforce of Physician and APC providers for a given facility/ies over to the employment of the Competitor member of the Goad Conspiracy Group who now held the medical directorship at the facility.  This entailed the Physicians and/or APCs who had serviced the facility for IPC to continue to do so through IPC, even though IPC was no longer the medical director at the facility.   Then, once the Physicians and/or APCs had become indoctrinated into the Group (who itself did not have its own workforce of Physicians and/or APCs to provide post-acute medical care to the facility), Goad as the medical director of the facility would have the facility terminate its physician and advanced practice clinician provider contract with IPC and give the contract to a Competitor member of the Goad Conspiracy Group who would now employ those same Physicians and/or APCs to render the same services at the facility.

250.    For example, on or around February 25, 2020, certain of IPC's medical director contracts were terminated with Goad (through one or more of the Competitors) becoming the replacement medical director at the following facilities:  Brian Center of Botetourt, Brian Center of Alleghany, The Springs Nursing Center, Bland County Nursing and Rehab, and Maple Grove

Nursing and Rehab.  Goad and Burnette had coordinated and confirmed to the facilities that despite the medical directorship change, IPC's advanced practice clinicians would continue to round for IPC and work under Goad.  The APCs involved would later terminate their employment at IPC to be employed by or through Goad and/or one of the Competitors in the Goad Conspiracy Group to render the same services at certain of these facilities.

251.    Another occurred on April 22, 2020 when Burnette and Dalton in concert with Goad terminated IPC's medical director contract at the Pheasant Ridge facility with the recommendation that Goad through PGS (a Competitor) become the medical director of the facility.  In doing so, Burnette and Dalton assured continuity of care to the facility via that medical director replacement by volunteering to send advanced practice clinician agreements for Smith (who at the time was still employed at IPC as an APC) and Carlton (who at the time was also still employed at IPC as an APC), representing that they "can still cover your facility the way they are now."  Both Smith and Carlton would later terminate their employment at IPC to be employed by or through Goad and/or one of the Competitors in the Goad Conspiracy Group.

252.    Another example occurred on April 3, 2020 when Burnette, Goad and/or Fife conspired to make Cupp (who at the time was still employed at IPC as an APC) work under Goad and Competitor PGS through Goad's new employment as medical director at the Heritage Hall Blacksburg facility.  Cupp would later terminate her employment at IPC to be employed by or through Goad and Competitor PGS.

253.    A fifth methodology involved utilizing assets that Goad and/or Garland had sold to IPC (e.g., Goad's personal goodwill; Garland's personal goodwill; Goad's right to do Business with certain facilities; Garland's right to do Business with certain facilities), and/or usurping IPC's own goodwill and business reputation, to develop the business of the start-up Competitor members

56

of the Group.  This entailed using those assets, goodwill and/or business reputation to get a Competitor member of the Group's foot in the door at a facility, as opposed to IPC.  In some instances that involved the Competitor first taking the medical director contract at a facility, and later taking the physician and advanced practice provider contract at the facility.

254.    For example, between May 7, 2020 and June 9-10, 2020, Goad, Burnette, Dalton and/or Fife conspired to allow Goad to utilize IPC's goodwill and reputation concerning its APC provider program and workforce to enable start-up Competitor PGS to contract with the Richfield Living facility using certain of the APCs who at the time were employed by IPC, but who would later become the employees of PGS or another competitor of the Goad Conspiracy Group for that facility, thereby resulting in IPC having lost its contract and/or business expectancy for that facility.

255.    The racketeering acts by Defendants escaped detection by IPC because the insider members of the Goad Conspiracy Group misrepresented, masked and concealed the acts.  These insider members were conflicted by their business loyalty to, and/or other lucrative business side hustles with, Goad and/or the other members of the Goad Conspiracy Group.

256.    For example, Burnette insufficiently disclosed to IPC the emails that she, Dalton and/or Fife had sent to the facilities wherein they had initiated IPC's termination of contracts with facilities in favor of Goad.  In addition, Burnette, Dalton and/or Fife, or others acting at their behest, deleted certain of their ESI communications concerning the Goad Conspiracy Group, and/or corresponded under the veil of emails using other domains such as the email domain of Elite, MAC, and/or MAEC, as well as personal yahoo.com or hotmail.com email domains.

257.    Burnette and Dalton would even misrepresent to IPC when logging facility terminations onto IPC's electronic software that emails concerning the termination of facility contracts did not exist even though they did exist.

258.    For example, Burnette and Dalton submitted a contract termination on April 26, 2020 for the Liberty Ridge Health and Rehab facility, wherein they made misrepresentations to IPC not only as to the reason for the termination but also as to the existence of email exchanges regarding the termination.   Specifically, Burnette and Dalton represented that the facility terminated the contract and that there were not any email exchanges regarding the termination.  In actuality, though, there were email exchanges involving Burnette, Goad and/or Dalton from two days prior to the fraudulent termination submission, on April 24, 2020, wherein Burnette had IPC "voluntarily" or "mutually" terminate the medical directorship contracts for not only Liberty Ridge Health and Rehab facility, but also the Alta Vista facility, with Goad through Competitor PGS replacing IPC.

259.    Each medical directorship contract lost by IPC has a value to IPC in excess of $1,000.00 per month.

260.    Each physician and advanced practice clinician contract lost by IPC has a value to IPC in excess of $1,000.00 per month.

261.    Each and every one of these acts by Defendants resulting in the loss of an IPC contract with a facility constitutes a violation of Virginia's Business Conspiracy Act, codified at *Va. Code* § 18.2-499.  Each such violation is a separate misdemeanor.

262.    Each and every one of these acts by Defendants resulting in the loss of an IPC contract with a facility constitutes larceny which is a violation of *Va. Code* § 18.2-23 and § 18.2-

95 and/or *N.C. Gen. Stat.* § 14-72, and/or embezzlement which is a violation of *Va. Code* § 18.2-111 and/or *N.C. Gen. Stat.* § 14-90.  Each such violation is a separate felony.

     **b.**     ***Pattern Of Racketeering To Get IPC To Relinquish Its Restrictive Covenants In The APC Agreements On False Pretenses.***

263.     The Goad Conspiracy Group engaged in a pattern of racketeering to get IPC to relinquish its restrictive covenants in certain of the APC Agreements on false pretenses.

264.     This entailed the Goad Conspiracy Group securing waivers wherein the insider members of the Group (e.g., Garland, Burnette, Dalton and/or Fife) who remained employed by IPC waived the restrictive covenants (i.e., noninterference and/or competition covenants) in IPC's employment contracts so that the employee could be employed by one or more of the Competitors in the Group, particularly PGS.

265.     The false pretenses used by the insider members were at least twofold.

266.     First, one or more insider members misrepresented that the contracts at the facilities to which the waivers pertained had been fairly lost, when in fact they had been converted, stolen and misappropriated.  Second, they misrepresented that the waivers were necessary to protect IPC from a larger competitor when the waivers were really for the benefit of larger competitors (e.g., the Competitors in the Goad Conspiracy Group) who had been masked as a friendly and/or lowly start-up entity – i.e., PGS.

267.     For example, on February 19, 2021, Garland, who had risen to the position of National Medical Director of Post-Acute Care at IPC, but who unbeknownst to IPC was also a member of the Goad Conspiracy Group, represented to other decision makers at IPC who were not members of the Goad Conspiracy Group as follows:

> If we can add something like "we wave [sic] for you to gain employment with Premier Geriatric Solutions/Dr. Goad's group" would at least keep them from possibly joining a

bigger competitor or group.  Again, that's where they all are headed as he got all the facility contracts, so VERY little risk of them going elsewhere.

Several days later, on February 24, 2021, and prior to the waivers being granted, Garland further represented:

We are releasing them to work with Premier Geriatric Solutions only.  I would stay away from the buildings.  We have no work for them [the APCs] so they have to be let go.  If it's creating this big of an issue, just give them a waiver on their non compete and be done with it.

What Garland concealed from IPC in these representations was that the facility contracts had been unfairly lost by IPC, and the employment contracts were being unfairly lost by IPC, because of the conversion, theft and/or misappropriation of the Goad Conspiracy Group.

268.    In reliance on these false pretenses, *in pari* or *in toto*, IPC was induced to grant the waivers.

269.    None of the waivers that were obtained via this pattern methodology were supported by any consideration that was ever paid to IPC.

270.    Examples of the waivers obtained via this methodology included: (a) the February 25, 2021 waiver for APC Roy to work for PGS at specified facilities; (b) the February 25, 2021 waiver for APC Van Auken to work for PGS at specified facilities; (c) the February 25, 2021 waiver for APC Gambill to work for PGS at specified facilities; (d) the February 26, 2021 waiver for APC Curtis to work for PGS at specified facilities; (e) the February 26, 2021 waiver for APC Vaughn to work for PGS at specified facilities; and (f) the February 26, 2021 waiver for APC Lyons to work for PGS at specified facilities.

271.    Each and every waiver obtained from IPC for the Defendants constitutes obtaining property (e.g., release of contractual rights) by a false pretense in violation of *Va. Code* § 18.2-178 and/or *N.C. Gen. Stat.* § 14-100.  Each such violation is a separate felony.

      *c.*      **Pattern Of Racketeering To Misappropriate IPC's Assets, And Confidential And Proprietary Information.**

272.    The Goad Conspiracy Group engaged in a pattern of racketeering to misappropriate IPC's assets, and confidential and proprietary information.

273.    Goad and Garland each owed duties to not use or misappropriate the assets that they each sold to IPC, including but not limited to each's personal goodwill and right to engage in the Business with certain facilities.

274.    In addition, Goad, Garland, Burnette, Physicians, APCs and CPMs all owed duties to maintain in all respects, and not to disclose to any third party, the assets, and confidential and proprietary information relating to the business practices, operations, contracts, trade secrets, pricing and other information of IPC.

275.    Despite these duties, Goad, Garland, Burnette, Physicians, APCs and CPMs, individually and/or in concert with each other unlawfully and wrongfully used and disclosed the assets and confidential and proprietary information of IPC in furtherance of the Goad Conspiracy Group's scheme as to interfere and unfairly compete with IPC's contracts and expectancies with facilities and with its workforce.

276.    Accordingly, Goad, Garland, Burnette, Physicians, APCs and CPMs, have individually and/or in concert with each other converted, stolen and/or misappropriated IPC's assets, and confidential and proprietary information.

277.    For example, after Goad terminated his employment at IPC he misappropriated his personal goodwill and/or his rights to engage in the Business with certain facilities that he had sold in 2015 to IPC to engage in the Business with those very facilities.  He also used IPC's goodwill and business reputation, as well as it confidential and proprietary information, which he had either

previously sold to IPC or otherwise obtained during his employment at IPC, to obtain new contracts with facilities that IPC did business and/or had a business expectancy of doing business.

