IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | | |
|---|---|---|
| INPATIENT CONSULTANTS OF<br>NORTH CAROLINA, P.C., | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civil Action No. 7:22-cv-00199 |
| DR. BRADLEY J. GOAD, et al., | ) ) | By: Elizabeth K. Dillon |
| Defendants. | ) | United States District Judge |

## MEMORANDUM OPINION

Plaintiff InPatient Consultants of North Carolina, P.C. ("IPC"), a medical group that

provides post-acute care to patients and residents in skilled/long term care and assisted

living/retirement facilities, brought this action against 25 individual and corporate-entity

defendants,[1] alleging that they planned and schemed to harm IPC's business by converting,

stealing, and misappropriating its business assets, contracts, workforce and expectancies.  IPC

alleges violations of the Racketeer Influenced and Corrupt Organizations ("RICO") Act, 18

U.S.C. § 1962, as well as twelve state-law business tort and contract claims.

All defendants have moved to dismiss the complaint for failure to state a claim.  (Dkt.

Nos. 72, 74, 75, 77, 79, 88.)  After briefing and oral argument, the motions are ripe for

resolution.  For the reasons stated below, the motions to dismiss will be granted as to the RICO

claim, and the court will decline to exercise supplemental jurisdiction over the remaining state-

law claims.

---

[1] There was originally a 26th defendant—Amanda Lanier—but IPC voluntarily dismissed its claims
against her pursuant to Federal Rule of Civil Procedure 41(a)(1)(A) prior to the hearing on these motions.  (*See* Dkt.
No. 96.)

I.   BACKGROUND[2]

**A.  IPC's Acquisition of Mid-Atlantic ElderCare**

On September 14, 2007, defendant Dr. Bradley Goad formed Mid-Atlantic ElderCare, PLLC ("MAEC"), which—like IPC—provided post-acute medical care to patients and residents in skilled/long term care and assisted living/retirement facilities in the Mid-Atlantic region. (Compl. ¶ 42.)  Dr. Goad thereafter worked as an officer and/or[3] physician at MAEC.  (*Id.* ¶ 55.) Defendant Dr. Jeffrey Garland became MAEC's Chief Executive Officer in February 2011, and in December 2012 defendant Carrie Burnette became its Chief Operating Officer and/or an Administrator.  (*Id.* ¶ 42.)  Drs. Goad and Garland each owned 50 percent of MAEC.  (*Id.* ¶ 45.)

In December 2012, Drs. Goad and Garland then co-founded Mid-Atlantic Quickcare, PLLC ("MAQ")—which provides urgent care services.  (*Id.* ¶ 43.)  Dr. Garland is also the CEO of MAQ, and Burnette is its COO and/or an Administrator.  (*Id.*)  MAQ was a companion company of MAEC—they shared the same founders, had similar Mid-Atlantic names, and operated out of the same building in Woodlawn, Virginia.  (*Id.* ¶ 44.)

On August 31, 2015, IPC acquired MAEC pursuant to an Asset Purchase Agreement (Dkt. No. 1-1 ["Purchase Agreement"]).  (Compl. ¶ 41.)  That agreement contained an Owner Non-Competition Agreement under which Dr. Goad agreed not to compete with IPC in Virginia, North Carolina, Tennessee, or within 50 miles of any IPC facility[4] (the "Restricted Territory")

---

[2]  The following facts, drawn from IPC's complaint (Dkt. No. 1), are accepted as true for the purposes of this motion.  But the court "need not accept legal conclusions couched as facts or 'unwarranted inferences, unreasonable conclusions, or arguments.'"  *Wag More Dogs, LLC v. Cozart*, 680 F.3d 359, 365 (4th Cir. 2012) (quoting *Giarratano v. Johnson*, 521 F.3d 298, 302 (4th Cir. 2008)).

[3]  The complaint repeatedly uses conditional conjunctions (most prominently, "and/or") to describe key factual details.  To the extent any such conjunctions appear in this opinion, they are used only to describe the facts as stated in the complaint and do not reflect any further interpretation of the allegations.

