IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | |
|---|---|
| INPATIENT CONSULTANTS OF ) <br> NORTH CAROLINA, P.C., ) <br>   ) <br>   Plaintiff, ) <br>   ) <br> v. ) <br>   ) <br> DR. BRADLEY J. GOAD, et al., ) <br>   ) <br>   Defendants. ) | Civil Action No. 7:22-cv-00199 <br><br> By: Elizabeth K. Dillon <br>     United States District Judge |

**MEMORANDUM OPINION**

Plaintiff InPatient Consultants of North Carolina, P.C. (IPC) brought this action against over two dozen individual and corporate-entity defendants, alleging that they schemed to harm IPC's business by converting, stealing, and misappropriating its business assets, contracts, workforce, and expectancies. (*See* Compl., Dkt. No. 1.) IPC alleged violations of the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1962, as well as twelve state-law business tort and contract claims. (*Id.*) The court dismissed the RICO claim with prejudice and declined to exercise jurisdiction over the remaining state law claims, dismissing them without prejudice. (*See* Dkt. Nos. 109, 110.) Two of the defendants, Dr. Jeffrey Garland and Dr. Bradley J. Goad, now move for attorneys' fees under their Asset Purchase Agreement (APA) with IPC. (Dkt. Nos. 111, 113.) For the reasons stated below, the motions for attorneys' fees will be granted in part and denied in part.

I.  BACKGROUND

The circumstances of this case are set forth in detail in the court's memorandum opinion on defendants' motions to dismiss. (Dkt. No. 109.) The court does not restate all of that detail here, but the nature of the parties' relationships and the facts alleged in the complaint are

important to the court's ruling herein, especially as to whether the claim on which defendants prevailed concerns the subject matter of the parties' agreement that contains the attorneys' fees provision in question.

To summarize, Goad formed Mid-Atlantic Eldercare, PLLC, (MAEC) in 2007; Garland joined MAEC thereafter and eventually became its CEO. (Compl. ¶ 42.) In August 2015, IPC acquired MAEC pursuant to an Asset Purchase Agreement. (APA, Dkt. No. 1-1; Compl. ¶ 41.) The APA contained a non-competition agreement under which Goad agreed to not compete with IPC in a certain geographic area for a three-year period. (APA 114–22.) IPC's acquisition of MAEC also included, among other things, the personal goodwill of Drs. Goad and Garland, their rights to engage in "business"[1] or enter into new agreements with certain IPC facilities, and certain confidential and proprietary information of MAEC. (Compl. ¶¶ 45, 53.) At that time, Goad and Garland also signed employment agreements with IPC that included non-compete clauses. (Goad 2015 Agreement 8–9, Dkt. No. 1-2; Garland 2015 Agreement, Dkt. No. 1-4.)

At the time of its acquisition, MAEC also employed numerous physicians and advanced practice clinicians (APCs), all of whom, including defendants in this matter, became employees of IPC in August 2015. (Compl. ¶ 51.) IPC alleged that all of the individual defendants—those working at IPC at the time of the acquisition and those hired afterward—had access to its proprietary and confidential information, which the individual defendants agreed to safeguard in their employment contracts with IPC. (*Id.* ¶¶ 62–63, 77–78, 86–87, 96–97, 110–11, 141–42, 177–78, 200–01.) Their employment agreements also included non-compete clauses. (*Id.*)

Goad left IPC in March 2018 and became employed by defendant GAPS Health, a national competitor of IPC, as its Chief Clinical Officer. (*Id.* ¶¶ 219, 221–22.) Goad was

---

[1] The term "business" is defined extensively in Section 7.9(c) of the APA. (APA 44–45.)

responsible for program and workforce development, which included developing a workforce of physicians and APCs throughout Virginia, North Carolina, and South Carolina. (*Id.* ¶ 223.) Goad subsequently formed several entities that were also IPC's competitors, while Garland and the other individual defendants continued their employment with IPC. (*Id.* ¶¶ 225–28.)