278.     On August 17, 2018, Burnette, who was supposed to be on the job for IPC, worked instead for Goad and his clinician Lee Thompson, neither of whom were employed by IPC, to obtain credentialing for them so that they could continue to perform services for Competitors. This included Burnette and Goad subsequently communicating about that credentialing on September 6, 2018 wherein an MAEC signature block for Burnette was included, with Burnette then using an MAEC email domain to privately forward the information to Dalton at her IPC email domain address.  This was not only a misappropriation of IPC domains and business time to enable the Competitors, but also an engagement of conflicts of interest and a breach by at least Burnette and Dalton of their contractual duties to work full time and on an exclusive basis for IPC.

279.     On July 22, 2019 and again on August 11, 2019, Burnette, using email domain addresses from MAEC and IPC, circulated back and forth to herself in her capacities for multiple companies an Implementation Schedule from 2015 that MAEC had used to implement its program of providing post-acute medical care to patients and residents in skilled/long-term care and assisted living/retirement facilities.  This occurred during the aforementioned time period in which the Competitors were being set up to compete in Virginia, North Carolina and South Carolina, with Goad forming PGS to interfere and unfairly compete with IPC in Virginia on November 13, 2019. That Implementation Schedule, which had become the confidential and proprietary business information of IPC when IPC acquired MAEC in 2015, or the contents thereof was supplied to Goad to assist in his implementing the program of PGS, and/or one or more of the Competitors in providing post-acute medical care to patients and residents in skilled/long-term care and assisted living/retirement facilities in Virginia, North Carolina and/or South Carolina.  This was not only a

misappropriation of IPC domains, business time and program information to enable the Competitors, but also an engagement of conflicts of interest and a breach by at least Burnette of her contractual duties to work full time and on an exclusive basis for IPC.

280.    On October 25, 2019, Dalton obtained copies of IPC medical director contracts and unlawfully and wrongfully disclosed them, with which contracts the Goad Conspiracy Group later interfered and unfairly competed so as to have the medical director contract with IPC terminated and replaced with a medical director contract with Goad through one or more of the Competitors at those facilities.  Those facilities included but were not necessarily limited to the Alleghany Center facility in Virginia and/or the Surry Community Health & Rehab facility in North Carolina.

281.    On February 28, 2020, Burnette scheduled a meeting with Dalton, Fife and Goad to discuss IPC's provider coverage at certain facilities, despite Goad no longer being employed by IPC and having not yet assumed the medical directorship through Competitor PGS at those facilities, thereby disclosing to Goad and/or one or more of the Competitors IPC's confidential and proprietary information about its program and contracts with these facilities.   Prior to this meeting, Burnette and Goad had discussed the meeting with Goad indicating that he wanted to attend to which Burnette acquiesced.

282.    On June 6, 7, 24 and 27, 2020, Burnette used IPC resources to help Goad and GAPs Health obtain licensure and credentialing for Goad, despite Goad having terminated his employment with IPC over two (2) years earlier.  This was not only a misappropriation of IPC resources to enable the Competitors, but also an engagement of conflicts of interest and a breach by at least Burnette of her contractual duties to work full time and on an exclusive basis for IPC.

283.     On June 16, 2020, Dalton forwarded to Burnette an IPC opportunity for a licensed nursing home administrator, which Burnette immediately forwarded to both Garland and Goad, despite Goad no longer being employed by IPC.

284.     On September 23, 2020, Burnette, Dalton and/or Garland used MAEC email domains and IPC email domains during regular IPC business hours to conduct the business of other entities with Goad (despite Goad no longer being employed by IPC), including but not limited to the business of MAC, related to insurers and advanced practice clinicians.  This was not only a misappropriation of IPC domains and business time to enable Competitors, but also an engagement of conflicts of interest and a breach by at least Burnette and Dalton of their contractual duties to work full time and on an exclusive basis for IPC.

285.     On March 2, 3 and/or 5, 2021, Fife and Dalton obtained IPC's confidential and proprietary information regarding at least 5 physicians, 17 advanced practice clinicians, 28 facilities, and 28 medical director contracts in North Carolina, and IPC's communication strategy related thereto, which Fife and/or Dalton unlawfully and wrongfully disclosed to others in the Goad Conspiracy Group in furtherance of the Group's scheme to interfere and unfairly compete with IPC concerning those physicians, advanced practice clinicians, facilities, and medical director contracts, many of which IPC has lost.

286.     Each of the business practices, operations, contracts, trade secrets, pricing and other information of IPC misappropriated from IPC has a value to IPC in excess of $1,000.00.

287.     Each and every act of misappropriation by Defendants is a violation of Virginia's Business Conspiracy Act, codified at *Va. Code* § 18.2-499.  Each such violation is a separate misdemeanor.

288.    Each and every act of misappropriation by Defendants is larceny and a violation of *Va. Code* § 18.2-23 and 18.2-95 and/or *N.C. Gen. Stat.* § 14-72, and/or embezzlement and a violation of *Va. Code* § 18.2-111 and/or *N.C. Gen. Stat.* § 14-90.  Each such violation is a separate felony.

## L.    The Interference And Unfair Competition To IPC's Contracts With Facilities.

289.    As a provider of primary care and behavioral health services, IPC contracts with facilities throughout Virginia, North Carolina and South Carolina, among other states, for medical directorship services, and/or for physician and advanced practice clinician provider services.

290.    At varying times and continuing, each Defendant in concert with other Defendants, and in furtherance of the scheme of the Goad Conspiracy Group, unfairly competed and interfered with, solicited and induced breaches of IPC's contracts with the certain facilities about which IPC has brought this complaint.  This wrongful and unlawful conduct by Defendants has directly and proximately caused each such facility to terminate its contracts with IPC and to move their business to one or more of the Competitors in the Goad Conspiracy Group, thereby resulting in the contracts having been converted, stolen and/or misappropriated from IPC to the benefit of the Goad Conspiracy Group and the individual members therein.

291.    IPC had a valid and enforceable contractual relationship and/or business expectancy with the following facilities, among others:

(1)    Alleghany Center;
(2)    Autumn Care of Alta Vista;
(3)    Cardinal Senior Living;
(4)    Carrington Cottage Memory Care Center;
(5)    Carrington Place at Botetourt;
(6)    Carrington Place at Rural Retreat;
(7)    Carrington Place at Wytheville;
(8)    Carrington Place at Wytheville Assisted Living;
(9)    Chatham Health & Rehab;
(10)    Commonwealth Senior Living at Cedar Bluff;
(11)    Commonwealth Senior Living at Christiansburg;

(12)   Commonwealth Senior Living at Hillsville;
(13)   Commonwealth Senior Living at Radford;
(14)   Davie Nursing and Rehabilitation Center;
(15)   English Meadows Blacksburg Campus;
(16)   English Meadows – Christiansburg;
(17)   English Meadows – Elks Home;
(18)   Galax Health and Rehab;
(19)   Grayson Rehabilitation and Health Center;
(20)   Gretna Health & Rehabilitation Center;
(21)   Heritage Hall – Laurel Meadows;
(22)   Hillsville Rehabilitation and HealthCare Center;
(23)   Kissito Healthcare Bland County;
(24)   Kissito Healthcare Hot Springs;
(25)   Kissito Post Acute – The Brian Center Alleghany;
(26)   Liberty Ridge Health & Rehabilitation Center;
(27)   Magnolia Lane Nursing and Rehabilitation;
(28)   Our Lady of the Valley – SNF;
(29)   Pheasant Ridge Nursing and Rehabilitation Center;
(30)   Pheasant Ridge Senior Living;
(31)   Red Oak Manor;
(32)   Richfield Living;
(33)   Showalter Center;
(34)   The Brian Center Botetourt;
(35)   The Wybe & Marietje Kroontje Health Care Center;
(36)   Trinity Ridge;
(37)   Waddell Nursing and Rehab;
(38)   White Oak Manor of Rock Hill;
(39)   White Oak of York;
(40)   Mountainview Nursing Home;
(41)   Fountain Inn;
(42)   Brian Center Spruce Spine;
(43)   Surry Community;
(44)   Brian Center Clayton;
(45)   White Oak Manor of Kings Mountain;
(46)   White Oak Manor of Waxhaw;
(47)   Accordius Health of Asheville;
(48)   Carolina Pines of Asheville;
(49)   Accordius Health of Rutherfordton;
(50)   Accordius Health of Brevard;
(51)   Pelican Health of Asheville;
(52)   Martinsville Health and Rehab;
(53)   Chatham Health and Rehab;
(54)   Any other Facilities identified in Attachment 1 to Schedule 1.1 of the Asset Purchase Agreement that are lost to or because of Defendants; and
(55)   Any other Facilities identified in Attachment 2 to Schedule 1.1 of the Asset Purchase Agreement that are lost to or because of Defendants.

IPC also has a valid and enforceable contractual relationship and/or business expectancy with at least the additional facilities that Fife indicated on May 13, 2021 that IPC was likely to lose in the future to Goad in the Virginia and/or Mount Airy region of North Carolina, and/or with the ones that Obrist has been soliciting since at least June 2021.  These contractual relationships and/or business expectancies are collectively referred to herein as the "IPC Facility Contracts."

292.    At a minimum, IPC has lost the IPC Facility Contracts to one or more Competitor Defendants in the Goad Conspiracy Group because of the wrongful and unlawful acts of Defendants, with Fife and/or Dalton having been employed as a CPM at IPC for each of those facilities.

293.    Since departing IPC, by or through Goad and/or one or more of the Defendant Competitors, Fife was employed within one (1) year of the termination of his employment contract with IPC, and remains employed, as the Administrator at the aforementioned Alleghany Center facility.  Dalton has also been employed by or through Goad and/or one or more of the Defendant Competitors within one (1) year of the termination of her employment contract with IPC.  In addition, each Physician and each APC that is a defendant herein has been employed by or through Goad and/or one or more of the Defendant Competitors within one (1) year of the termination of his or her employment contract with IPC, or has been provided assurances of future employment, to provide medical directorship, medical care and/or collaboration services regarding one or more of these facilities.

**M.    The Interference And Unfair Competition To IPC's Employment Contracts.**

294.    IPC had a valid and enforceable contractual relationship and/or business expectancy with Goad, Garland, Burnette, each Physician (e.g., Fant, Campbell and Bell), each APC (e.g., Smith, Curtis, Lyons, Roy, Gambill, Vaughn, Cupp, Jones, Van Auken, Carlton, Lanier,

Bolden, Obrist, and Young), and/or each CPM (e.g., Fife and Dalton).   These contractual relationships and/or business expectancies are collectively referred to herein as the "IPC Employment Contracts".