[4]  The agreement defines a "facility" as various types of short- and long-term acute care hospitals, nursing homes, and assisted living facilities.  (Compl. ¶ 48.)

for three years—through August 31, 2018 (the "Restricted Period").  (Purchase Agreement 114–

22.)  IPC's acquisition of MAEC included, among other things, the personal goodwill of Drs.

Goad and Garland, their rights to engage in "business"[5] or enter into new agreements with

certain IPC facilities, and certain confidential and proprietary information of MAEC.[6]  (Compl.

¶¶ 45, 53.)  In October 2015, IPC signed a property lease for a building in Woodlawn to operate

MAEC.  (*Id.* ¶ 44, 54.)

**B.  Defendants' Employment at IPC**

On August 31, 2015 (concurrent with acquiring MAEC), IPC hired Dr. Goad as a

physician and Practice Group Leader.  (Compl. ¶¶ 55–57; Dkt. No. 1-2 ["Goad 2015

Agreement"].)  Pursuant to his employment agreement, Dr. Goad agreed not to compete with

IPC during the term of his employment and for two years thereafter.  (Goad 2015 Agreement 8–

9.)  The agreement also contained an "Exclusive Basis" provision under which Dr. Goad was

obligated to work on a full-time, exclusive basis for IPC during the term of the agreement

without notice to and approval from IPC.  (*Id.* 2–3.)  This agreement was amended on August 17,

2017, to remove Dr. Goad's duties as a Practice Group Leader at IPC, with all other duties to

render medical services remaining the same.  (*See* Compl. ¶ 57, 66–68; Dkt. No. 1-3 ["Goad

2017 Amendment"].)

Like Dr. Goad, Dr. Garland also signed an employment agreement with IPC on the day of

the MAEC acquisition to work as a physician and Practice Group Leader.  (Compl. ¶ 69; Dkt.

No. 1-4 ["Garland 2015 Agreement"].)  The terms of that agreement contained the same general

---

[5]  The term "business" is defined extensively in Section 7.9(c) of the purchase agreement.  (Purchase Agreement 44–45.)

[6]  This "proprietary information" included "data, know-how, customer lists, current and anticipated customer requirements, price lists, market studies, [and] business plans."  (Compl. ¶ 53.)

terms as the Goad 2015 Agreement.  (Compl. ¶ 72.)  Dr. Garland also signed two other

employment agreements that each displaced its predecessor—one dated April 24, 2018 (Dkt. No.

1-5 ["Garland 04/2018 Agreement"]), and another dated December 14, 2018 (Dkt. No. 1-6

["Garland 12/2018 Agreement"]).  (Compl. ¶ 71.)

        IPC also hired Burnette in August 2015 on the same day as the acquisition; she later

became its Vice President of Operations (in May 2019) and ultimately its Senior Vice President

of Operations (in November 2020).  (Compl. ¶ 105.)  Burnette signed two letters of

understanding, under which she agreed to "not engage in any other employment, consulting or

other business activity (whether full-time or part-time) that could create a conflict of interest"

with IPC and agreed to safeguard its confidential information and avoid interference or unfair

competition with IPC.  (*Id.* ¶¶ 107–11; Dkt. No. 1-7.)

        At the time of its acquisition, MAEC also employed numerous physicians and advanced

practice clinicians ("APCs"), all of whom became employees of IPC on August 31, 2015.

(Compl. ¶ 51.)  Those hires included several defendants in this action.[7]  One defendant—Natasha

Obrist—was hired by IPC prior to the MAEC acquisition.  (*Id.* ¶ 168.)  Over the following five

years, IPC hired several nurse practitioners, physicians, and other employees who are also named

defendants—some of whom were previously employed at MAQ.[8]

_____

[7] The defendants that were hired on the same day as the acquisition include Dr. Vanessa Jean Sturgill Fant (physician); Jamie Wood Smith (nurse practitioner), Lisa Elmore Curtis (nurse practitioner), Arneda Lyons (nurse practitioner), and Holly Hullett Roy (physician assistant).  (Compl. ¶¶ 51, 131, 156–159.)