IPC claimed that Goad formed a "conspiracy group" (Goad Conspiracy Group) with the other individual defendants, with the aim of diverting IPC's clients to the entities that Goad worked for and/or formed. (Compl. ¶¶ 230–31.) The Group allegedly disparaged IPC to the companies with whom it had contracted to support its facilities and encouraged the companies to work for one or more of Goad's entities. (*Id.* ¶ 241.) IPC also claimed that the individual defendants schemed to induce medical directors at IPC to resign and then replace them with Group members. (*Id.* ¶ 243.) The Group purportedly employed a process of "placeholding" medical directorships at facilities until after the expiration of Goad's restrictive covenants in his employment contract at IPC, after which time a Group member would replace the placeholder. (*Id.* ¶ 246.) IPC also alleged that the Group induced individual defendants to terminate their employment with IPC and instead work with one of Goad's entities. (*Id.* ¶ 249.) IPC asserted that the Group accomplished these acts by using IPC's proprietary information regarding business practices, operations, contracts, trade secrets, and pricing. (*Id.* ¶ 86.)

IPC then brought this action against defendants in April 2022, alleging that they engaged in a pattern of racketeering activity to "get IPC to relinquish its restrictive covenants in certain of the APC agreements on false pretenses" and "misappropriate IPC's assets[] and confidential and proprietary information." (*Id.* ¶¶ 263–71, 272–88). The complaint also asserted that defendants unfairly competed and interfered with, solicited, and induced breaches of both IPC's contracts with certain facilities as well as IPC's employment contracts. (*Id*. ¶¶ 289–328).

3

The defendants each brought motions to dismiss IPC's claims, and the court held a hearing on these motions on October 3, 2022. (*See* Dkt. Nos. 72, 74, 75, 77, 79, 88, 108.) The court subsequently found that IPC had failed to allege the requisite predicate act necessary for a valid RICO claim and dismissed the RICO claim *with* prejudice. (Mem. Op. on Mot. to Dismiss 16–17, Dkt. No. 109.) The court then declined to exercise supplemental jurisdiction over the remaining state-law claims and dismissed those claims *without* prejudice. (*Id.* at 17.)

## II.  DISCUSSION

Garland and Goad seek attorneys' fees under their APA with IPC. The attorneys' fees provision of the APA reads as follows:

> If any party files a suit or an action, or commences any proceeding (whether in arbitration, mediation, or otherwise), to *enforce the provisions of this Agreement or otherwise with respect to the subject matter of this Agreement*, the *prevailing party* shall be entitled to recover its *reasonable attorneys' fees* as fixed by the court or arbitrator.

(APA 51 (emphasis added).) In deciding the defendants' motion for attorneys' fees, the court must therefore consider (1) whether the defendants were the prevailing party, (2) whether IPC's claims involve the "subject matter" of the APA, and (3) whether the attorneys' fees sought by the defendants are reasonable.

### A.  "Prevailing Party"

The parties do not dispute that Goad and Garland are prevailing parties as to the RICO claim. (Resp. in Opp'n to Garland 3, Dkt. No. 121; Resp. in Opp'n to Goad 5, Dkt. No. 124.) The remaining question, then, is whether Goad and Garland are prevailing parties as to the state-law claims the court dismissed without prejudice. The court concludes they are not.

The Fourth Circuit has previously held (though in the voluntary dismissal context) that the dismissal of a claim without prejudice does not render a defendant the prevailing party. *Best*

*Indus., Inc., v. CIS BIO Int'l*, 134 F.3d 362 (4th Cir., 1998) (unpublished table opinion). There, the court adopted the Seventh Circuit's reasoning that "under a dismissal without prejudice the defendant was still at risk from litigation on the claim." *Id.* at *4 (citing *Szabo Food Serv., Inc. v. Canteen Corp.*, 823 F.2d 1073, 1076–77 (7th Cir. 1987)). The court likened dismissal without prejudice to more of a "draw than a victory for a defendant." *Id.* Courts have since extended this principle to involuntary dismissals without prejudice. The Eastern District of Virginia has found that whether a voluntary or involuntary dismissal, a dismissal without prejudice "still fails to forge a material change in the legal relationship of the parties." *Harris v. Lexjet Corp.*, No. 3:09-cv-616, 2010 WL 133599, at *1 (E.D. Va. Jan. 11, 2010) (citing *Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep't of Health & Human Res.,* 532 U.S. 598, 604 (2001)). Furthermore, the granting of a motion to dismiss without prejudice is "not an adjudication on the merits[,]" since the suit may be re-filed at a later time. *Robinson v. Bartlow*, No. 3:12-cv-00024, 2014 WL 2468817, at *4 (W.D. Va. June 3, 2014); *see also Semtek Int'l Inc. v. Lockheed Martin Corp.,* 531 U.S. 497, 503–06 (2001) (holding that an adjudication on the merits is "the opposite of a 'dismissal without prejudice,'" and that the "primary meaning of 'dismissal without prejudice' . . . is dismissal without barring the plaintiff from returning later.").