295.   At varying times and continuing, each Defendant in concert with other Defendants, and in furtherance of the scheme of the Goad Conspiracy Group, unfairly competed and interfered with, solicited and induced breaches of the IPC Employment Contracts.

296.   At varying times and continuing, every Physician, APC and CPM Defendant in concert with other Defendants, and in furtherance of the scheme of the Goad Conspiracy Group, terminated his or her employment at IPC.

297.   Each Physician, APC and CPM terminated his or her employment with IPC with the concerted design and intention to: (a) become employed by or associated with one or more of the Defendant Competitors; (b) perform as an employee of one or more of the Defendant Competitors the same services that he or she performed for IPC in the same IPC customer facility or facilities where he or she performed services as an IPC employee; and/or (c) use his or her knowledge of IPC's contracts, contacts and relationships, confidential and proprietary information, and other business to interfere, solicit and induce each facility with whom IPC had a contract to terminate its business with IPC and to move that business to one or more of the Competitors, and/or to interfere, solicit and induce certain of the other Physicians, APCs and/or CPMs to resign their employment with IPC so that he or she too engaged with that same design and intention.

298.   In fact, each facility about which IPC complains where a Physician, APC and/or CPM performed services did end business relationships with IPC, with each such Physician, APC and/or CPM terminating his or her employment with IPC to become employed by or associated with one or more of the defendant Competitors, with each such Physician, APC and/or CPM now

performing the same services he or she performed for IPC in the same IPC facility in violation of each Physician's, APC's and CPM's respective employment agreement with IPC.

299.    The Goad Conspiracy Group first schemed and planned to interfere, solicit and induce the resignation and termination of certain Physicians, including Fant, who the Defendant Competitors needed to employ in order to be able to render medical services at facilities whose contracts the Competitors desired and sought to convert, steal and misappropriate from IPC.

300.    The result of that scheme was that Fant, a medical doctor, terminated her employment at IPC on January 1, 2021, and within one (1) year of that termination became employed by one or more of the defendant Competitors.  Fant submitted her letter of resignation of employment with IPC on November 1, 2020 wherein she represented that she was resigning "to pursue another career opportunity."  Fant's career opportunity was to work for one or more of the defendant Competitors, especially PGS, with Fant having previously worked for Goad's company MAEC which had been acquired by IPC in or around August 2015 through which acquisition she had been employed by IPC.

301.    With Goad and other Physicians (including Fant) having terminated their employment with IPC and having been employed by one or more of the defendant Competitors, the Goad Conspiracy Group then schemed and planned to interfere, solicit and induce the resignation and termination of certain advanced practice clinicians whom the defendant Competitors needed to work under and/or in collaboration with the Physicians who had joined the Defendant Conspiracy Group.

302.    The result of that scheme was that all of the APC Defendants terminated his or her employment at IPC, and within one (1) year of each APC's termination he or she became employed by one or more of the defendant Competitors.

303.    Jones submitted her resignation of employment at IPC on February 12, 2021.  In Jones' letter of resignation to IPC, she represented that she has "accepted a position with Rocky Mount Rehabilitation Center under the direction of Dr. Goad which will start April 1, 2021." Dalton even privately sent to Jones on February 12, 2021 certain of IPC's credentialing information on Jones stating: "An NP [Nurse Practitioner] who is going to work for Dr. Goad requested this info so I figure you will need it to."  On April 1, 2021 Jones' employment at IPC did terminate with her becoming employed by one or more of the defendant Competitors within one (1) year of that termination.

304.    Four days later, on February 16, 2021, Roy submitted her resignation of employment at IPC.  Roy had been induced to resign as she had been advised by Garland, Burnette, Dalton and/or Fife (all members of the Goad Conspiracy Group) that certain facilities had terminated their medical director and/or APC provider contracts with IPC therefore leaving no employment for her at IPC, with Fife designating for Roy that her last day of employment at IPC was to be April 1, 2021.  Roy was to be employed by one or more of the defendant Competitors, especially PGS, with Garland, Burnette, Dalton and/or Fife having represented that Roy would receive a waiver of her noncompete obligations in her employment contract with IPC to work for that Competitor.  Prior to Roy's resignation, Dalton even privately sent to Roy on February 12, 2021 certain of IPC's credentialing information on Roy stating: "An NP [Nurse Practitioner] who is going to work for Dr. Goad requested this info so I figure you will need it to."  On April 1, 2021 Roy's employment at IPC did terminate with her receiving the aforementioned waiver and becoming employed by one or more of the defendant Competitors within one (1) year of that termination.  That April 1, 2021 termination date coincides with the termination date for Jones.

305.    On that same day, February 16, 2021, Van Auken submitted her resignation of employment at IPC.  Van Auken had been induced to resign as she had been advised by Garland, Burnette, Dalton and/or Fife (all members of the Goad Conspiracy Group) that certain facilities had terminated their medical director and/or APC provider contracts with IPC therefore leaving no employment for her at IPC, with her last day of employment at IPC to be February 28, 2021. Van Auken was to be employed by one or more of the defendant Competitors, especially PGS, with Garland, Burnette, Dalton and/or Fife having represented that Van Auken would receive a waiver of her noncompete obligations in her employment contract with IPC to work for that Competitor.  Prior to Van Auken's resignation, Dalton had even privately sent to Van Auken on February 12, 2021 certain of IPC's credentialing information on Van Auken stating: "An NP [Nurse Practitioner] who is going to work for Dr. Goad requested this info so I figure you will need it to."  On February 28, 2021 Van Auken's employment at IPC did terminate with Van Auken receiving the aforementioned waiver and becoming employed by one or more of the defendant Competitors within one (1) year of that termination.

306.    The next day, on February 17, 2021, Curtis submitted her resignation of employment at IPC to work for one or more of the defendant Competitors, especially PGS, with Curtis having previously worked for Goad's company MAEC which had been acquired by IPC in August 2015 through which acquisition she had been employed by IPC.  Curtis had been induced to resign as she had been advised by Garland, Burnette, Dalton and/or Fife (all members of the Goad Conspiracy Group) that certain facilities had terminated their medical director and/or APC provider contracts with IPC therefore leaving no employment for her at IPC, with her last day of employment at IPC to be April 1, 2021.  Curtis was to be employed by one or more of the defendant Competitors, especially PGS, with Garland, Burnette, Dalton and/or Fife having represented that

she would receive a waiver of her noncompete obligations in her employment contract with IPC to work for that Competitor.   Dalton and Fife even discussed the scheme for Curtis' resignation to become employed for Goad a month prior to Curtis' resignation, on January 13, 2021.   Dalton then privately sent to Curtis on February 12, 2021 (which was five days prior to Curtis' resignation at IPC) certain of IPC's credentialing information on Curtis stating: "An NP [Nurse Practitioner] who is going to work for Dr. Goad requested this info so I figure you will need it to."  On February 28, 2021, Curtis' employment at IPC did terminate with her receiving the aforementioned waiver and becoming employed by one or more of the defendant Competitors within one (1) year of that termination.  That February 28, 2021 termination date coincides with the termination date for Van Auken.

307.    Six days later, on February 23, 2021, Gambill submitted her resignation of employment at IPC to Dalton.  Gambill had been induced to resign as she had been advised by Garland, Burnette, Dalton and/or Fife (all members of the Goad Conspiracy Group) that certain facilities had terminated their medical director and/or APC provider contracts with IPC therefore leaving no employment for her at IPC, with her last day of employment at IPC to be April 1, 2021. Gambill was to be employed by one or more of the defendant Competitors, especially PGS, with Garland, Burnette, Dalton and/or Fife having represented that she would receive a waiver of her noncompete obligations in her employment contract with IPC to work for that Competitor.  Prior to Gambill's resignation, Dalton even privately sent to Gambill on February 12, 2021 certain of IPC's credentialing information on Gambill stating: "An NP [Nurse Practitioner] who is going to work for Dr. Goad requested this info so I figure you will need it to."  On April 1, 2021 Gambill's employment at IPC did terminate with her receiving the aforementioned waiver and becoming

employed by one or more of the defendant Competitors within one (1) year of that termination. That April 1, 2021 termination date coincides with the termination date for both Roy and Jones.

308.    Three days later, on February 26, 2021, Vaughn submitted her resignation of employment at IPC.  Vaughn had been induced to resign as she had been advised by Garland, Burnette, Dalton and/or Fife (all members of the Goad Conspiracy Group) that certain facilities had terminated their medical director and/or APC provider contracts with IPC therefore leaving no employment for her at IPC, with her last day of employment at IPC to be April 1, 2021.  Vaughn was to be employed by one or more of the defendant Competitors, especially PGS, with Garland, Burnette, Dalton and/or Fife having represented that she would receive a waiver of her noncompete obligations in her employment contract with IPC to work for that Competitor.  Prior to Vaughn's resignation, Dalton even privately sent to Vaughn on February 12, 2021 certain of IPC's credentialing information on Vaughn stating: "An NP [Nurse Practitioner] who is going to work for Dr. Goad requested this info so I figure you will need it to."  On April 1, 2021 Vaughn's employment at IPC did terminate with her receiving the aforementioned waiver and becoming employed by one or more of the defendant Competitors within one (1) year of that termination. That April 1, 2021 termination date coincides with the termination date for Gambill, Roy and Jones.

309.    On that same day, February 26, 2021, Lyons submitted her resignation of employment at IPC.  Lyons had been induced to resign as she had been advised by Garland, Burnette, Dalton and/or Fife (all members of the Goad Conspiracy Group) that certain facilities had terminated their medical director and/or APC provider contracts with IPC therefore leaving no employment for her at IPC, with her last day of employment at IPC to be February 28, 2021. Lyons was to be employed by one or more of the defendant Competitors, especially PGS, with

Garland, Burnette, Dalton and/or Fife having represented that she would receive a waiver of her noncompete obligations in her employment contract with IPC to work for that Competitor. Two weeks prior to Lyons' resignation, Dalton had even privately sent to Lyons on February 12, 2021 certain of IPC's credentialing information on Lyons stating: "An NP [Nurse Practitioner] who is going to work for Dr. Goad requested this info so I figure you will need it to." On February 28, 2021 Vaughn's employment at IPC did terminate with her receiving the aforementioned waiver and becoming employed by one or more of the defendant Competitors within one (1) year of that termination. That February 28, 2021 termination date coincides with the termination date for Curtis and Van Auken.

310. Less than two weeks later, on March 10, 2021 Smith submitted her resignation of employment at IPC. In Smith's letter of resignation she represented that " . . . I'll be moving forward with Dr. Goad." On April 13, 2021 Dalton sent to Smith certain of IPC's credentialing information on Smith stating: "You will need this to be credentialed under Goad's group." On April 30, 2021 Smith's employment at IPC did terminate with her becoming employed by one or more of the defendant Competitors within one (1) year of that termination. Smith had previously worked for Goad's company MAEC which had been acquired by IPC in August 2015 through which acquisition Smith had been employed by IPC.