[8] Those defendants hired after the acquisition included nurse practitioners (or "advanced practice clinicians") Jessica Van Auken (hired in October 2015), Ashley Cupp (hired in September 2016), Ryan Carlton (hired in January 2017), Stacy Johnson Gambill (hired in March 2017), Farrah Russell Vaughn (hired in June 2018), Viola Jones (hired in February 2019), Michie Bolden (hired in August 2019), and Candace Young (hired in August 2019); physicians Dr. David Campbell (hired in January 2017) and Dr. Victor Bell (hired in June 2020); and clinical practice managers Jessi Dalton (hired in April 2017) and Matthew Fife (hired May 2019).  (Compl. ¶¶ 132–33, 160–169, 193–94.)

The complaint alleges that, through their respective employment at IPC, Dr. Goad, Dr. Garland, Burnette, as well as every other physician, APC, and clinical practice manager ("CPM") named as a defendant in this action, were each "given access to the confidential and proprietary information of IPC, including but not limited to the confidential and proprietary information of MAEC" that Drs. Goad and Garland had sold to IPC.  (Compl. ¶¶ 56, 70, 106, 135, 171, 196.)  That information allegedly included "the terms and conditions of IPC's contracts, as well as the opportunities for contracts, with skilled/long-term care and assisted living/retirement facilities for medical directorships and/or for the provision of physician and advanced practice clinician medical care services," as well as contracts for the physicians and advanced practice clinicians that IPC employed.  (*Id.*)  Each of these individuals "agreed to safeguard and not disclose to others IPC's proprietary and confidential information" and "to not interfere and compete with IPC."  (*Id.* ¶¶ 62–63, 77–78, 86–87, 96–97, 110–11, 141–42, 177–78, 200–01.)

**C.  Dr. Goad's Resignation from IPC and Subsequent Employment**

On December 26, 2017, Dr. Goad gave verbal notice to IPC that he was resigning from his employment with the company.[9]  (Compl. ¶ 210.)  Written notice followed on January 8, 2018; the notice indicated that Dr. Goad's last day of employment to be February 28, 2018.  (*Id.* ¶¶ 211, 213.)  However, Dr. Goad agreed with Burnette and/or Dr. Garland to remain employed at IPC on a part-time basis and continue working through March 31, 2018, though the parties never amended Dr. Goad's employment agreement, nor did Dr. Goad ever revise his resignation letter.  (*Id.* ¶ 213.)

On August 6, 2018, Dr. Goad instructed Dalton (a clinical practice manager who was

---

[9]  The complaint alleges that Burnette and Dr. Garland knew of Dr. Goad's plans to resign by at least December 7, 2017.  (Compl. ¶ 209.)

then still employed at IPC) to submit a request for IPC to provide him with a copy of his employment agreement with IPC.  (*Id.* ¶ 215.)  Dalton did so and then privately forwarded this request directly to Burnette.  (*Id.* ¶ 217.)

In October 2018 (within two months of the request for his employment agreement), Dr. Goad became employed by defendant GAPS Health, a national competitor of IPC, as its Chief Clinical Officer.  (*Id.* ¶¶ 219, 221–22.)  At GAPS Health, Dr. Goad was responsible for program and workforce development, including developing and implementing a program to obtain medical directorship and/or physician and advanced practice clinician provider contracts with skilled/long-term care and assisted living/retirement facilities in Virginia, North Carolina, and/or South Carolina, as well as forming and developing a workforce of physicians and advanced practice clinicians to enable GAPS Health to perform those contracts (neither of which it had at the time of Dr. Goad's hiring).  (*Id.* ¶¶ 223.)

One method through which GAPS Health allegedly conducts its business is to have officers and/or physicians that it employs to form one or more entities in each state in which it plans to obtain and perform its medical directorship or provider contracts.  (*Id.* ¶ 224.)  From June 2019 to September 2020, Dr. Goad (either individual or through his employment at GAPS Health), formed several such entities, allegedly to "interfere and compete with IPC" in their respective states of incorporation:

- Claris Health, PLLC (a Virginia company);

- Defendant GAPS Health NC, PLLC (a North Carolina company which was later registered to do business in South Carolina); and

- Defendant Premier Geriatric Solutions, PLLC (a Virginia company).