The court's dismissal without prejudice of IPC's state-law claims in no way forecloses IPC's ability to bring these claims in state court. Further, the court did not assess the merits of IPC's state-law claims when considering the sufficiency of the RICO claim in Count I. Indeed, the court remarked in its memorandum opinion that "[t]he court does not foreclose the prospect that any one of the defendants did indeed engage in the conduct IPC attempted to allege (either as to Count One or any of the state-law claims)." (Mem. Op. on Mot. to Dismiss 16.) Goad and

Garland are therefore "still at risk from litigation on the claim[s]." *Best Indus.*, 134 F.3d at *4. As such, Goad and Garland are not prevailing parties as to Counts II through XIII.

**B.  "Subject Matter" of the APA**

IPC contends that the RICO claim did not involve the subject matter of the APA because the APA concerned "the purchase and sale of certain assets in return for cash and other consideration[]" and not a criminal racketeering scheme. (Resp. in Opp'n to Garland 5.) Yet IPC alleged in its complaint that the "Goad Conspiracy Group" misappropriated some of the confidential and proprietary information it had purchased *through the APA*. (See Compl. ¶ 236 ("[Proprietary information] was used and disclosed by other members of the Goad Conspiracy Group in violation of the Asset Purchase Agreement . . . .").)  Furthermore, IPC contended that Goad and Garland used their personal goodwill and rights to engage in business with other facilities, purchased *through the APA*, to further the Goad Conspiracy Group's purported scheme to interfere and unfairly compete with IPC. (*See id*. ¶ 235 ("A fifth methodology [of racketeering] involved utilizing assets that Goad and/or Garland had sold to IPC (e.g., Goad's personal goodwill; Garland's personal goodwill; Goad's right to do Business with certain facilities; Garland's right to do Business with certain facilities) . . . , to develop the business of the start-up Competitor members of the Group.").)  Therefore, the court finds, by reason of IPC's own allegations, that the RICO claim in Count I *did* implicate, at least in part, the subject matter of the APA.

While the RICO claim may have implicated the APA, Garland and Goad alone are the only defendants that are parties to the APA and entitled to attorneys' fees under the APA. Goad, however, is seeking reimbursement for attorneys' fees that both he and *sixteen* other defendants incurred.  Goad notes in his reply, "Because he believed it was legally and morally wrong for

6

Plaintiff to falsely accuse 16 local medical providers who worked for him of engaging in a RICO 'criminal enterprise,' Goad personally paid for their legal defense in this action." (Goad's Reply 1, Dkt. No. 125.) Goad admits that the fees he is seeking are "not only fees incurred in his personal defense (which is the vast majority), but also fees incurred in defense of his wrongfully accused employees who were only sued (without any basis in law or fact) to leverage him." (*Id.*) Goad's belief in the impropriety of the lawsuit, however, does not expand the APA provision. While Goad represents that the "vast majority" of the fees were incurred in his defense, the court identifies dozens of invoice entries for work solely performed for defendants other than Goad. (*See, e.g.*, Goad Invoices 4, Dkt. No. 114-5 (including entries for "[t]elephone conference with Jessica Van Auken pertaining to rebuttal evidence"; "[a]nalyze email correspondence from Stacy Gambill pertaining to resignation letter"; and "[a]nalyze email correspondence from Natasha Obrist and attached rebuttal evidence.").) Moreover, Goad and the sixteen other defendants *each* benefited from Woods, Rogers' more generalized work such as "[c]ontinue analysis of authorities pertaining to RICO claim" and [p]repare chart pertaining to each party's allegations and counts[,]" making it nearly impossible for the court to parse with precision which fees were incurred by Goad, who was entitled to attorneys' fees under the APA, and which were incurred by non-parties to the APA. The court will therefore reduce Goad's amount of requested fees by 50%.