311. With Goad and other Physicians (including Fant) having terminated their employment with IPC and moved their employment over to one or more of the defendant Competitors, and with several APCs (including Jones, Roy, Van Auken, Curtis, Gambill, Vaughn, Lyons, and Smith) having terminated their employment with IPC and moved their employment over to one or more of the defendant Competitors, the Goad Conspiracy Group schemed and planned to interfere, solicit and induce the resignation and termination of an additional Physician

whom defendant Competitors needed for medical director purposes and/or for supervision and/or collaboration with the APCs who had already joined, or were going to join, the Goad Conspiracy Group.

312.    The result of that scheme was that Campbell terminated his employment at IPC, and within one (1) year of that termination became employed by one or more of the defendant Competitors, especially PGS.  On March 31, 2021 Campbell submitted his resignation to Burnette and Fife, with Campbell's last day of employment at IPC set for May 31, 2021.   On April 13, 2021 Dalton sent to Campbell certain of IPC's credentialing information on Campbell stating: "You will need this to be credentialed under Goad's group." On May 31, 2021 Campbell's employment at IPC did terminate with his becoming employed by or through one or more of the defendant Competitors within one (1) year of that termination.

313.    With Goad and other Physicians (including Fant and Campbell) having terminated their employment with IPC and moved their employment over to one or more of the defendant Competitors, and with several APCs (including Jones, Roy, Van Auken, Curtis, Gambill, Vaughn and Lyons) having terminated their employment with IPC and moved their employment over to one or more of the defendant Competitors, the Goad Conspiracy Group continued to interfere, solicit and induce the resignation and termination of certain advanced practice clinicians whom defendant Competitors needed to work under and/or in collaboration with the Physicians who had joined the Goad Conspiracy Group.

314.    The result of that scheme was that all of the remaining APC Defendants terminated his or her employment at IPC, and within one (1) year of each termination became employed by or through one or more of the defendant Competitors.

315.    The next day following Campbell's resignation, on April 1, 2021, Carlton submitted his resignation of employment at IPC to Dalton. On April 13, 2021 Dalton privately sent to Carlton certain of IPC's credentialing information on him stating: "You will need this to be credentialed under Goad's group."    On April 14, 2021, Dalton privately sent to Goad IPC's certificate of insurance related to Carlton.  On May 31, 2021 Carlton's employment at IPC did terminate with him becoming employed by or through one or more of the defendant Competitors within one (1) year of that termination.  That May 31, 2021 termination date coincides with the termination date for Campbell.

316.    Within two weeks later, on April 12, 2021, Cupp submitted her resignation of employment at IPC to Burnette and Fife.  In her letter of resignation Cupp represented that she was resigning "to seek another career opportunity."  That opportunity was to be employed by one or more of the Defendant competitors.  On April 14, 2021, Fife even sent a private email to Cupp stating:

> I feel fairly confident that all of your facilities will give us termination notices that will be effective as of either 5/31, or 6/1.  Would you be good with moving your last day to 5/31 so that it coordinates with everything?

On that same day, Dalton privately sent to Goad IPC's certificate of insurance related to Cupp. On May 31, 2021 Cupp's employment at IPC did terminate with her becoming employed by or through one or more of the Defendant Competitors within one (1) year of that termination.  That May 31, 2021 termination date coincides with the termination date for Campbell and Carlton.

317.    The very next day, on April 13, 2021, Lanier submitted her resignation of employment at IPC.  On June 12, 2021 Lanier's employment at IPC did terminate with her becoming employed by or through one or more of the defendant Competitors within one (1) year of that termination.

318.     Within a week later, on April 19, 2021, Bolden submitted her resignation of employment at IPC to Dalton.  Prior to her resignation and unbeknownst to IPC, Bolden had started a company to compete with IPC, namely Renew Psychiatry Services, PLLC ("Renew").  Renew is a limited liability company organized under the laws of Virginia with a principal place of business at 1201 Texas St., Salem, Virginia 24153.  Bolden, individually and/or in coordination with Goad, Gaps and/or PGS, formed Renew on May 23, 2018, which was after Goad had terminated his employment with TeamHealth.  On May 4, 2021 Bolden's employment at IPC did terminate with her being employed by or through Renew and/or one or more of the defendant Competitors within one (1) year of that termination.

319.     With Goad and other Physicians (including Fant and Campbell) having terminated their employment with IPC and moved their employment over to one or more of the defendant Competitors, and with all but one of the APC Defendants (including Jones, Roy, Van Auken, Curtis, Gambill, Vaughn, Lyons, Smith, Carlton, Cupp, Lanier and Bolden) having terminated their employment with IPC and moved their employment over to one or more of the defendant Competitors, and with all of those APC terminations having been boarded (e.g., to join the Goad Conspiracy Group and/or become employed with the Competitor members thereof) at IPC with the assistance of CPMs Dalton and/or Fife, the Goad Conspiracy Group interfered, solicited and induced the resignation and termination of those CPMs as defendant Competitors needed them to manage and/or collaborate with these Physicians and APCs.

320.     The result of that scheme was that all of the CPM Defendants terminated his or her employment at IPC, and within one (1) year of that termination became employed by or through one or more of the defendant Competitors.

321.     On April 30, 2021, Fife submitted his resignation of employment at IPC.  On May 27, 2021 Fife's employment at IPC did terminate with him becoming employed by or through one or more of the defendant Competitors within one (1) year of that termination.  Prior to leaving his employment at IPC, Fife destroyed certain documents and/or emails concerning his communications with other members of the Goad Conspiracy Group in a concerted effort to conceal the conspiracy and the wrongful acts committed.

322.     Less than two weeks later, on May 10, 2021, Dalton submitted her resignation of employment at IPC.  On May 14, 2021 Dalton's employment at IPC did terminate with her becoming employed by or through one or more of the defendant Competitors within one (1) year of that termination.  Prior to leaving her employment at IPC, Dalton destroyed certain documents and/or emails concerning her communications with other members of the Goad Conspiracy Group in a concerted effort to conceal the conspiracy and the wrongful acts committed.

323.     Therefore, by the end of May 2021, the interference, solicitation, and inducement of the Goad Conspiracy Group resulted in the termination of at least two (2) Physician contracts at IPC (Fant and Campbell), at least twelve (12) APC contracts with IPC (including Jones, Roy, Van Auken, Curtis, Gambill, Vaughn, Lyons, Smith, Carlton, Cupp, Lanier, Bolden), and 2 CPM contracts with IPC (Fife and Dalton).

324.     Within one (1) year of their respective employment terminations, each of those Physicians, APCs and CPMs went on to: (a) perform as an employee of one or more of the defendant Competitors the same services that he or she performed for IPC in the same IPC customer facility or facilities where he or she performed services as an IPC employee; and/or (b) use his or her knowledge of IPC's contracts, contacts and relationships, confidential and proprietary information, and other business to interfere, solicit and induce each facility with whom

IPC had a contract to terminate its business with IPC and to move that business to one or more of the Competitors, and/or to interfere, solicit and induce certain of the other Physicians, APCs and/or CPMs to resign their employment with IPC so that he or she too engaged with that same design and intention.

325.    This scheme of the Goad Conspiracy Group is continuing.

326.    For instance, on June 19, 2021, Obrist submitted her resignation of employment at IPC. On June 21, 2021 Obrist represented to Melissa Smith, another CPM at IPC, that Obrist was terminating her employment to work for Goad's and Dalton's group (i.e., the Goad Conspiracy Group) in the Virginia and North Carolina markets.  Unbeknownst to IPC at the time, Obrist and/or one or more of the other members of the Goad Conspiracy Group had already taken steps toward forming a competitor entity, namely Altmed Virginia, P.C. ("Atlmed"), prior to Obrist's notice of resignation to IPC in violation of her employment agreement with IPC.   Altmed is a corporation organized under the laws of Virginia with a principal place of business at 3865 Colonial Green Cir. SW, Roanoke, Virginia 24018.  Altmed was formed on June 22, 2021.  On June 30, 2021 Obrist in concert with one or more of the other members of the Goad Conspiracy Group even contacted the Skyline Manor facility in Floyd Virginia, with whom IPC has an advanced practice clinician contract, with Obrist representing that she was working for Goad and soliciting the facility to terminate its contract with IPC and to move it to her and Goad.  The next day, on July 1, 2021, Obrist in concert with one or more of the other members of the Goad Conspiracy Group contacted the Accordius Roanoke facility in Virginia, with whom IPC has an advanced practice clinician contract, with Obrist representing that she was working for Goad and soliciting the facility to terminate its contract with IPC and to move it to her and Goad's group.  On August 20,

2021 Obrist's employment at IPC did terminate with her becoming employed by or through one or more of the Defendant Competitors within one (1) year of that termination.

327.    On December 21, 2021, Young terminated her employment at IPC with her becoming employed by or through one or more of the Defendant Competitors within (1) year of that termination.

328.    On January 31, 2022, Bell terminated his employment at IPC with him becoming employed by or through one or more of the Defendant Competitors within (1) year of that termination.

## Counts

## COUNT I – RACKETEER INFLUENCED AND CORRUPT ORGANIZATION ACT
### (Against All Defendants)
### (18 U.S.C. § 1962)

329.    The allegations in Paragraph Numbers 1-328 above are incorporated herein by reference as if fully set forth herein.

330.    Defendants agreed to, and did form into, a racketeer influenced and corrupt association-in-fact, namely the Goad Conspiracy Group.

331.    At all relevant times, the Goad Conspiracy Group was an enterprise engaged in and whose activities affect interstate commerce in at least Virginia, North Carolina, South Carolina, Tennessee and/or California.

332.    The Goad Conspiracy Group schemed to convert, steal and misappropriate the business assets, contracts, workforce and expectancies of IPC so that IPC's business became the business of one or more of the Competitors and other members of the Group.

333.    Each Defendant member of the Goad Conspiracy Group agreed to and did conduct and participate in the conduct of the affairs of the Goad Conspiracy Group through a pattern of

racketeering activity and for the unlawful purpose of intentionally defrauding and stealing from IPC.

334.   Defendants' acts underlying these claims involve larceny (e.g., *Va. Code* § 18.2-95; *N.C. Gen. Stat.* § 14-72), false pretenses (e.g., *Va. Code* § 18.2-23 and/or § 18.2-178; *N.C. Gen. Stat.* § 14-100), embezzlement (e.g., *Va. Code* § 18.2-111; *N.C. Gen. Stat.* § 14-90), and business conspiracy (e.g., *Va. Code* § 18.2-499).  These acts and omissions constitute a pattern of racketeering activity pursuant to 18 U.S.C. §1961(5).