(*Id.* ¶¶ 225–28.)  Additionally, in June 2019, Dr. Goad, Dr. Garland, and/or Burnette formed Elite Urgent Care, PLLC, a Tennessee company.  Elite Urgent Care uses the same billing address

as MAQ, which is owned by Dr. Goad.  (*Id.* ¶ 117.)  Burnette continues to be employed by Elite

Urgent Care and did not disclose that to IPC.  (*Id.* ¶ 118.)  The complaint collectively refers to

the entities discussed in this section as the "Competitor members" of an alleged conspiracy.

(*See, e.g.*, Compl. ¶ 233.)

## D.  The "Goad Conspiracy Group"[10]

The complaint broadly alleges that Goad, along with Burnette, Garland "and/or" Dalton

(each of whom remained employed at IPC), "and/or" along with one or more of the Competitors,

"associated themselves into an enterprise (the 'Goad Conspiracy Group') wherein they

conspired, participated in, and accomplished a scheme to convert, steal and misappropriate the

business assets, contracts, workforce, and expectancies of IPC in at least Virginia, North

Carolina and South Carolina," and that "[e]ach of the remaining defendant Physicians, APCs and

CPMs have joined and participated in the Goad Conspiracy Group and its scheme against IPC."

(Compl. ¶¶ 230–31.)[11]

According to the complaint, the Goad Conspiracy Group employed five methodologies

with respect to IPC's business that collectively constitute racketeering activity.[12]  (*Id.* ¶ 240.)

First, its members allegedly disparaged IPC to its facility customers to induce the facility to

terminate its contract(s) with IPC and to replace them with one or more of the Competitor

members of the Goad Conspiracy Group.  (*Id.* ¶ 241.)

Second, members of the Group allegedly "orchestrat[ed] 'voluntary' or 'mutual' medical

---

[10]  Use of this moniker herein is not to be taken as an indication that the alleged members of the "Goad Conspiracy Group" did indeed form a conspiracy as a matter of law; rather, the court employs the label used in the complaint as a matter of convenience.

[11]  Due to the use of the "and/or" conditional conjunction herein, it is somewhat unclear which defendants the complaint alleges were part of the "Goad Conspiracy Group" (if not all of them).

[12]  Specific examples of the Group's alleged use of these methodologies are alleged at various parts of the complaint.  (*See, e.g.*, Compl. ¶¶ 242, 244–245, 247–48, 250–52, 254.)

directorship termination to induce and enable Competitor members of the Group to replace IPC at those facilities." (*Id.* ¶ 243.)  This involved "insider members (e.g., Dr. Garland, Burnette, Dalton, and/or Fife)[13] of the [Group] performing a 'voluntary' or 'mutual' termination of IPC's medical director contract with a facility and recommending that IPC be replaced in that role by Goad through one or more of the Competitors in the [Group]." (*Id.*)

Third, the Group employed a process of "placeholding" medical directorships at facilities until after the expiration of Dr. Goad's restrictive covenants in his employment contract at IPC, after which time the placeholder would be replaced by Dr. Goad by bringing in one or more of the Competitor members of the Group. (*Id.* ¶ 246.)  Once those Competitors were formed, the placeholder physicians "stepped-aside" as the medical director or "otherwise contrived his or her unavailability so as to necessitate a replacement medical director, so that [Dr.] Goad through one or more of the Competitors could convert and steal the medical director contract at the facility." (*Id.*)

Fourth, the Group "discreetly transitioned" IPC's workforce of physician and APC providers for a given facility over to the employment of the Competitor member of the group— who now held the medical directorship at the facility—so that those who had previously serviced the facility for IPC could continue to do so "through IPC," even though IPC was no longer the medical director there. (*Id.* ¶ 249.)  Then, once those employees had become "indoctrinated into the Group," Dr. Goad, as the medical director of the facility, would have the facility terminate its provider contract with IPC and give the contract to a Competitor member of the Group. (*Id.*)

Fifth and lastly, the Group "utilize[ed] assets that [Drs.] Goad and/or Garland had sold to IPC," such as their goodwill or their right to do business with certain facilities, and/or usurped

---

13 The complaint describes members of the Group who remained employed at IPC at the time of the alleged conspiracy as "insider members."  (Compl. ¶ 243.)

IPC's own goodwill and business reputation to develop the businesses of the start-up Competitor members of the Group; this involved using those assets to "get a Competitor member of the Group's foot in the door at a facility, as opposed to IPC." (*Id.* ¶ 253.)