**C. Reasonableness of Attorneys' Fees**

To calculate reasonable attorneys' fees, the Fourth Circuit has articulated a three-step process. *See, e.g.*, *McAfee v. Boczar*, 738 F.3d 81, 88 (4th Cir. 2013). The court must first calculate the lodestar amount—that is, it must multiply the number of reasonable hours expended by the reasonable rate the attorney charged. *Id*. To determine what is "reasonable in

terms of hours expended and the rate charged," courts apply the factors set forth in *Johnson v. Georgia Highway Express Inc.*, 488 F.2d 714, 717–19 (5th Cir. 1974).[2]  However, courts are not bound to "become green-eyeshade accountants." *Fox v. Vice*, 563 U.S. 826, 838 (2011). The "essential goal" of shifting fees is "not to achieve auditing perfection," but to ensure that "rough justice" is done. *Id*.  The court retains broad discretion to take in its "overall sense of [the] litigation," and may "modify the lodestar to more accurately reflect the extent of a litigant's success." *Id*.; *Lux v. Judd*, 868 F. Supp. 2d 519, 533 (E.D. Va. 2012).

Once it has determined the lodestar amount, the court must then subtract any hours spent in the litigation that did not relate to or otherwise advance the prevailing party's successful claims. *McAfee*, 738 F.3d at 88.  Finally, the court should "award some percentage of the remaining amount, depending on the degree of success enjoyed by the plaintiff." *Id*. (internal quotations omitted).  The Supreme Court has repeatedly emphasized the "strong presumption" that the lodestar amount accounts for reasonable fees. *See, e.g.*, *Perdue v. Kenny A. ex rel. Winn*, 559 U.S. 542, 554 (2010).

### 1. Legal services contracts and joint defense agreement

As an initial matter, the court addresses IPC's argument that Garland and Goad's failure to produce their legal services contracts and joint defense agreement inhibits its ability to assess

---

[2] The Fourth Circuit adopted the *Johnson* factors in *Barber v. Kimbrell's Inc.*, 577 F.2d 216, 226 (4th Cir. 1978).  The factors to be considered are:

> (1) the time and labor expended; (2) the novelty and difficulty of the questions raised; (3) the skill required to properly perform the legal services rendered; (4) the attorney's opportunity costs in pressing the instant litigation; (5) the customary fee for like work; (6) the attorney's expectations at the outset of the litigation; (7) the time limitations imposed by the client or circumstances; (8) the amount in controversy and the results obtained; (9) the experience, reputation and ability of the attorney; (10) the undesirability of the case within the legal community in which the suit arose; (11) the nature and length of the professional relationship between attorney and client; and (12) attorneys' fees awards in similar cases.

*McAfee,* 738 F.3d at 88 n.5.

the reasonableness of the requested fees. (Resp. in Opp'n to Garland 9; Resp. in Opp'n to Goad 13–14.) IPC primarily questions whether Goad himself paid his attorneys' fees or if some of the other defendants, who are not parties to the APA, contributed to these fees, and whether the joint defense agreement contained any fee-shifting provisions. (Resp. in Opp'n to Goad 13–14.) Rule 54(d)(2)(B)(iv) of the Federal Rules of Civil Procedure requires disclosure, *if the court so orders*, of the terms of any agreement about fees for the services for which the claim is made. IPC requests the court order disclosure of the legal services contracts and joint defense agreement. (Resp. in Opp'n to Garland 10; Resp. in Opp'n to Goad 14.) The court, however, does not find it necessary to order Goad and Garland to produce these documents because it has already reduced Goad's fee award by 50% to account for the fees incurred by non-parties to the APA. IPC also argues that one of Goad's companies, Premier Geriatrics Solutions, PLLC, actually paid the attorneys' fees. However, Goad's name is listed above his business's name on his invoices, leading the court to believe that this is just a billing or business address and not that the company itself paid the fees. (Resp. in Opp'n to Goad 13–14; *see* Goad Invoices.)