335.   In addition, Defendants' acts involve wrongful and unlawful interference and unfair competition with IPC's contracts with the facilities, as well as its contracts with its employees. Defendants' acts also involve misappropriation of IPC's assets, and confidential and proprietary information.

336.   Insider members of the Goad Conspiracy Group, who remained employed at IPC, misrepresented, masked and concealed the acts of the conspiracy so as to not be detected by IPC. In reliance on the false and fraudulent representations of those insiders, and without knowledge of the masking and concealments, IPC was compelled to take actions that it would not have otherwise taken in the ordinary course and scope of its business as such actions were not in the best interests of IPC and instead were in the best interests of the members of the Goad Conspiracy Group, such as the "voluntary" or "mutual" termination of certain of the contracts with facilities, the granting of waivers so that certain of the APCs could be employed by Competitor PGS, the employment of IPC's APCs under Goad and/or one or more Competitor members of the Goad Conspiracy Group, and the continued employment of the insiders and sharing of strategic information with them.

337.   Goad and/or one or more of the Competitor members of the Goad Conspiracy Group benefited from the scheme by: replacing IPC as medical director at certain facilities,

replacing IPC as the provider of physician and advanced practice clinician services at certain facilities, acquiring IPC's workforce for its own, and by using IPC's assets and confidential and proprietary information for the business of Goad and/or one or more of the Competitor members; and by otherwise disrupting the business of IPC as a competitor.  Each non-Competitor member of the Goad Conspiracy Group benefited, as he or she received new employment contracts or the assurance of future employment (including promotion to executive and managements roles for some non-Competitor members), monies and/or other side hustle benefits for the performance of the scheme of the Goad Conspiracy Group that, for some, were in addition to the regular pay that he or she was receiving from IPC.

338.    Through Defendants' conspiracy and commission of wrongful acts they have violated 18 U.S.C. 1962(d).

339.    Through Defendants' conspiracy and the commission of the predicate racketeering acts Defendants have violated 18 U.S.C. § 1962(a), (b) and/or (c).

340.    18 U.S.C. § 1964(c) authorizes this civil action by IPC as IPC has been injured in its business and property by reason of Defendants violations of 18 U.S.C. § 1962.

341.    As a direct and proximate result of Defendants' wrongful acts and their racketeering acts in violation of 18 U.S.C. §1962, IPC has suffered monetary damages and been injured in its business and property in that it has been made to lose its business assets, contracts, workforce, expectancies, confidential and proprietary information, and goodwill and reputation; for which damages IPC demands from Defendants.

342.    Every person and entity involved in the racketeering activities of the Goad Conspiracy Group have joint and several liability to IPC.

343.    In accordance with 18 U.S.C. §1964(c), IPC is entitled to recover threefold the damages it has sustained and the cost of this suit, including a reasonable attorney's fee, which IPC demands from Defendants.

## COUNT II. – VIRGINIA BUSINESS CONSPIRACY ACT
### (Against All Defendants)
### (*Va. Code* §§ 18.2-499 – 18.2-500)

344.    The allegations in Paragraph Numbers 1-343 above are incorporated herein by reference as if fully set forth herein.

345.    Defendants combined in the Goad Conspiracy Group, which was comprised of more than two members, for the purpose of willfully and maliciously injuring IPC's business.

346.    IPC had a valid and enforceable contractual relationship and/or business expectancy with the IPC Facility Contracts.

347.    IPC had a valid and enforceable contractual relationship and/or business expectancy with the IPC Employment Contracts.

348.    Defendants, in concert via the Goad Conspiracy Scheme, were interferers with the IPC Facility Contracts and the IPC Employment Contracts.  Defendants knew of the IPC Facility Contracts and the IPC Employment Contracts from either his or her employment at IPC and/or through the unlawful and wrongful disclosure of those contracts during the furtherance of the scheme of the Goad Conspiracy Group.

349.    Defendants, in concert via the Goad Conspiracy Scheme, intentionally interfered with the Facility Contracts and/or the IPC Employment Contracts so as to induce breaches and/or terminations of the Facility Contracts and/or the IPC Employment Contracts.

350.    That interference was by the wrongful and unlawful means set forth in this Complaint, including but not limited to the conversion and/or theft of IPC's assets and confidential

and proprietary information, as well as the interference and unfair competition conspiracy and associated unlawful and criminal acts.

351.    That interference directly and proximately caused damage to IPC whose relationship and/or expectancy with the facilities and employees were disrupted.

352.    As a result, IPC has been made to lose the Facility Contracts and the Employment Contracts.  IPC has also been caused to lose its assets and confidential and proprietary information, which Defendants, in concert via the Goad Conspiracy Scheme, continue to unlawfully and wrongfully utilize and disclose for their individual and collective benefits to interfere with additional facilities for which IPC has contracts and/or business expectancies.

353.    In addition, IPC has been caused to suffer irreparable harm which cannot be adequately compensated with monetary damages.  Accordingly, Defendants must be enjoined from all continuing interference and disgorged of the benefits that Defendants have received therefrom.

354.    IPC has also been caused to suffer monetary damages including but not limited to the loss of revenue from the lost Facility Contracts, as well as the resources that IPC expended to form and develop its workforce which has been converted and/or stolen by Defendants.  As a result, IPC has suffered compensatory damages for which IPC is entitled to a recovery from Defendants.

355.    In interfering with IPC's Facility Contracts and/or Employment Contracts, Defendants acted with legal malice.  Defendants acted intentionally, purposely and without lawful justification.  Accordingly, IPC is entitled to treble damages, attorneys fees, and costs pursuant to *Va. Code* § 18.2-500.

## COUNT III – COMMON LAW CONSPIRACY
### (Against All Defendants)

356.    The allegations in Paragraph Numbers 1-355 above are incorporated herein by reference as if fully set forth herein.

357.    Defendants combined in the Goad Conspiracy Group, which was comprised of more than two members, for the purpose of willfully and maliciously injuring IPC's business assets, contracts, workforce, expectancies, confidential and proprietary information, and goodwill and reputation.

358.    IPC had a valid and enforceable contractual relationship and/or business expectancy with the IPC Facility Contracts.

359.    IPC had a valid and enforceable contractual relationship and/or business expectancy with the IPC Employment Contracts.

360.    Defendants, in concert via the Goad Conspiracy Scheme, were interferers with the IPC Facility Contracts and the IPC Employment Contracts.  Defendants knew of the IPC Facility Contracts and the IPC Employment Contracts from either his or her employment at IPC and/or through the unlawful and wrongful disclosure of those contracts during the furtherance of the scheme of the Goad Conspiracy Group.

361.    Defendants, in concert via the Goad Conspiracy Scheme, intentionally interfered with the Facility Contracts and/or the IPC Employment Contracts so as to induce breaches and/or terminations of the Facility Contracts and/or the IPC Employment Contracts.

362.    That interference was by the wrongful and unlawful means set forth in this Complaint, including but not limited to the conversion and/or theft of IPC's assets and confidential and proprietary information, as well as the interference and unfair competition conspiracy and associated unlawful and criminal acts.

363.    That interference directly and proximately caused damage to IPC whose relationship and/or expectancy with the facilities and employees was disrupted.

364.    As a result, IPC has been made to lose the Facility Contracts and the Employment Contracts.  IPC has also been caused to lose its assets and confidential and proprietary information, which Defendants, in concert via the Goad Conspiracy Scheme, continue to unlawfully and wrongfully utilize and disclose for their individual and collective benefits to interfere with additional facilities for which IPC has contracts and/or business expectancies.

365.    In addition, IPC has been caused to suffer irreparable harm which cannot be adequately compensated with monetary damages.  Accordingly, Defendants must be enjoined from all continuing interference and disgorged of the benefits that Defendants have received therefrom.

366.    IPC has also been caused to suffer monetary damages including but not limited to the loss of revenue from the lost Facility Contracts, as well as the resources that IPC expended to form and develop its workforce which has been converted and/or stolen by Defendants.  As a result, IPC has suffered compensatory damages for which IPC is entitled to a recovery from Defendants.

367.    In interfering with IPC's Facility Contracts and/or Employment Contracts, Defendants acted wantonly, oppressively, or with such malice as to evince a spirit of malice or criminal indifference to their civil obligations owed toward IPC.  Accordingly, IPC is entitled to recover punitive damages from Defendants in an amount to be determined at trial.

### COUNT IV – TORTIOUS INTERFERENCE WITH CONTRACT AND/OR BUSINESS EXPECTANCY
### (Against All Defendants)

368.    The allegations in Paragraph Numbers 1-367 above are incorporated herein by reference as if fully set forth herein.

369.    IPC had a valid and enforceable contractual relationship and/or business expectancy with the IPC Facility Contracts.

370.    IPC had a valid and enforceable contractual relationship and/or business expectancy with the IPC Employment Contracts.

371.    Defendants, individually and/or in concert via the Goad Conspiracy Scheme, were interferers with the IPC Facility Contracts and the IPC Employment Contracts.  Defendants knew of the IPC Facility Contracts and the IPC Employment Contracts from either his or her employment at IPC and/or through the unlawful and wrongful disclosure of those contracts during the furtherance of the scheme of the Goad Conspiracy Group.

372.    Defendants, individually and/or in concert via the Goad Conspiracy Scheme, intentionally interfered with the Facility Contracts and/or the IPC Employment Contracts so as to induce breaches and/or terminations of the Facility Contracts and/or the IPC Employment Contracts.

373.    That interference was by the wrongful and unlawful means set forth in this Complaint, including but not limited to the conversion and/or theft of IPC's assets and confidential and proprietary information, as well as the interference and unfair competition conspiracy and associated unlawful and criminal acts.

374.    That interference directly and proximately caused damage to IPC whose relationship and/or expectancy with the facilities and employees was disrupted.

375.    As a result, IPC has been made to lose the Facility Contracts and the Employment Contracts.  IPC has also been caused to lose its assets and confidential and proprietary information, which Defendants, individually and/or in concert via the Goad Conspiracy Scheme, continue to

unlawfully and wrongfully utilize and disclose for their individual and collective benefits to interfere with additional facilities for which IPC has contracts and/or business expectancies.

376.    In addition, IPC has been caused to suffer irreparable harm which cannot be adequately compensated with monetary damages.  Accordingly, Defendants must be enjoined from all continuing interference and disgorged of the benefits that Defendants, individually and/or collectively, have received therefrom.

377.    IPC has also been caused to suffer monetary damages including but not limited to the loss of revenue from the lost Facility Contracts, as well as the resources that IPC expended to form and develop its workforce which has been converted and/or stolen by Defendants.  As a result, IPC has suffered compensatory damages for which IPC is entitled to a recovery from Defendants.