IPC did not detect this alleged activity because the insider members of the Goad Conspiracy Group allegedly "misrepresented, masked, and concealed the acts." (*Id.* ¶ 255.)  IPC claims that each medical directorship contract, physician contract, and active practice clinician contract is worth over $1,000 per month to IPC. (*Id.* ¶¶ 259–60.)

The complaint further alleges that the Group "engaged in a pattern of racketeering activity" to "get IPC to relinquish its restrictive covenants in certain of the APC agreements on false pretenses" (*id.* ¶¶ 263–71) and "misappropriate IPC's assets[] and confidential and proprietary information" (*id.* ¶¶ 272–88.  The complaint also asserts that defendants unfairly competed and interfered with, solicited, and induced breaches both of IPC's contracts with certain facilities (*id.* ¶¶ 289–93), as well as IPC's employment contracts (*id.* ¶¶ 294–328).

**E.  IPC's Claims**

IPC asserts thirteen causes of action against defendants—one under federal law and twelve under various state statutes and common law.  They include:

- <u>Count One</u>**:** RICO Act (against all defendants);

- <u>Count Two</u>**:** Virginia Business Conspiracy Act (against all defendants);

- <u>Count Three</u>**:** Common-law conspiracy (against all defendants)

- <u>Count Four</u>: Tortious interference with contract and/or business expectancy (against all defendants);

- <u>Count Five</u>: Fraud (against Dr. Garland, Burnette, Dalton, and Fife);

- <u>Count Six</u>: Trespass to chattel or conversion (against all defendants);

- <u>Count Seven</u>: Breach of contract (against Dr. Goad);

- <u>Count Eight</u>: Breach of contract (against Dr. Garland);

- <u>Count Nine</u>: Breach of contract (against Burnette);

- <u>Count Ten</u>: Breach of contract (against each physician defendant[14]);

- <u>Count Eleven</u>: Breach of contract (against each APC defendant);

- <u>Count Twelve</u>: Breach of contract (against each CPM defendant);

- <u>Count Thirteen</u>: Common law breach of fiduciary duty (against Dr. Goad, Dr. Garland, Burnette, and each physician, APC, and CPM defendant).

## II.  ANALYSIS

### A.  Rule 12(b)(6) Motion to Dismiss Standard

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a plaintiff's allegations must "state a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  This standard "requires the plaintiff to articulate facts, when accepted as true, that 'show' that the plaintiff has stated a claim entitling him to relief, i.e., the 'plausibility of entitlement to relief.'"  *Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009) (quoting *Iqbal*, 556 U.S. at 678).  The plausibility standard requires more than "a sheer possibility that a defendant has acted unlawfully."  *Iqbal*, 556 U.S. at 678.  "[A] formulaic recitation of the elements of a cause of action will not do."  *Twombly*, 550 U.S. at 555.  Relatedly, Rule 8(d) requires that each allegation in a pleading be "simple, concise, and direct."  Fed. R. Civ. P. 8(d).

In deciding the motion, the court must accept as true all well-pleaded facts in the complaint and in any documents incorporated into or attached to the complaint.  *Sec'y of State*

---

[14] For a description of which defendants held which roles at IPC (e.g., physician, APC, CPM), see *supra* p. 4 nn.7–8

*for Defence v. Trimble Navigation Ltd.*, 484 F.3d 700, 705 (4th Cir. 2007).  Further, it must

"draw[] all reasonable factual inferences from those facts in the plaintiff's favor," *Edwards v.*

*City of Goldsboro*, 178 F.3d 231, 244 (4th Cir. 1999), but pleadings which are conclusory "are

not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 679.

## B.  Count One—RICO Act

Count One alleges that defendants formed a racketeer-influenced and corrupt association-

in-fact—namely, the "Goad Conspiracy Group"—and engaged in a pattern of racketeering

activity, in violation of 18 U.S.C. § 1962.

The Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961–1968,

established four criminal offenses that proscribe certain activities involving a "pattern of

racketeering activity." *RJR Nabisco, Inc. v. Eur. Cmty.*, 579 U.S. 325, 329–30 (2016); *see* 18

U.S.C. §§ 1962(a)–(d).  RICO also created a civil cause of action, empowering private

individuals to sue those who engaged in racketeering activity and thereby caused them harm.