As to any question that *Garland* paid other defendants' attorneys' fees, his attached invoices clearly demonstrate that his fees were incurred solely for his own representation. (See Garland Invoices, Dkt. No. 111-1.) For all of these reasons, the court will deny IPC's request to order Garland and Goad to provide their legal services contracts and joint defense agreement.

### 2. The lodestar amount

Garland requests the following fees:

| Representative | Hourly Rate | Hours Billed | Total |
| --- | --- | --- | --- |
| Paul G. Beers, Esq. (Member) | $375.00 | 94.80 | $35,550.00 |
| Robert A. Ziogas, Esq. (Former Member of Glenn Feldmann) | $375.00 | 27.80 | $10,425.00 |
| Jinsu Sohn (Intern) | $100.00 | 41.50 | $4,150.00 |
| Paralegal Services | $80.00 | 5.40 | $432.00 |

9

(Garland Br. in Supp. 5, Dkt. No. 112.) Garland received a discount of $262.50 on his most recent bill. (*Id.*) Garland also requests litigation expenses in the amount of $1,049.95. (*Id.*) Garland states that he is additionally seeking "all fees and costs he itemizes in any forthcoming supplemental motion covering the period from April 6, 2023, forward."[3] (*Id.*)

Goad requests the following fees:

| Representative | Hourly Rate | Hours Billed | Total |
| --- | --- | --- | --- |
| Joshua F.P. Long (Principal and Member) | $375.00 | 155.60 | $58,350.00 |
| Pietro F. Sanitate (Associate) | $235.00 | 97.70 | $22,959.50 |

(Declaration of Joshua F.P. Long 2, Dkt. No. 114-2.) The court has reduced his fee award by 50%, making Mr. Long's requested fees $29,175 and Mr. Sanitate's requested fees $11,479.75, for a new total of $40,654.75. Goad also requests the court award him fees incurred while litigating the attorneys' fee award.[4]

### a. Reasonableness of hourly rates

Notably, IPC does not contest that Garland and Goad's attorneys' hourly rates are reasonable. Both Garland and Goad have submitted affidavits attesting to the reasonableness of these rates for their counsels' level of experience and the community in which this court sits. (*See* Dkt. Nos. 112-1, 112-2, 112-3, 112-4 (Garland); Dkt. Nos. 114-2, 114-3, 114-4 (Goad).) The court's own familiarity with typical rates in this community also suggests that these are reasonable rates for attorneys (at their respective levels of experience) for business litigation

---

[3] Garland may file a supplemental motion for attorneys' fees for this time period as set forth in the accompanying order.

[4] As stated above, Goad may file a supplemental motion for attorneys' fees as set forth in the accompanying order.

cases of this nature. Based on all of these factors, the court finds that the hourly rates that Garland and Goad's attorneys charged are reasonable.

      b. *Reasonableness of hours expended*

          i. *Block billing*

IPC contends that Garland and Goad's attorneys engaged in impermissible block billing in the provided invoices. (Resp. in Opp'n to Garland 10; Resp. in Opp'n to Goad 15.) Block billing is generally defined as the practice of combining "several tasks together under a single entry, without specifying the amount of time spent on each particular task." *Lusk v. Va. Panel Corp.*, 96 F. Supp. 3d 573, 582 (W.D. Va. 2015) (internal quotations omitted). "The practice is disfavored because it does not provide the court with a sufficient breakdown to support an attorneys' fee request." *Hurd v. Cardinal Logistics Mgmt. Corp.*, No. 7:17-cv-00319, 2019 WL 6718111, at *4 (W.D. Va. Dec. 10, 2019) (internal quotations omitted).