378.    In interfering with IPC's Facility Contracts and/or Employment Contracts, Defendants acted wantonly, oppressively, or with such malice as to evince a spirit of malice or criminal indifference to each Defendant's civil obligations owed toward IPC.  Accordingly, IPC is entitled to recover punitive damages from Defendants in an amount to be determined at trial.

## COUNT V – FRAUD
### (Against Garland, Burnette, Dalton and Fife)

379.    The allegations in Paragraph Numbers 1-378 above are incorporated herein by reference as if fully set forth herein.

380.    Garland, Burnette, Dalton and Fife were each insider members of the Goad Conspiracy Group,

381.    Each remained employed at IPC during the performance of the scheme of the Goad Conspiracy Group, wherein they misrepresented, masked and concealed the acts of the conspiracy

with the intent to deceive IPC so that the conspiracy and the acts thereof would not be detected by IPC.

382.    In reliance on the false and fraudulent representations of those insiders, and without knowledge of the masking and concealments, IPC was made to take actions that it would not have otherwise taken in the ordinary course and scope of its business as such actions were not in the best interests of IPC and instead were in the best interests of the members of the Goad Conspiracy Group, such as the "voluntary" or "mutual" termination of certain of the contracts with facilities, the granting of waivers so that certain of the APCs could be employed by Competitor PGS, the employment of IPC's APCs under Goad and/or one or more Competitor members of the Goad Conspiracy Group, and the continued employment of the insiders and sharing of strategic information with them.

383.    This reliance by IPC was justifiable, as Garland was its National Medical Director for Post-Acute Care, Burnette was its Vice President of Operations, and Dalton and Fife were each CPMs who were entrusted by IPC to honestly and fairly conduct this business of IPC in good faith and in the best interests of IPC, with judgment that was not impaired and compromised by undisclosed and contractually prohibited conflicts of interests.

384.    As a direct and proximate result of these Defendants' wrongful and unlawful acts, IPC has suffered monetary damages and been injured in its business and property in that it has been made to lose its business assets, contracts, workforce, expectancies, confidential and proprietary information, and goodwill and reputation; for which damages IPC demands from these Defendants.

385.    Because these Defendants acted wantonly, oppressively, or with such malice in defrauding IPC, IPC is entitled to recover punitive damages from these Defendants in an amount to be determined at trial.

**COUNT VI – TRESPASS TO CHATTEL OR CONVERSION**
**(Against All Defendants)**

386.    The allegations in Paragraph Numbers 1-385 above are incorporated herein by reference as if fully set forth herein.

387.    Assets purchased by IPC from Goad and Garland, including but not limited to each's respective personal goodwill and rights to engage in the Business and to enter into new agreements with the Facilities referenced in Attachment 1 to Schedule 1.1 of the Asset Purchase Agreement or listed in Attachment 2 to that Schedule 1.1, are the property of IPC

388.    IPC's confidential and proprietary information is its property.

389.    IPC's contracts with third party facilities are its property.

390.    IPC's contracts with its employees, including but not limited to the restrictive covenants therein, are its property.

391.    IPC's funds and proceeds for its services are its property.

392.    Defendants, individually and/or in concert with each other, dispossessed IPC of its property for their own uses and damaged the value of that property.

393.    As a direct and proximate cause of Defendants' trespass or conversion, IPC was made to suffer, and continues to suffer, monetary damages.

394.    Defendants' trespass and conversion was willful and malicious.

395.    Because Defendants acted wantonly, oppressively, or with such malice in trespassing upon or converting IPC's property, IPC is entitled to recover punitive damages from Defendants in an amount to be determined at trial.

## COUNT VII – BREACH OF CONTRACT
### (Against Goad)

396.    The allegations in Paragraph Numbers 1-395 above are incorporated herein by reference as if fully set forth herein.

397.    Goad and IPC entered into a valid and enforceable Asset Purchase Agreement, wherein IPC purchased from Goad, among other things, Goad's personal goodwill and Goad's right to engage in the Business and to enter into new agreements with the Facilities referenced in Attachment 1 to Schedule 1.1 of the Asset Purchase Agreement or listed in Attachment 2 to that Schedule 1.1.

398.    Goad breached the Asset Purchase Agreement by misappropriating, stealing and/or converting assets that he sold to IPC, including but not limited to Goad's personal goodwill and right to engage in the Business and to enter into new agreements with the Facilities, for his own benefit and the benefit of others, including but not limited to members of the Goad Conspiracy Group.

399.    Goad and IPC also entered into a separate valid and enforceable employment contract for a specified term, which contract was comprised of the Goad 2015 Agreement as amended by the Goad 2017 Amendment.  Included in Goad's employment contract were valid and enforceable restrictive covenants related to interference, unfair competition and IPC's confidential and proprietary information.

400.    On or about January 8, 2018, Goad gave written notice of his termination of his employment contract with IPC.  In that notice, Goad set his last day for employment at IPC for February 28, 2018.

401.    Goad's employment with IPC did terminate on February 28, 2018, or alternatively, by no later than March 31, 2018.

402.    The restrictive covenants in Goad's employment contract with IPC survived Goad's termination, including but not necessarily limited to his obligations set forth in Article 3 of that contract related to disclosure and use of IPC's confidential and proprietary information by Goad (i.e., Goad 2015 Agreement, § 3.1 and Exh. 3.1), and to competition by Goad (i.e., Goad 2015 Agreement, § 3.4).

403.    Goad breached his employment contract with IPC via his acts and omissions set forth in this Complaint.  Goad's breaches included but were not limited to his breaches of Article 3 related to his unlawful and wrongful disclosure and use of IPC's confidential and proprietary information, his interference with IPC, and his unfair competition against IPC.  Goad also breached his duties of loyalty and care to IPC, his professional duty to work on a full-time and exclusive basis for IPC and/or otherwise to not engage in undisclosed conflicts of interests.  Goad breached the exclusive basis provision of his employment agreement (i.e., Goad 2015 Agreement, § 1.1(b)) for at least the month of March 2018, by not working for IPC on a full-time and exclusive basis despite receiving full-time pay and benefits from IPC for that month.  In addition, Goad breached his duty to perform his employment contract with IPC in good faith and with fair dealing.

404.    As a result of Goad's breaches of contracts, IPC has been made to lose medical directorship contracts, as well as physician and advanced practice clinician provider contracts, with facilities, which IPC continues to lose because of Goad's continuing breaches and the scheme of the Goad Conspiracy Group.  In addition, IPC has been caused to lose its employment contracts with the Physicians and APCs, who constituted a significant portion of the workforce that IPC had expended substantial resources in forming and developing in the Mid-Atlantic region including Virginia and North Carolina, which IPC continues to lose because of Goad's continuing breaches and the scheme of the Goad Conspiracy Group.  IPC has also been caused to lose its confidential

and proprietary information, which Goad and other members of the Goad Conspiracy Group continue to unlawfully and wrongfully utilize and disclose for their individual and collective benefits.

405.    Goad's breaches of his contracts with IPC directly and proximately caused IPC to suffer irreparable harm to IPC which cannot be adequately compensated with monetary damages. Accordingly, Goad must be enjoined from all acts and omissions in violation of the Asset Purchase Agreement and/or his employment contract with IPC and disgorged of the benefits that he has received therefrom.

406.    Goad's breaches of his contracts with IPC directly and proximately caused IPC to suffer monetary damages including but not limited to the loss of revenue from the medical director contracts and the provider contracts with the facilities lost, as well as the resources that IPC expended to form and develop its workforce which has been converted and/or stolen by Goad and the scheme of the Goad Conspiracy Group.

407.    In breaching the Asset Purchase Agreement Goad has also deprived IPC of the benefit of its bargain, as IPC paid millions for assets that Goad has continued to use for his own benefit and to the detriment of IPC.

408.    As a result, IPC has suffered compensatory damages for which IPC is entitled to a recovery from Goad.

409.    In breaching his contracts with IPC in addition to committing the torts set forth in this Complaint, Goad acted wantonly, oppressively, or with such malice as to evince a spirit of malice or criminal indifference to his civil obligations under the contract.  Accordingly, IPC is entitled to recover punitive damages from Goad in an amount to be determined at trial.

## COUNT VIII – BREACH OF CONTRACT
### (Against Garland)

410.    The allegations in Paragraph Numbers 1-395 above are incorporated herein by reference as if fully set forth herein.

411.    Garland and IPC entered into a valid and enforceable Asset Purchase Agreement, wherein IPC purchased from Garland, among other things, Garland's personal goodwill and Garland's right to engage in the Business and to enter into new agreements with the Facilities referenced in Attachment 1 to Schedule 1.1 of the Asset Purchase Agreement or listed in Attachment 2 to that Schedule 1.1.

412.    Garland breached the Asset Purchase Agreement by misappropriating, stealing and/or converting assets that he sold to IPC, including but not limited to Garland's personal goodwill and right to engage in the Business and to enter into new agreements with the Facilities, for his own benefit and the benefit of others, including but not limited to members of the Goad Conspiracy Group.

413.    Garland and IPC also entered into a separate valid and enforceable employment contract for a specified term, which contract was comprised of the Garland 2015 Agreement, the Garland 4/2018 Agreement and/or the Garland 12/2018 Agreement.   Included in Garland's employment contract were valid and enforceable restrictive covenants related to interference, unfair competition and IPC's confidential and proprietary information.

414.    IPC terminated Garland's employment in September 2021.

415.    The restrictive covenants in Goad's employment contract with IPC survived Garland's termination, including but not necessarily limited to his obligations set forth in: (a) Article 3 of the Garland 2015 Agreement related to disclosure and use of IPC's confidential and proprietary information by Garland (i.e., Garland's 2015 Agreement, § 3.1 and Exh. 3.1), and to

competition by Garland (i.e., Garland 2015 Agreement, § 3.4); (b)  Section 13.1 of the Garland

4/2018 Agreement related to disclosure and use of IPC's confidential and proprietary information

by Garland as well as Section 14 of the Garland 4/2018 Agreement related to noninterference and

unfair competition; and/or (c) Section 13.1 of the Garland 12/2018 Agreement related to disclosure

and use of IPC's confidential and proprietary information by Garland as well as Section 14 of the

Garland 12/2018 Agreement related to noninterference and unfair competition.

416.    Garland breached his employment contract with IPC via his acts and omissions set

forth in this Complaint.  Garland's breaches included but were not limited to his breaches related

to his wrongful and unlawful disclosure and use of IPC's confidential and proprietary information,

his interference with IPC, and his unfair competition against IPC.    Garland also breached his

duties of loyalty and care to IPC, his professional duty to work on an exclusive basis for IPC and/or

otherwise to not engage in undisclosed conflicts of interests.  In addition, Garland breached his

duty to perform his employment contract with IPC in good faith and with fair dealing.