*See RJR Nabisco*, 579 U.S. at 329; § 1964(c).  A violation of § 1962 "requires (1) conduct (2) of

an enterprise (3) through a pattern (4) of racketeering activity.  The plaintiff must, of course,

allege each of these elements to state a claim." *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496

(1985) (footnote omitted).

### 1.  Predicate acts of racketeering activity

The RICO statute "is a unique cause of action that is concerned with eradicating

organized, long-term, habitual criminal activity." *U.S. Airline Pilots Ass'n v. AWAPPA, LLC*,

615 F.3d 312, 317 (4th Cir. 2010) (internal quotations omitted).  Thus, for a pattern of

racketeering activity to exist, "two or more predicate acts of racketeering must have been

committed within a ten year period." *ePlus Tech., Inc. v. Aboud*, 313 F.3d 166, 181 (4th Cir.

2002) (citing 18 U.S.C. § 1961(5)).  "These requirements are designed to prevent RICO's harsh sanctions, such as treble damages, from being applied to garden-variety fraud schemes," *id.*, as RICO's remedies are not appropriate for "the general run of commercial and contractual disputes."  *See HMK Corp. v. Walsey*, 828 F.2d 1071, 1076 (4th Cir. 1987).

The statute provides an "exhaustive list" of the predicate offenses which can form the basis of a RICO claim.  *See Beck v. Prupis*, 529 U.S. 494, 497 n.2 (2000).  It defines "racketeering activity" as either (1) "any act or threat involving murder, kidnapping, gambling, arson, robbery, bribery, extortion, dealing in obscene matter, or dealing in a controlled substance or listed chemical, . . . which is chargeable under State law and punishable by imprisonment for more than one year," or (2) "any act which is indictable" under any of several enumerated federal offenses.[15]  18 U.S.C. § 1961(1).

IPC claims that the acts constituting a pattern of racketeering activity here involved "larceny (e.g., Va. Code § 18.2-95; N.C. Gen. Stat. § 14-72), false pretenses (e.g., Va. Code § 18.2-23 and/or § 18.2-178; N.C. Gen. Stat. § 14-100), embezzlement (e.g., Va. Code § 18.2-111; N.C. Gen. Stat. § 14-90), and business conspiracy (e.g., Va. Code § 18.2-499)."  (Compl. ¶ 334.) However, it is plainly clear that none of those offenses, under either Virginia or North Carolina law, are named in § 1961(1) as proper predicate acts for a civil RICO claim.

IPC argues that these acts "are all state criminal offenses (e.g., in Virginia and North Carolina) that fall within the *generic category* of robbery, bribery or extortion in Section 1961(1)."  (Dkt. No. 95 at 2 (emphasis added); *see also* 1 Peter J. Henning, *Corporate Criminal Liability*, 3d § 7:15 (Sept. 2020 update) (noting that "the statutory designations of state predicate crimes are generic only" and thus "the question is whether the conduct is generally recognized as

---

[15]  There is no allegation here that the RICO violation asserted in the complaint is based upon any of those federal predicate offenses.

falling within the federal statutory category.").)  It further points out that "most of the state criminal statutes under Virginia law to which IPC has cited in its Complaint" fall under the broader definition of "racketeering activities" set forth in *Virginia's* RICO statute, Virginia Code. §§ 18.2-512-17.  (*Id.*)

　　But neither rationalization has any merit here.  First and more simply, IPC has chosen to sue under the federal civil RICO statute—*not* Virginia's RICO statute.  And state-law racketeering is simply not one of the predicate offenses enumerated in the federal statute.  Thus, IPC's attempt to incorporate by reference Virginia's definition of racketeering is misplaced. Moreover, the court's primary concern here is whether the alleged state offenses are "generally recognized as falling within the federal statutory category."  Henning, *Corporate Criminal Liability*, 3d § 7:15; *cf.* H.R. Rep. No. 1549, 91st Cong., 2d Sess. 25 (1970), *reprinted in* 1970 U.S.C.C.A.N. 4032 ("State offenses are included by generic designation.").  Here, three of the alleged predicate offenses—false pretenses, embezzlement, and business conspiracy—are far afield from robbery, bribery, extortion, or any other act listed in § 1961(1).