IPC points to a single example of block billing in Garland's invoices for the day of the motion to dismiss hearing. (Garland Invoices 13.) This one instance does not meaningfully impede the court's ability to assess the reasonableness of Garland's fees. Goad's invoices, however, are a different matter. The court notes numerous examples of block billing on the part of one of Goad's attorneys, Mr. Long. One example is Long's entry for August 8, 2022, where he worked 7.80 hours to "[r]eview Plaintiff's opposition to motion to dismiss. Research RICO, fraud and non-compete issues for reply. Outline reply." (Goad Invoices 27.) Each of these are discrete acts that Long could have invoiced separately. Similarly, on May 4, 2022, Long reported that he spent 2.20 on both "review[ing] the Complaint and exhibits" and "correspond[ing] with Dr. Goad and team." (*Id.* at 2.) Then on May 6, 2022, Long worked 2.60 hours on "[c]orrespondence with Brad Goad re: representation and case status. Review and

11

analyze conflict issues. Prepare engagement agreement." (*Id.* at 3.) These invoice entries impede the court's ability to parse how much time was spent on each activity and ultimately determine whether Long's fees were reasonable.

Courts in this circuit, including this court, have consistently reduced fees based on similar practices. *See McAfee*, 738 F.3d at 86 (affirming a ten percent reduction in hours to account for block billing); *Doe v. Alger*, No. 5:15-cv-00035, 2018 WL 4655749, at *8 (W.D. Va. Sept. 27, 2018) (reducing two attorneys' hours by 20% and 5% to account for block billing); *Lusk*, 96 F. Supp. 3d at 583 (reducing the total fee award by five percent for block billing); *Sky Cable, LLC v. Coley*, No. 5:11-cv-00048, 2014 WL 4407130, at *5 (W.D. Va. Sept. 8, 2014) (adopting a magistrate judge's recommendation to impose a fifteen percent reduction in fees); *SunTrust Mortg., Inc. v. AIG United Guar. Corp.*, 933 F. Supp. 2d 762, 778 (E.D. Va. 2013) (imposing a 20% reduction in hours for block billing and "unintelligible and inconsistent time entries."). Accordingly, the Court will further reduce Long's fees by 10% for a new total of $26,257.50.

    ii. Inconsistent time entries

IPC further argues that Goad's invoices contain "inconsistent time entries[,]" where Long billed 3.2 hours to attend the motion to dismiss hearing and Sanitate billed 2.7 hours, when the hearing itself was only two hours and seven minutes. (Resp. in Opp'n to Goad 15; Goad Invoices 34.) Goad explains that the reason for this inconsistency is that "Mr. Long arrived earlier and stayed later to discuss next steps with Goad (who also attended the hearing)." (Reply at 16 n.2.) The court finds this inconsistency reasonable and of no consequence, and concludes that it does not bear on the reasonableness of Goad's attorneys' fees.

### iii. Travel expenses

IPC also takes issue with the fact that Goad's attorneys submitted time entries for travel even though "Woods Rogers [is] located down the street from the Roanoke courthouse." (Resp. in Opp'n to Goad 15.) The time entries indicate that Mr. Sanitate traveled from Fairfax County to Roanoke for the motion to dismiss hearing on October 3, 2022, and then traveled to Richmond after the hearing. (Goad Invoices 34.) Goad explains this expense in his reply: "Mr. Sanitate was traveling from his parents' house in Fairfax where he had spent the preceding weekend to Roanoke for the hearing and then back home to Richmond afterwards. Mr. Sanitate accurately described his travel itinerary and then reduced the travel charge to equate to a shorter round trip between Richmond and Roanoke (6.1 hours) as opposed to the longer trip from Fairfax to Roanoke to Richmond (7 plus hours)." (Reply at 34.) Travel expenses are generally only reduced if they appear "unreasonable, excessive, or of such a concentrated nature that unproductive time must, of necessity, have been included within the expenditure." *Spell v. McDaniel*, 616 F. Supp. 1069, 1099 (E.D.N.C. 1985), *aff'd in part and rev'd in part*, 824 F.2d 1380, 1402 (4th Cir. 1987). The court finds that these travel expenses were entirely reasonable, particularly since Woods Rogers has already reduced the amount billed to make up for Sanitate's personal travel from Fairfax County. The court therefore declines to subtract the travel expenses from the lodestar amount.