417.    As a result of Garland's breaches of contracts, IPC has been made to lose medical

directorship contracts, as well as physician and advanced practice clinician provider contracts, with

facilities, which IPC continues to lose because of Garland's continuing breaches and the scheme

of the Goad Conspiracy Group.  In addition, IPC has been caused to lose its employment contracts

with the Physicians and APCs, who constituted a significant portion of the workforce that IPC had

expended substantial resources in forming and developing in the Mid-Atlantic region including

Virginia and North Carolina, which IPC continues to lose because of Garland's continuing

breaches and the scheme of the Goad Conspiracy Group.  IPC has also been caused to lose its

confidential and proprietary information, which Garland and other members of the Goad

Conspiracy Group continue to unlawfully and wrongfully utilize and disclose for their individual

and collective benefits. Further, prior to departing IPC, and/or thereafter, Garland has masked, concealed and/or otherwise destroyed documents and/or other electronically stored information, or directed others to do so, in an effort to hide his participation and the participation of others in the scheme of the Goad Conspiracy Group against IPC.

418.    Garland's breaches of his contracts with IPC directly and proximately caused IPC to suffer irreparable harm to IPC which cannot be adequately compensated with monetary damages. Accordingly, Garland must be enjoined from all acts and omissions in violation of the Asset Purchase Agreement and/or his employment contract with IPC and disgorged of the benefits that he has received therefrom.

419.    Garland's breaches of his contracts with IPC directly and proximately caused IPC to suffer monetary damages including but not limited to the loss of revenue from the medical director contracts and the provider contracts with the facilities lost, as well as the resources that IPC expended to form and develop its workforce which has been converted and/or stolen by Garland and the scheme of the Goad Conspiracy Group.

420.    In breaching the Asset Purchase Agreement Garland has also deprived IPC of the benefit of its bargain, as IPC paid millions for assets that Garland has continued to use for his own benefit and to the detriment of IPC.

421.    As a result, IPC has suffered compensatory damages for which IPC is entitled to a recovery from Garland.

422.    In breaching his contracts with IPC in addition to committing the torts set forth in this Complaint, Garland acted wantonly, oppressively, or with such malice as to evince a spirit of malice or criminal indifference to his civil obligations under the contract. Accordingly, IPC is entitled to recover punitive damages from Garland in an amount to be determined at trial.

## COUNT IX – BREACH OF CONTRACT
### (Against Burnette)

423.    The allegations in Paragraph Numbers 1-395 above are incorporated herein by reference as if fully set forth herein.

424.    Burnette and IPC entered into a valid and enforceable at will employment contract, specifically the Burnette Agreement, which was comprised of two letters of understanding. Included in the Burnette Agreement were valid and enforceable restrictive covenants related to interference, unfair competition and IPC's confidential and proprietary information.

425.    IPC terminated Burnette's employment in September 2021.

426.    The restrictive covenants in Burnette's employment contract with IPC survived Burnette's termination.

427.    Burnette breached her employment contract with IPC via her acts and omissions set forth in this Complaint.  Burnette's breaches included but were not limited to her breaches related to her wrongful and unlawful disclosure and use of IPC's confidential and proprietary information, her interference with IPC, and her unfair competition against IPC.   Burnette also breached her duties of loyalty and care to IPC, her professional duty to work on a full-time and exclusive basis for IPC and/or otherwise to not engage in undisclosed conflicts of interests.  In addition, Burnette breached her duty to perform her employment contract with IPC in good faith and with fair dealing.

428.    As a result of Burnette's breaches of contract, IPC has been made to lose medical directorship contracts, as well as physician and advanced practice clinician provider contracts, with facilities, which IPC continues to lose because of Burnette's continuing breaches and the scheme of the Goad Conspiracy Group.  In addition, IPC has been caused to lose its employment contracts with the Physicians and APCs, who constituted a significant portion of the workforce that IPC had

expended substantial resources in forming and developing in the Mid-Atlantic region including Virginia and North Carolina, which IPC continues to lose because of Burnette's continuing breaches and the scheme of the Goad Conspiracy Group.  IPC has also been caused to lose its confidential and proprietary information, which Burnette and other members of the Goad Conspiracy Group continue to unlawfully and wrongfully utilize and disclose for their individual and collective benefits.  Further, prior to departing IPC, and/or thereafter, Burnette has masked, concealed and/or otherwise destroyed documents and/or other electronically stored information, or directed others to do so, in an effort to hide her participation and the participation of others in the scheme of the Goad Conspiracy Group against IPC.

429.    Burnette's breach of her contract with IPC directly and proximately caused IPC to suffer irreparable harm to IPC which cannot be adequately compensated with monetary damages. Accordingly, Burnette must be enjoined from all acts and omissions in violation of her employment contract with IPC and disgorged of the benefits that she has received therefrom.

430.    Burnette's breach of her contract with IPC directly and proximately caused IPC to suffer monetary damages including but not limited to the loss of revenue from the medical director contracts and the provider contracts with the facilities lost, as well as the resources that IPC expended to form and develop its workforce which has been converted and/or stolen by Burnette and the scheme of the Goad Conspiracy Group.  As a result, IPC has suffered compensatory damages for which IPC is entitled to a recovery from Burnette.

431.    In breaching her employment contract with IPC in addition to committing the torts set forth in this Complaint, Burnette acted wantonly, oppressively, or with such malice as to evince a spirit of malice or criminal indifference to her civil obligations under the contract.  Accordingly, IPC is entitled to recover punitive damages from Burnette in an amount to be determined at trial.

**COUNT X – BREACH OF CONTRACT**
**(Against Each Physician – e.g., Fant, Campbell and Bell)**

432.    The allegations in Paragraph Numbers 1-395 above are incorporated herein by reference as if fully set forth herein.

433.    Each Physician and IPC entered into a valid and enforceable employment contract for a specified term, which contract was comprised of the Physician Agreement.  Included in each Physician Agreement were valid and enforceable restrictive covenants related to interference, unfair competition and IPC's confidential and proprietary information.

434.    Each Physician terminated his or her employment with IPC individually, and/or in concert with other Defendants in furtherance of the scheme of the Goad Conspiracy Group.

435.    The restrictive covenants in the Physician Agreement between that Physician and IPC survived that Physician's termination, including but not necessarily limited to his or her obligations set forth in Section 13.1 related to disclosure and use of IPC's confidential and proprietary information as well as Section 14 related to noninterference and unfair competition.

436.    Each Physician breached his or her employment contract with IPC via his or her acts and omissions set forth in this Complaint.  Each Physician's breaches included but were not limited to his or her wrongful and unlawful disclosure and use of IPC's confidential and proprietary information, his or her interference with IPC, and his or her unfair competition against IPC.   Each Physician also breached his or her duties of loyalty and care to IPC, his or her professional duty to work on a full-time and exclusive basis for IPC and/or otherwise to not engage in undisclosed conflicts of interests.  In addition, each Physician breached his or her duty to perform his or her employment contract with IPC in good faith and with fair dealing.

437.    As a result of each Physician's breaches of contract, IPC has been made to lose medical directorship contracts, as well as physician and advanced practice clinician provider

99

contracts, with facilities, which IPC continues to lose because of each Physician's continuing breaches and the scheme of the Goad Conspiracy Group. In addition, IPC has been caused to lose its employment contracts with the other Physicians and APCs, who constituted a significant portion of the workforce that IPC had expended substantial resources in forming and developing in the Mid-Atlantic region including Virginia, which IPC continues to lose because of each Physician's continuing breaches and the scheme of the Goad Conspiracy Group. IPC has also been caused to lose its confidential and proprietary information, which each Physician and other members of the Goad Conspiracy Group continue to unlawfully and wrongfully utilize and disclose for individual and collective benefits. Further, prior to departing IPC, and/or thereafter, each Physician has masked, concealed and/or otherwise destroyed documents and/or other electronically stored information in an effort to hide his or her participation and the participation of others in the scheme of the Goad Conspiracy Group against IPC.

438.   Each Physician's breach of his or her contract with IPC directly and proximately caused IPC to suffer irreparable harm to IPC which cannot be adequately compensated with monetary damages. Accordingly, each Physician must be enjoined from all acts and omissions in violation of his or her employment contract with IPC and disgorged of the benefits that he or she has received therefrom.

439.   Each Physician's breach of his or her contract with IPC directly and proximately caused IPC to suffer monetary damages including but not limited to the loss of revenue from the medical director contracts and the provider contracts with the facilities lost, as well as the resources that IPC expended to form and develop its workforce which has been converted and/or stolen by each Physician and the scheme of the Goad Conspiracy Group. As a result, IPC has suffered compensatory damages for which IPC is entitled to a recovery from each Physician.

440.   In breaching his or her employment contract with IPC in addition to committing the torts set forth in this Complaint, each Physician acted wantonly, oppressively, or with such malice as to evince a spirit of malice or criminal indifference to his or her civil obligations under the contract.  Accordingly, IPC is entitled to recover punitive damages from each Physician in an amount to be determined at trial.

## COUNT XI – BREACH OF CONTRACT
**(Against Each APC – e.g., Smith, Curtis, Lyons, Roy, Gambill, Vaughn, Cupp, Jones, Van Auken, Carlton, Lanier, Bolden, Obrist, and Young)**

441.   The allegations in Paragraph Numbers 1-395 above are incorporated herein by reference as if fully set forth herein.

442.   Each APC and IPC entered into a valid and enforceable employment contract for a specified term, which contract was comprised of the APC Agreement.  Included in each APC Agreement were valid and enforceable restrictive covenants related to interference, unfair competition and IPC's confidential and proprietary information.

443.   Each APC terminated his or her employment with IPC individually, and/or in concert with other Defendants in furtherance of the scheme of the Goad Conspiracy Group.

444.   Upon each APC's termination, the restrictive covenants in the APC Agreement between that APC and IPC survived that APC's termination, including but not necessarily limited to his or her obligations set forth in Section 13.1 related to disclosure and use of IPC's confidential and proprietary information as well as Section 14 related to noninterference and unfair competition.

445.   Each APC breached his or her employment contract with IPC via his or her acts and omissions set forth in this Complaint.  Each APC's breaches included but were not limited to his or her wrongful and unlawful disclosure and use of IPC's confidential and proprietary

information, his or her interference with IPC, and his or her unfair competition against IPC.  Each APC also breached his or her duties of loyalty and care to IPC, his or her professional duty to work on a full-time and exclusive basis for IPC and/or otherwise to not engage in undisclosed conflicts of interests.  In addition, each APC breached his or her duty to perform his or her employment contract with IPC in good faith and with fair dealing.