　　The only state offense alleged in the complaint that even resembles one of the statutory predicate acts is larceny—which, like robbery (one of the nine § 1961(1) offenses), involves theft of another's property.  But apart from that one similarity, larceny and robbery are undoubtedly different offenses—most prominently because the elements of generic robbery include requirements that generic larceny does not.  Under both Virginia and North Carolina law, robbery is a crime of violence for which there must be actual or threatened use of force to deprive the victim of property, whereas larceny requires neither force nor the threat of force. *See, e.g.*, *Butts v. Commonwealth*, 133 S.E. 764, 767 (Va. 1926) ("Robbery is an aggravated form of larceny, but is treated as a distinctive crime."); *Commonwealth v. Hudgins*, 611 S.E.2d

362, 365 (Va. 2005) (finding that robbery requires proof of an element that grand larceny does not because "proof of violence or intimidation is required in a prosecution for robbery but not for grand larceny from the person."); *State v. Porter*, 679 S.E.2d 167, 171 (N.C. App. 2009) ("Robbery is an aggravated form of larceny, and absent the element of violence or intimidation, the offense becomes larceny.").

The Supreme Court applied this principle to the RICO context in, for example, *Scheidler v. National Organization for Women, Inc.*, 537 U.S. 393 (2003). There, in a civil RICO suit alleging extortion as one of the predicate acts, the Court considered whether the petitioners' violations of a state-law extortion statute qualified as an "act or threat involving . . . extortion, . . . which is chargeable under State law," as RICO requires, given that the petitioners did not obtain or attempt to obtain the respondents' property. *See id.* at 409 (quoting 18 U.S.C. § 1961(1)). The Court found that "where as here the Model Penal Code and a majority of States recognize the crime of extortion as requiring a party to obtain or to seek to obtain property . . . the state extortion offense for purposes of RICO must have a similar requirement." *Id.* On that basis, the Court reversed the judgment that the petitioners violated RICO because the state "extortion" statute did not have that requirement. *Id.* at 411.

Here, the same issue proves fatal to IPC's RICO claim. Generic robbery requires actual or threatened use of force, and the larceny statutes cited by IPC from Virginia and North Carolina do not. The court finds—as several federal courts already have—that the generic offense of larceny is not a predicate act for purposes of § 1961(1). *See, e.g.*, *United States v. Gonzalez*, 21 F.3d 1045, 1046–47 (11th Cir. 1994) ("A robbery is a 'racketeering activity' for purposes of federal RICO, but a larceny is not."); *Clayton v. Stephens*, 6 F. Supp. 2d 480, 485 (E.D.N.C. 1996) (noting that larceny "[is] not included in § 1961's exhaustive list of predicate

crimes," and thus the plaintiff could not maintain a RICO claim based on that offense).  For that reason alone, Count One must be dismissed.

### 2. Rule 8

Even if the legal deficiencies in Count One could be resolved, it remains subject to dismissal because it fails to satisfy the pleading requirements of Rule 8 of the Federal Rules of Civil Procedure.  As previously noted, Rule 8 requires that the complaint comprise "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), and that its allegations be "simple, concise, and direct." Fed. R. Civ. P. 8(d)(1).  The 467-paragraph, 109-page complaint (605 pages including exhibits) filed in this case is anything but concise, and it fails to provide several, if not any, defendants with "fair notice" of the actions they are alleged to have committed in violation of the RICO Act.  *See Fauber v. Commonwealth*, No. 3:10-cv-00059, 2010 WL 4961743, at *2 (W.D. Va. Nov. 30, 2010) (dismissing a complaint that consisted primarily of "convoluted and redundant narratives and far-fetched legal conclusions" that rendered it "nearly incomprehensible").  The portion of the complaint containing the factual allegations is alone 73 pages, which "requires both the court and the defendant to guess as to which facts concern which claims."  *See Cook v. Unisys Fed. Gov't Group*,  No. 7:14-cv-00579, 2015 WL 5690976, at *6 (W.D. Va. Sept. 28, 2015); *see also North Carolina v. McGuirt*, 114 F. App'x 555, 558 (4th Cir. 2004) (affirming dismissal of a 79-page complaint that was "both long and complex and fail[ed] to state its claims clearly enough for the defendants to know how to defend themselves").