### iv. Relevance of time entries

Finally, IPC notes that several of Goad's time entries appear to be unrelated to the case at hand. (Resp. in Opp'n to Goad 16.) IPC points to entries on September 7 and 12, 2022, by Thomas T. Palmer, who IPC identifies as Goad's expert, that state, "Review Tapestry Health summary" and "Additional review of possible contract for VMP services" for a total of 1.6 hours

13

at $440 an hour. (Goad Invoices 33.) The court knows Mr. Palmer to be an attorney at Wood, Rogers. Goad does not respond to IPC's assertion that these entries are unrelated. The court agrees that these entries are unrelated to the case and will therefore deduct $704, which is 1.6 hours at a rate of $440 an hour, from Goad's total fee award.

Based on the above, the court finds that the attorneys' fees sought by Garland and Goad are reasonable, less the aforementioned deductions. Therefore, the initial lodestar calculation for Garland is $50,294.50 and the initial lodestar for Goad is $37,033.25.

### 3. Interrelatedness of claims

IPC contends that it should not be responsible for Garland and Goad's attorneys' fees associated with the unsuccessful state-law claims. IPC takes issue with the fact that Garland and Goad do not explicitly delineate which charges relate to the RICO claim that they prevailed upon and which relate to the dismissed state law claims. (Resp. in Opp'n to Garland 7; Resp. in Opp'n to Goad 11– 12.) "When successful and unsuccessful claims are related, much of the counsel's time is devoted generally to the litigation as a whole, making it difficult to divide the hours expended on a claim-by-claim basis." *Tech Sys. Inc. v. Pyles*, No. 1:12-cv-374 GBL/JFA, 2013 WL 4033650, at *4 (E.D. Va. Aug. 6, 2013), *aff'd*, 630 F. App'x 184 (4th Cir. 2015). "It is well-settled that a grant of attorneys' fees includes hours spent reasonably advancing unsuccessful claims to the extent that the unsuccessful claims share a 'common core of facts' or are otherwise related to the successful claim." *Bradford v. HSBC Mortg. Corp.*, 859 F. Supp. 2d 783, 792 (E.D. Va. 2012) (citing *Abshire v. Walls*, 830 F.2d 1277, 1282–83 (4th Cir. 1987)); *Hensley v. Eckerhart*, 461 U.S. 424, 435 (1983)) (internal quotations omitted). Moreover, as the Fourth Circuit has noted, "'[t]he Supreme Court has directed district courts not to draw overly fine distinctions' when determining whether claims or issues are related, given that the determination

is 'not reached through application of any precise roles or formulae, but rather through an equitable judgment of the district court exercising discretion in light of the concerns expressed in *Hensley*.'" *Id.* (quoting *Perry v. Bartlett*, 231 F.3d 155, 163 (4th Cir. 2000)). Indeed, the Supreme Court observed in *Hensley* that, in many cases, "much of counsel's time will be devoted generally to the litigation as a whole, making it difficult to divide the hours expended on a claim-by-claim basis." 461 U.S. at 435. As the Court in *Hensley* recognized, "there is no certain method of determining when claims are 'related' or 'unrelated.'" *Id.* at 437 n.12.

The RICO claim arose primarily out of defendants' purported breaches of their employment and facility contracts with IPC and their alleged use of IPC's confidential and proprietary information. (*See* Compl.) The state claims are also based on these alleged actions and therefore share a common core of facts with the RICO claim. (*See id.*) Indeed, as Goad points out, IPC based many of its state law claims on "*the same* acts" that served as the bases for its RICO claim. (Reply 8 (emphasis in original).) Garland and Goad's attorneys represent that they spent significant time and energy on litigation as a whole and did not separate the RICO claim from the state-law claims. (*Id.* at 10–15.) As the court previously found, the 467-paragraph, 109-page complaint was excessively long to the point that it violated the requirements of Rule 8 of the Federal Rules of Procedure that pleadings must comprise "a short plain statement of the claim . . . ." (Mem. Op. on Mot. to Dismiss 15.) Goad further explains that "the Complaint was extensive, complex, and rather ambiguous at times, requiring careful analysis of each count's application to each of the 26 defendants, as well as an extensive analysis of the contracts at issue, including the Asset Purchase Agreement." (Goad's Br. in Supp. 9, Dkt. No. 114.) IPC's response to the motions to dismiss was an additional 98 pages. (*Id.* at 8.) Garland and Goad's attorneys had to expend significant time and labor to analyze the complaint, compose

15

extensive briefs for their motions to dismiss, and prepare for a hearing on all thirteen claims, all of which favor an award of the full amount of fees sought, less the deductions mentioned above.