446.    As a result of each APC's breaches of contract, IPC has been made to lose medical directorship contracts, as well as physician and advanced practice clinician provider contracts, with facilities, which IPC continues to lose because of each APC's continuing breaches and the scheme of the Goad Conspiracy Group.  In addition, IPC has been caused to lose its employment contracts with the other Physicians and APCs, who constituted a significant portion of the workforce that IPC had expended substantial resources in forming and developing in the Mid-Atlantic region including Virginia and North Carolina, which IPC continues to lose because of each APC's continuing breaches and the scheme of the Goad Conspiracy Group.  IPC has also been caused to lose its confidential and proprietary information, which each APC and other members of the Goad Conspiracy Group continue to unlawfully and wrongfully utilize and disclose for individual and collective benefits.  Further, prior to departing IPC, and/or thereafter, each APC has masked, concealed and/or otherwise destroyed documents and/or other electronically stored information in an effort to hide his or her participation and the participation of others in the scheme of the Goad Conspiracy Group against IPC.

447.    Each APC's breach of his or her contract with IPC directly and proximately caused IPC to suffer irreparable harm to IPC which cannot be adequately compensated with monetary damages.  Accordingly, each APC must be enjoined from all acts and omissions in violation of his

or her employment contract with IPC and disgorged of the benefits that he or she has received therefrom.

448.     Each APC's breach of his or her contract with IPC directly and proximately caused IPC to suffer monetary damages including but not limited to the loss of revenue from the medical director contracts and the provider contracts with the facilities lost, as well as the resources that IPC expended to form and develop its workforce which has been converted and/or stolen by each APC and the scheme of the Goad Conspiracy Group.  As a result, IPC has suffered compensatory damages for which IPC is entitled to a recovery from each APC.

449.     In breaching his or her employment contract with IPC in addition to committing the torts set forth in this Complaint, each APC acted wantonly, oppressively, or with such malice as to evince a spirit of malice or criminal indifference to his or her civil obligations under the contract.  Accordingly, IPC is entitled to recover punitive damages from each APC in an amount to be determined at trial.

### COUNT XII – BREACH OF CONTRACT
### (Against Each CPM – e.g., Dalton and Fife)

450.     The allegations in Paragraph Numbers 1-395 above are incorporated herein by reference as if fully set forth herein.

451.     Each CPM and IPC entered into a valid and enforceable at will employment contract, which contract was comprised of the CPM Agreement.   Included in each CPM Agreement were valid and enforceable restrictive covenants related to interference, unfair competition and IPC's confidential and proprietary information.

452.     Each CPM terminated his or her employment with IPC individually, and/or in concert with other Defendants in furtherance of the scheme of the Goad Conspiracy Group.

453.    Upon each CPM's termination, the restrictive covenants in the CPM Agreement between that CPM and IPC survived that CPM's termination, including but not necessarily limited to his or her obligations related to disclosure and use of IPC's confidential and proprietary information as well as related to noninterference and unfair competition.

454.    Each CPM breached his or her employment contract with IPC via his or her acts and omissions set forth in this Complaint.  Each CPM's breaches included but were not limited to his or her wrongful and unlawful disclosure and use of IPC's confidential and proprietary information, his or her interference with IPC, and his or her unfair competition against IPC.  Each CPM also breached his or her duties of loyalty and care to IPC, his or her professional duty to work on a full-time and exclusive basis for IPC and/or otherwise to not engage in undisclosed conflicts of interests.  In addition, each CPM breached his or her duty to perform his or her employment contract with IPC in good faith and with fair dealing.

455.    As a result of each CPM's breaches of contract, IPC has been made to lose medical directorship contracts, as well as physician and advanced practice clinician provider contracts, with facilities, which IPC continues to lose because of each CPM's continuing breaches and the scheme of the Goad Conspiracy Group.  In addition, IPC has been caused to lose its employment contracts with the other Physicians and APCs, who constituted a significant portion of the workforce that IPC had expended substantial resources in forming and developing in the Mid-Atlantic region including Virginia and North Carolina, which IPC continues to lose because of each CPM's continuing breaches and the scheme of the Goad Conspiracy Group.  IPC has also been caused to lose its confidential and proprietary information, which each CPM and other members of the Goad Conspiracy Group continue to unlawfully and wrongfully utilize and disclose for individual and collective benefits.  Further, prior to departing IPC, and/or thereafter, each CPM has masked,

concealed and/or otherwise destroyed documents and/or other electronically stored information in an effort to hide his or her participation and the participation of others in the scheme of the Goad Conspiracy Group against IPC.

456.    Each CPM's breach of his or her contract with IPC directly and proximately caused IPC to suffer irreparable harm to IPC which cannot be adequately compensated with monetary damages.  Accordingly, each CPM must be enjoined from all acts and omissions in violation of his or her employment contract with IPC and disgorged of the benefits that he or she has received therefrom.

457.    Each CPM's breach of his or her contract with IPC directly and proximately caused IPC to suffer monetary damages including but not limited to the loss of revenue from the medical director contracts and the provider contracts with the facilities lost, as well as the resources that IPC expended to form and develop its workforce which has been converted and/or stolen by each CPM and the scheme of the Goad Conspiracy Group.  As a result, IPC has suffered compensatory damages for which IPC is entitled to a recovery from each CPM.

458.    In breaching his or her employment contract with IPC in addition to committing the torts set forth in this Complaint, each CPM acted wantonly, oppressively, or with such malice as to evince a spirit of malice or criminal indifference to his or her civil obligations under the contract.  Accordingly, IPC is entitled to recover punitive damages from each CPM in an amount to be determined at trial.

### COUNT XIII – COMMON LAW BREACH OF FIDUCIARY DUTY
### (Against Goad, Garland, Burnette, Each Physician, APC & CPM)

459.    The allegations in Paragraph Numbers 1-458 above are incorporated herein by reference as if fully set forth herein.

460.    IPC was the employer of Goad, Garland, Burnette, each Physician, each APC, and each CPM Defendant.

461.    As an IPC employee, Goad, Garland, Burnette, each Physician, each APC, and each CPM Defendant owed a fiduciary duty of loyalty to IPC during his or her employment.  Within this duty was the more specific duty of not competing with IPC during his or employment.  Each is therefore duty bound not to act adversely to the interest of IPC by serving or acquiring a private interest of his or her own antagonism or opposition thereto.

462.    Goad, Garland, Burnette, each Physician, each APC, and/or each CPM Defendant failed to use integrity and fairness in engaging in undisclosed conflicts of interests with others and in seeking other employment.  Each breached the common law duty of loyalty that he or she owed to IPC by entering into outside contracts and directly competing with IPC.

463.    For example, Garland and/or Burnette violated the corporate opportunity doctrine by entering into contracts with third parties to provide post-acute medical care services for his or her own benefit, rather than the best interests of IPC and failing to disclose those business opportunities to IPC.

464.    Another example is prior to the termination of their respective IPC's employments, Goad, Garland, Burnette, each Physician, each APC, and/or each CPM Defendant misappropriated and misused IPC's assets and confidential and proprietary information, and/or interfered and unfairly competed as to IPC's customer facilities and/or IPC other employees.  In addition, Goad, Garland, Burnette, each Physician, each APC, and/or each CPM Defendant appropriated without full disclosure to and the consent of IPC, IPC assets, opportunities, the Facility Contracts (e.g., substitution of Competitor for IPC as the medical director at certain facilities) and/or the Employment Contracts (e.g., nefarious waivers of restrictive covenants in certain of the APC

Agreements in favor of Defendant PGS). Therefore, Goad, Garland, Burnette, each Physician, each APC, and/or each CPM Defendant breached their respective fiduciary duties and duties of loyalty owed to IPC at common law.

465.    As a result of each breach, IPC has been made to lose medical directorship contracts, as well as physician and advanced practice clinician provider contracts, with facilities. In addition, IPC has been caused to lose its employment contracts with the other Physicians and APCs, who constituted a significant portion of the workforce that IPC had expended substantial resources in forming and developing in the Mid-Atlantic region including but not limited to Virginia and North Carolina. IPC has also been caused to lose its assets, and confidential and proprietary information.

466.    As a result, IPC has been directly and proximately caused to suffer monetary damages including but not limited to the loss of revenue from the medical director contracts and the provider contracts with the facilities lost, as well as the resources that IPC expended to form and develop its workforce which has been converted and/or stolen. As a result, IPC has suffered compensatory damages for which IPC is entitled to a recovery.

467.    In breaching his or her fiduciary duties and duties of loyalty, Goad, Garland, Burnette, each Physician, each APC, and/or each CPM acted wantonly, oppressively, or with such malice as to evince a spirit of malice or criminal indifference to his or her civil obligations owed at common law to IPC. Accordingly, IPC is entitled to recover punitive damages from each of these Defendants in an amount to be determined at trial.

WHEREFORE, IPC prays the Court for the following relief:

A.     That the Court enter judgment in favor of IPC on the counts set forth in IPC's Complaint, together with interest at the highest legal rate until paid in full;

B.     That the Court award IPC its compensatory damages, which amount IPC requests be at least Five Million Dollars ($5,000,000.00);

C.     That the Court award IPC its attorneys' fees and costs pursuant to its contractual agreements with each Defendant;

D.     That the Court treble the damages proven and award IPC its reasonable attorneys' fees under IPC's RICO claims in accordance with 18 U.S.C. §1964(c);

E.     That the Court treble the damages proven and award IPC its reasonable attorneys' fees under IPC's Virginia Business Conspiracy Act claim in accordance with *Va. Code* § 18.2-500;

F.     That the Court grant punitive damages on IPC's tort claims, and/or breach of contract claims, which amount IPC requests be at least Fifteen Million Dollars ($15,000,000.00);

G.     That each Defendant be enjoined from all acts and omissions in violation of his or her employment contract with IPC and disgorged of the benefits that he or she has received therefrom;

H.     That the Court tax Defendants with all costs of this action, including but not necessarily limited to court costs and discretionary costs;

I.     That the trial in this action be by a jury; and

J.     That the Court grant IPC such other relief as the Court deems just and appropriate.

DATED this 7th day of April 2022.

Respectfully submitted,

**INPATIENT CONSULTANTS OF NORTH CAROLINA, P.C.**

s/ Gary L. Edwards
Gary L. Edwards, Esq.

BAKER, DONELSON, BEARMAN,
CALDWELL & BERKOWITZ, P.C.
602 Sevier Street, Suite 300
P.O. Box 3038
Johnson City, TN  37602
VA Bar No. 44848; TN Bar No. 20058
NC Bar No. 27553
(423) 928-0181 (phone)
(423) 928-5694 (facsimile)
gedwards@bakerdonelson.com

*Counsel for InPatient Consultants of North
Carolinas, P.C.*