More glaringly, the complaint is replete with indeterminate allegations that "one or more" defendants, or one defendant "and/or"[16] another defendant engaged in certain conduct.  The

---

[16]  Apart from its quotation of contractual provisions, the complaint uses the conjunction "and/or" 298 times.

complaint attributes much of the alleged conduct to the "Goad Conspiracy Group," but the court is left to speculate who exactly is in this group.  (*See, e.g.*, Compl. ¶¶ 230–31 (alleging that Dr. Goad, Burnette, Dr. Garland "and/or" Dalton "and/or" along with "one or more" of the Competitors, as well as "[e]ach of the remaining defendant Physicians, APCs and CPMs," were part of the group).)

IPC is correct that pleading in the alternative does not, in and of itself, make a complaint deficient, and the court is cognizant of the reality that much of the pertinent information may be in defendants' possession.  However, when claims are made against multiple defendants, the complaint must, at the very list, "minimally . . . apprise each defendant[] of who did what to whom and when."  *See Switzer v. Thomas*, No. 5:12-cv-00056, 2013 WL 693090, at *6 (W.D. Va. Feb. 25, 2013).  At least with respect to the RICO claim, the complaint fails to do so.  This is especially disconcerting for many of the physician, APC, and CPM defendants whom the complaint does not definitively ascribe any conduct yet seeks to hold liable for treble damages. The Fourth Circuit has quite recently cautioned against, for example, assigning certain conduct to "'the Defendants,' without specifying which ones."  *See Langford v. Joyner*, No. 21-7737, 2023 WL 2335957, at *3 (4th Cir. Mar. 2, 2023).  In such an instance, "it is not reasonable to infer liability against each Defendant based on the facts alleged."  *See id.*

The court does not foreclose the prospect that any one of the defendants did indeed engage in the conduct IPC attempted to allege (either as to Count One or any of the state-law claims).  But this complaint, as presently constructed, "do[es] not permit the court to infer more than the mere possibility of misconduct."  *Iqbal*, 556 U.S. at 679.  As such, even if IPC had properly alleged a qualifying predicate act under § 1961(1), Count One would nevertheless be dismissed as a matter of the pleading rules.

**C. Counts Two Through Thirteen—Supplemental Jurisdiction Over State Claims**

Having dismissed IPC's only federal claim, what remains are twelve counts alleging exclusively state-law statutory and common-law causes of action—breach of contract, breach of fiduciary duty, trespass to or conversion of chattel, fraud, tortious interference with contract and/or business expectancy, common-law conspiracy, and a violation of the Virginia Business Conspiracy Act.

Accordingly, the court has wide discretion to decline supplemental jurisdiction over those claims and to dismiss them without prejudice pursuant to 28 U.S.C. § 1367(c)(2).  In exercising its discretion, the court must consider factors of judicial economy, convenience, fairness, and comity.  *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988).  Generally, though, when a case is in its early stages, courts will decline to exercise jurisdiction.  13D Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure*, (3d ed., April 2022 Update) ("[I]f the jurisdiction-invoking federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well.") (internal quotations omitted).  The court sees no unfairness or inconvenience to either party from dismissal without prejudice.  Further, the remaining claims raise no underlying issues of federal policy.  To the contrary, given that the Fourth Circuit has repeatedly denounced the use of the RICO statute to litigate run-of-the-mill commercial disputes, it would likely contravene federal interests to allow these entirely state-created claims to proceed simply because they were pled alongside a RICO claim that has since been dismissed.

Considering these factors, the court declines to exercise jurisdiction over the state-law claims in Counts Two through Thirteen and will dismiss them without prejudice.

III. CONCLUSION

For the foregoing reasons, defendants' motions to dismiss for failure to state a claim will be granted as to Count One—which will be dismissed with prejudice—and the court will decline to exercise jurisdiction over Counts Two through Thirteen—which will be dismissed without prejudice.  The court will issue an appropriate order.

Entered: March 22, 2023.

*/s/ Elizabeth K. Dillon*
Elizabeth K. Dillon
United States District Judge