### 4. Degree of success

As noted above, this litigation was highly complex and labor-intensive, requiring Garland and Goad's attorneys to devote significant time to all thirteen of IPC's claims. However, the court must also take into account the results Garland and Goad obtained and their degree of success. As the Supreme Court recognized in *Hensley*, "the most critical factor" in calculating a reasonable fee award "is the degree of success obtained," and when "a plaintiff has achieved only partial or limited success, the product of hours reasonably expended on the litigation as a whole times a reasonable hourly rate may be an excessive amount." *Hensley*, 461 U.S. at 436; *see also McDonnell v. Miller Oil Co., Inc.*, 134 F.3d 638, 641 (4th Cir. 1998). A court must ask whether "the plaintiff achieve[d] a level of success that makes the hours reasonably expended a satisfactory basis for making a fee award." *McAfee*, 738 F.3d at 92. Courts regularly "reduce the award [of attorneys' fees] to account for the limited success." *Hensley*, 461 U.S. at 436-37; *see, e.g.*, *R.S. by & through Soltes v. Bd. of Directors of Woods Charter Sch. Co.,* No. 21-1826, 2023 WL 3735217, at *4 (4th Cir. May 31, 2023) (affirming district court's decision to reduce attorneys' fees award by 33% where plaintiff prevailed on four of seven claims); *Prison Legal News v. Nw. Reg'l Jail Auth.*, No. 5:15-cv-00061, 2020 WL 7023893, at *7 (W.D. Va. Nov. 30, 2020) (reducing attorneys' fees award by 40% where plaintiff failed on one out of four claims and only received nominal damages); *Hansberger v. L'Italia Rest., LLC*, No. 5:16-CV-00056, 2018 WL 10609716, at *3 (W.D. Va. Aug. 7, 2018) (reducing attorneys' fees award by 25% because plaintiff was awarded only 15% of her requested damages); *Denton v. Pennymac Loan*

16

*Servs., LLC*, 252 F. Supp. 3d 504, 530 (E.D. Va. 2017) (reducing attorneys' fee award by 40% for plaintiff's limited success as to damages).

Defendants prevailed on only one of the thirteen claims, resulting in a success rate, by percent, of 7.7%. However, the court also recognizes the considerable time and effort Garland and Goad's attorneys expended in this matter and the interrelated nature of the claims. For all of these reasons, the court will impose a 50% reduction to Garland's requested attorneys' fees and an additional 50% reduction to Goad's fees. Garland shall be awarded $25,278.25 in attorneys' fees, and Goad shall be awarded $18,516.63.

**D. Requested Costs**

Garland additionally requests $1,049.95 in litigation costs. (Garland's Br. in Supp. 5, Dkt. No. 112.) IPC argues that the APA does not provide for the award of litigation expenses, only "reasonable attorneys' fees." (Resp. in Opp'n to Garland 7.) The court similarly interprets the plain text of the APA as only granting attorneys' fees and will therefore deny Garland's request for litigation costs. (*See* APA 51 ("[T]he prevailing party shall be entitled to recover its reasonable attorneys' fees as fixed by the court or arbitrator.").)

### III. CONCLUSION

For the foregoing reasons, Garland's and Goad's motions for attorneys' fees will be granted in part and denied in part. Specifically, the court will reduce Goad's attorneys' fees by 50% for his payment of fees incurred by non-parties to the APA, reduce Goad's attorney Mr. Long's requested fees by 10%, deduct $704 from Goad's fees award, deny Garland's request for costs, and reduce Garland and Goad's attorneys' fees award by 50% due to their limited degree of success. The court will award Garland $25,147.25 in attorneys' fees and Goad $18,516.63 in

attorneys' fees. Garland and Goad may file supplemental motions for attorneys' fees incurred during litigation of the issue of attorneys' fees no later than 14 days after entry of the order.

An appropriate order will follow.

Entered: March 29, 2024.

*/s/ Elizabeth K. Dillon*
Elizabeth K. Dillon
United States District Judge